UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-20048-CR-WILLIAMS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

CARLOS MIGUEL OLIVIER CRUZ,
NICOMEDES HERNANDEZ-ROBALLO,
JOSE ANTONIO GRANADOS-IPUANA,
RIQUELVIS ALFONSECA, and
DOMINGO MARTINEZ PERALTA,

      Defendants.

_____/

## DEFENDANTS' JOINT MOTION TO DISMISS INDICTMENT PURSUANT TO RULE 12(b) FEDERAL RULES OF CRIMINAL PROCEDURE

      Defendants by and through undersigned counsel, and pursuant to Fed. R. Crim. P. 12(b), respectfully moves this Honorable Court to dismiss the indictment for lack of subject matter jurisdiction and personal jurisdiction, unconstitutionality of the statute as applied, and unreasonable delay in presentment.

### Background

      According to the allegations in the criminal complaint, the Defendants were arrested on January 7th, 2022, while on a vessel in the Caribbean Sea, approximately 50 nautical miles south of Oviedo, Dominican Republic, at coordinates 15.54N and 072.13W. (D.E. 1 ¶ 3 ). At the time law enforcement boarded the vessel, the master of the vessel made a claim of Colombian nationality for the vessel (D.E. 1 at ¶ 4).  The arrest was conducted by a team composed of members

1

of a U.S. Coast Guard Law Enforcement Detachment (LEDETs) embarked aboard the USS Milwaukee of the United States Navy. The Defendants were transferred to the USS Milwaukee, detained and transported to the Southern District of Florida. For reasons not yet established in the record, the journey took approximately 24 days. (*See, D.E. 4-8*).

The criminal complaint was filed on January 14, 2022—7 days after the Defendants had first been detained at sea by the United State Navy.  The criminal complaint charged the Defendants with conspiracy to possess with the intent to distribute at least five kilograms of cocaine while onboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) & 70506(b), also known as the Maritime Drug Law Enforcement Act or MDLEA. (D.E. 1).

The Defendants made their initial appearances in the Southern District of Florida on February 1, 2022. (D.E. 4-8). An indictment was returned on February 10, 2022, charging the Defendants with one count of conspiracy to possess with intent to distribute at least five kilograms of cocaine while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1) & 70506(b), and one count of possession with intent to distribute at least five kilograms of cocaine on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1). (D.E. 9).

*     *     *

The Defendants now move this Honorable Court to dismiss the indictment on four distinct grounds.  First, the MDLEA is unconstitutional as applied here because the Defendants were arrested in the Exclusive Economic Zone (EEZ) of the Dominican Republic, which is not part of the "high Seas," as defined by customary international law. This offense therefore falls outside of Congress's authority under the Felonies Clause and the indictment must be dismissed.

Second, the MDLEA's definition of "stateless" vessels is facial unconstitutional. It is well-established that Congress's authority to prosecute offenses under the MDLEA rests solely on its power under Art. I § 8, cl. 10 of the U.S. Constitution to "define and punish . . . Felonies committed on the high Seas" (the "Felonies Clause"). *See United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1258 (11th Cir. 2012).

As recently explained by the First Circuit in *United States v. Davila-Reyes*, __ F.4th __, 2022 WL 178854 (1st Cir. 2022) *(attached as Exhibit 1),* Congress' authority under the "Felonies Clause" is inherently limited by customary international law. As found by the court in *Davila-Reyes,*, the MDLEA clause which defines as "stateless" vessels for "which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality," 46 U.S.C. § 70502(d)(1)(C), is facially unconstitutional because it plainly applies to vessels that are not "stateless" under customary international law and thus purports to extend Congress' authority beyond that contained in the Felonies Clause.

Third, for preservation purposes, the Defendants assert that Congress lacks the Article I authority to regulate extraterritorial drug trafficking offenses bearing no nexus to the United States occurring within a foreign nation's EEZ. They further maintain that the Court's exercise of jurisdiction over them violates due process because their offense(s) lacked any ties or nexus to the United States.

Finally, the Defendants move to dismiss the indictment as a sanction for the government's unlawful, unreasonable, and "outrageous" conduct in detaining them for an extended period of time without charges being filed or presenting them to a magistrate judge, such that the Defendants

were held as prisoners of the United States—in the absence of any judicial oversight for approximately 24 days.

The Defendants respectfully request an evidentiary hearing as it is necessary, at a minimum, to establish the government's reasons for the delay.

## MEMORANDUM OF LAW

I.    **The United States' authority pursuant to the MDLEA is limited to offenses occurring on the high Seas; because this offense took place within the Exclusive Economic Zone of the Dominican Republic, it did not occur on the "high Seas," and the indictment must be dismissed.**

Congress's authority to enact the MDLEA (46 U.S.C. § 70501 *et seq.*) emanates solely from its Article I, Section 8, Clause 10 power to "define and punish Piracies and Felonies committed on the high Seas." *Bellaizac-Hurtado*, 700 F.3d at 1258; *Davila-Mendoza*, 972 F.3d at 1264. Accordingly, Congress's power to act under this Clause is limited to offenses "committed on the high Seas." *See Bellaizac-Hurtado*, 700 F.3d at 1258 (holding that "Congress exceeded its power, under the Offences Clause, when it proscribed the defendants' conduct in the territorial waters of Panama."). Because this offense occurred within the Exclusive Economic Zone of the Dominican Republic, which is not the "high Seas," the allegations in the indictment fall outside of Congress's enumerated powers, and this Court lacks jurisdiction to adjudicate the offense.[1] Stated differently, the MDLEA is unconstitutional as applied to the Defendants' alleged conduct.

A.    <u>The Felonies Clause is "textually limited to conduct on the high seas".</u>

---

[1] Though the vessel's location is described relative to the Dominican Republic in court filings, the vessel was within the Dominican Republic's Exclusive Economic Zone (EEZ) at the time of interdiction. According to internal USS Milwaukee logs made available in discovery, the vessel on which the Defendants were allegedly travelling was intercepted while at a standstill, at coordinates 15.54N and 072.13W. Pursuant to these coordinates, the vessel would have been within the boundaries of the Dominican Republic's Exclusive Economic Zone, EEZ. See Dominican Republic MRGID 8409, www.Marineregions.org, https://www.marineregions.org/eezdetails.php?mrgid=8409&all_territories=1&zone=eez and https://www.marineregions.org/eezdetails.php?mrgid=8409  (last accessed on Mar. 10th, 2022) (searchable map of EEZ boundaries by coordinates and/or countries).

Article 1, Section 8, Clause 10 grants Congress the authority to "define and punish Piracies and Felonies committed *on the high Seas*, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10 (emphasis added). Plainly, that power is "textually limited to conduct *on the high seas*." *Bellaizac-Hurtado*, 700 F.3d at 1248. (citing U.S. Const., art. I, § 8, cl. 10).

Thus, the question is whether the waters located within the Dominican Republic's Exclusive Economic Zone are part of the high Seas within the meaning of Article I, Section 8, Clause 10. They are not.

B. The Exclusive Economic Zone is not the "high Seas".

The Exclusive Economic Zone, or EEZ, was recognized in the 1982 United Nations Convention on the Law of the Seas (UNCLOS), 1833 U.N.T.S. 397 *(attached as Exhibit 2).* "Under customary international law as reflected in Article 55 of UNCLOS, and with respect to other nations, exclusive economic zone means the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States." 33 C.F.R. § 2.30(b). Article 55 of UNCLOS states that the "exclusive economic zone is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established by this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention." Under the UNCLOS, coastal states have sovereign rights regarding the conservation, management, and exploitation of natural resources within their EEZ. Article 58 provides that all states may enjoy the freedoms of navigation and overflight, as well as other "internationally lawful uses of the sea" within the EEZ.

In sum, the EEZ is neither territorial waters nor the high seas. It is something distinct, with features of both. Most significant for present purposes, however, is that "under customary international law," the EEZ is *not* the high seas:

> Under customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea and without prejudice to high seas freedoms that may be exercised within exclusive economic zones pursuant to article 58 of the United Nations Convention on the Law of the Sea, and unless the context clearly requires otherwise . . . *the high seas means waters that are not the exclusive economic zone* (as defined in § 2.30), territorial sea (as defined in § 2.22), or internal waters of the United States or any other nation.

33 C.F.R. § 2.32(d) (emphasis added). While other definitions may be found,[2] it is this definition of high seas—the one provided by customary international law—that is relevant and authoritative here.

The Define and Punish Clause includes three distinct powers: "the power to define and punish piracies, the power to define and punish felonies committed on the high seas, and the power to define and punish offenses against the law of nations." *Bellaizac-Hurtado*, 700 F.3d at 1248 (citation omitted). In analyzing Congress's power to define and punish offenses against the law of nations, the Eleventh Circuit explained that the "text, history, and structure of the Constitution confirm that the power to 'define' is limited by the law of nations." *Id.* at 1249. In other words, Congress's power to "define" means that it has the authority "to codify and explain offenses that had already been understood as offenses against the law of nations" *not* "the power to create or declare offenses against the law of nations." *Id*. at 1249–50; *see also id.* at 1249 (explaining that, during the "Founding period" the word 'define' meant [t]o give the definition; to explain a thing by its qualities and to circumscribe; to mark limits"). This clause "does not grant Congress the authority to punish conduct that is not a violation of the laws of nations." *Id.* at 1249. "The insertion

---

[2] A different provision of the C.F.R. defines the "high seas" to include the EEZ for certain specific purposes. *See* 33 C.F.R. § 2.32(c). But for the reasons explained *infra*, this definition has no bearing on the meaning of Article I.

of the power to 'define' enabled Congress to provide notice to the people through codification; it did not enable Congress to create offenses that were not recognized by the law of nations." *Id.* at 1250.

The same reasoning and limitations apply to Congress's power to "define" felonies on the high seas. The power to "define and punish" in each phrase (to define and punish piracy, to define and punish felonies on the high seas, and to define and punish offenses committed against the laws of nations) is the same—and emanates from the singular use of the terms in the text. Thus, it does not give Congress the authority to recast the boundaries of the "high Seas" in order to expand its own sphere of authority. Instead, the "high Seas" referenced in Article I must be construed according to the definition of the high seas accorded by customary international law.

This understanding is confirmed by our constitutional structure. As the Eleventh Circuit has noted, if "Congress could define any conduct as 'piracy' or as a 'felony' or as an 'offense against the law of nations,' its power would be limitless and contrary to our constitutional structure." *Id.* Similarly here, the locus of the high Seas provides a substantive limit on Congress's authority to "define" felonies under Clause 10. If Congress were permitted to redefine the "high Seas" as it so chose, it could greatly expand the authority given to it by the Framers, in contravention of the very notion of enumerated powers. *See id.* For these reasons, this Court, too, should "look to international law to ascertain the scope" of the High Seas under Clause 10. *See id.; cf. id.* at 1260 (Barkett, J., specially concurring).

In summary, Congress's authority to punish felonies on the high seas is limited to the "high Seas" as that term is defined by customary international law. And that definition *excludes* the EEZ.

Here, the Defendants were arrested within the EEZ of the Dominican Republic, and not on the high seas.[3] According to internal USS Milwaukee logs made available in discovery, the vessel on which the Defendants were allegedly travelling was intercepted while at a standstill, at coordinates 15.54N and 072.13W. Pursuant to these coordinates, the vessel would have been within the boundaries of the Dominican Republic's Exclusive Economic Zone, EEZ.

*See Dominican Republic MRGID 8409*, and below.

www.Marineregions.org,https://www.marineregions.org/eezdetails.php?mrgid=8409&all_territories=1
&zone=eez, and https://www.marineregions.org/eezdetails.php?mrgid=8409, (last accessed on Mar. 10th, 2022) (searchable map of EEZ boundaries by coordinates and/or countries).  Thus, the United States lacks jurisdiction over these alleged offenses. Put differently, because his offense falls outside of Congress's limited Article I powers, this Court is without subject matter jurisdiction over his offense, and the indictment must be dismissed.

## II.   The MDLEA's definition of a "stateless" vessel in Section 70502(d)(1)(C) is facially unconstitutional, because it applies to vessels that are not "stateless" under customary international law and therefore exceeds Congress's authority under the "Felonies Clause."

On January 20, 2022, the First Circuit held that 46 U.S.C. § 70502(d)(1)(C) is facially unconstitutional because it plainly applies to vessels that are not "stateless" under customary international law and therefore exceeds Congress's authority under Article I, Section 8, Clause 10 (the Felonies Clause). *See United States v. Davila-Reyes*, __ F.4th __, 2022 WL 178854 (1st Cir. 2022) (attached as Exhibit 1). Because the government relies on the same unconstitutional provision of the MDLEA to establish statutory jurisdiction here, (*see* D.E. 1 at ¶ 6), the Court lacks

---

[3] Though the vessel's location is described relative to the Dominican Republic in court filings, the vessel was within the Dominican Republic's Exclusive Economic Zone (EEZ) at the time of interdiction. According to internal USS Milwaukee logs made available in discovery, the vessel on which the Defendants were allegedly travelling was intercepted while at a standstill, at coordinates 15.54N and 072.13W.

constitutional subject matter jurisdiction, and the indictment against the Defendants must be dismissed.[4]

The Defendants are charged with conspiracy to possess with intent to distribute, and possession with intent to distribute, cocaine on board a "vessel subject to the jurisdiction of the United States," in violation of 46 U.S.C. § 70503(a)(1) and 70506(b). (*See* D.E. 8). The phrase "vessel subject to the jurisdiction of the United States" includes "a vessel without nationality." 46 U.S.C. § 70502(c)(1)(A). The MDLEA defines "vessel without nationality" to include, as relevant here, any vessel "aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C).[5] When it enacted this provision of the MDLEA, Congress exceeded the authority granted to it by the Felonies Clause because § 70502(d)(1)(C) plainly applies to individuals on vessels that are *not* considered stateless under customary international law. *See Davila-Reyes*, 2022 WL 178854, at \*31.

A. <u>Congress's power to prosecute "Felonies on the high Seas" is limited by customary international law.</u>

Congress enacted the relevant portions of the MDLEA solely pursuant to its enumerated grant of authority to "define and punish . . . Felonies committed on the high Seas" (*i.e.* the "Felonies Clause" of Article I, Section 8, Clause 10).[6] *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1258 (11th Cir. 2012) (holding that Congress could not proscribe drug trafficking under

---

[4] As discussed more fully below, this is a question of first impression before this Court. The Eleventh Circuit has never addressed whether Congress' Article I powers under the Felonies Clause as limited, as the First Circuit found in *Davila-Reyes*, by customary international law.

[5] Sections 70502(d)(1)(A) & (B) provide that a vessel is without nationality if: the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claim; or the master or individual in charge fails, on request, to make a claim of nationality or registry. Those provisions are not at issue here.

[6] The Defendants refer to the entirety of Article I, Section 8, Clause 10 as the "Define and Punish Clause" and the portion of the Define and Punish Clause that authorizes Congress to "define and punish . . . Felonies committed on the high Seas" as the Felonies Clause.

9

the Offences Clause of Article I, Section 8, Clause 10, because it is not an offense against the Law of Nations); *United States v. Davila-Mendoza*, 972 F.3d 1264 (11th Cir. 2020) (holding that Congress lacked the power to enact the MDLEA pursuant to the Foreign Commerce Clause and rejecting the government's alternative argument that the statute was passed as a necessary and proper exercise of the Treaty power); *[see also United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016)]; *Davila-Reyes*, 2022 WL 178854, at *11.

Furthermore, the Framers incorporated customary international law as a limit on Congress's authority under the Felonies Clause. *See Bellaizac-Hurtado*, 700 F.3d at 1248–49. In *Davila-Reyes*, the First Circuit undertook an exceptionally thorough and persuasive review of the historical record (including the Framers' own statements) and legal precedent, which confirmed the same. *See Davila-Reyes*, 2022 WL 178854, at *14–24. As a general matter, the Framers were deeply committed to international law and saw, as their "primary goal," "improving the new nation's ability to meet its obligations to other countries under international law." *Id.* at *15; *see also id.* at *16 (explaining that, for both pragmatic and ideological reasons, "as they embarked on drafting a constitution, the Framers saw a federal system capable of upholding international law as an imperative for the United States to achieve equal status in the community of nations."). Consistent with these goals and concerns, "the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations." *Id.* at *16.

This is particularly evident in Article I, Section 8, Clause 10 (the Define and Punish Clause). The Define and Punish Clause is made up of phrases borrowed from international law— "Offences against the Law of Nations," "Piracies," and "Felonies" are "all concepts taken directly from international law." *Id.* These phrases were "familiar shorthand" for "international law

concepts" and their inclusion in the Constitution is "strong evidence that the Framers intended the Define and Punish clause to align with the international law understanding of those concepts." *Id.*

The Framers' decision to treat "Piracies" and "Felonies" distinctly within the Define and Punish Clause is also significant. At the time, and consistent with international law, piracy was understood to be a crime of universal jurisdiction, meaning it could be punished by any country no matter where it was committed or by whom. *Id.* at *18–19. Felonies—*i.e.,* serious crimes other than piracy—were not, even if committed on the high seas. "It was a well-accepted principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, *but only* as to a given country's own nationals or *on vessels over which the country could exercise jurisdiction pursuant to international law*." *Id.* at *19 (emphases added) (citing numerous primary and secondary sources). Thus, by separating "Piracies" and "Felonies" in the Define and Punish Clause, the Framers "manifest[ed] an intent to distinguish between crimes with different jurisdictional limits under international law: classic piracy, which can be punished no matter where committed or by whom, and Felonies, which can be punished only if committed by U.S. nationals or on vessels subject to U.S. jurisdiction under international law" while on the high seas. *Id.* (footnote omitted); *see also United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 630–34 (1818) (holding that Congress could not extend U.S. jurisdiction to foreigners on foreign vessels for the common law form of robbery); *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 197–98 (1820) (holding the same for murder on a foreign vessel, and again contrasting piracy, which can be punished by Congress "even when committed by a foreigner upon a foreigner in a foreign ship").

In sum: Congress's authority to "define and punish . . . Felonies committed on the high Seas" goes only as far as international law permits. International law prohibits "any country from

asserting jurisdiction over foreign vessels on the high seas[.]" *Davila-Reyes*, 2022 WL 178854*,* at *20 (citation and internal quotation marks omitted). Thus, the United States can only exercise jurisdiction over vessels on the high seas that are considered stateless (*i.e.* without nationality) *under international law*. *Id*. Put differently:

> there can be no doubt that the Constitution's drafters intended that Congress's authority under [the Felonies Clause] be constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas… [T]hat constraint [necessarily] applies when Congress passes legislation deeming vessels on the high seas stateless. . . It therefore follows that the Felonies Clause requires Congress to abide by international law principles in defining statelessness.

*Id.* at *22.

> B. Section 70502(d)(1)(C) purports to extend Congress' power beyond that granted in the Felonies Clause.

Customary international law considers as stateless a vessel that has not been granted nationality by any country. *See id.* at *22. A vessel may be deemed stateless under international law if it has never been granted nationality by any state, has had its nationality/authorization cancelled, refuses to claim any nationality, or claims more than one nationality. *See id.* at 22–23. A verbal claim of nationality by the master or individual in charge constitutes prima facie proof of the vessel's nationality. *Id.* at *24; *see also United States v. Obando*, 891 F.3d 929, 939 (11th Cir. 2018) (Black, J. concurring).

Section 70502(d)(1)(C) allows the United States to deem vessels stateless (*i.e.* without nationality) when they would not be deemed stateless under international law: when the master or individual in charge makes a claim of nationality, which is neither confirmed nor denied by the identified nation. In other words, "§ 70502(d)(1)(C) displaces the prima facie showing of nationality that arises from an oral assertion of nationality or registry"— a method recognized by both international law and the MDLEA — "without any affirmative evidence to the contrary."

*Davila-Reyes*, 2022 WL 178854, at *24 (citations omitted); *see also* § 70502(e)(3) ("A claim of nationality or registry . . . includes . . . a verbal claim of nationality or registry by the master or individual in charge of the vessel.").

Because the MDLEA treats as stateless a vessel that, under international law, would be a vessel with nationality, "the prosecution of foreign nationals traveling on such a vessel for a violation of U.S. law is impermissible under the Felonies Clause of the Constitution, the only source of authority for Congress's adoption of the MDLEA." *Id.* at *31. And because this "constitutional flaw" is "evident in the statutory terms themselves," § 70502(d)(1)(C) is facially unconstitutional. *Id.* at *30 n.61 (explicitly holding that the entire provision is facially unconstitutional and rejecting the government's characterization of the appellants' challenge as an "as-applied" challenge).

As the *Davila-Reyes* Court explained, this issue was one of "first impression for the federal courts." *Id.* at *14. The Eleventh Circuit has never addressed this issue.

In the absence of relevant Eleventh Circuit precedent, this Court should follow the persuasive, thorough, and well-reasoned holding of the First Circuit in *Davila-Reyes* and dismiss the indictment here.

### III.   Congress's power under the Felonies Clause is limited to offenses bearing a nexus to the United States and the exercise of jurisdiction over the Defendants in this case violates due process.

Because neither the Defendants nor their offense(s) had any prior ties to the United States, the indictment must be dismissed because (1) Congress's Article I authority under the Felonies Clause does not extend to felonies committed within a foreign nation's EEZ and bearing no ties to the United States; and (2) this Court's exercise of *in personam* jurisdiction over the Defendants violates the Due Process Clause of the United States Constitution.

A. Congress's Article I authority under the Felonies Clause does not extend to felonies committed within a foreign nation's EEZ and bearing no ties to the United States.

The MDLEA exceeds Congress's Art. I § 8, cl. 10 power to define and punish Felonies on the high Seas, because Congress's power under the Felonies Clause does not extend to drug trafficking offenses bearing no connection to the United States. *United States v. Angulo-Hernández*, 576 F.3d 59, 60 (1st Cir. 2009) (Torruella, J., dissenting from the denial of en banc review) ("The term 'Felonies' has not been read to include all felonies, but rather only felonies with an adequate jurisdictional nexus to the United States.") (citing *United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 189 (1820)). *See generally also* Eugene Kontorovich, *The "Define and Punish" Clause and the Limits of Universal Jurisdiction*, 103 Nw. U. L. Rev. 149, 163-4 (Winter 2009) (discussing the history of Art. I, § 8, cl. 10, and arguing that the Felonies Clause is limited to felonies with a nexus to the United States).

The Defendants acknowledge that the Eleventh Circuit has rejected challenges to the MDLEA's constitutionality as applied to unregistered vessels on the high seas. *See, e.g.*, *United States v. Campbell*, 734 F.3d 802, 806 (11th Cir. 2014); *United States v. Cruickshank*, 837 F.3d 1182, 1190 (11th Cir. 2016); *United States v. Estupinan*, 453 F.3d 1336, 1338 n.2 (11th Cir. 2006); *United States v. De La Garza*, 516 F.3d 1266, 1272 (11th Cir. 2008); *United States v. Rendon*, 354 F.3d 1320, 1325 (11th Cir. 2003); *United States v. Marino-Garcia*, 679 F.2d 1373, 1383 (11th Cir. 1982). Therefore, if the Court finds that the MLDEA may constitutionally be enforced in another nation's Exclusive Economic Zone, the Defendants maintain this argument for purposes of further review.

B. <u>This Court's exercise of *in personam* jurisdiction over the Defendants violates the Due Process Clause of the United States Constitution.</u>

Although the Eleventh Circuit has reviewed Due Process challenges to the Maritime Drug Law Enforcement Act (MDLEA) in other contexts, it is believed that the Court has never ruled on the narrow "as applied" challenge presented by this case, which is based on the Dominican Republic's interest in regulating its Exclusive Economic Zone. Whatever interest the United States may have in prosecuting drug trafficking cases occurring on the high seas, there is a clear diminishment of the United States' legitimate exercise of authority where another nation has a clearly defined sphere of interest and authority.

The Defendants respectfully maintain that the Court's exercise of jurisdiction in this case is inconsistent with "traditional notions of fair play and substantial justice." *See Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (holding that, in order to subject a defendant to a civil judgment, due process requires that the individual "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'") (internal citation omitted). The Defendants were neither present in the United States nor inside any United States territory at the time of the offense. None of the Defendants are or were U.S. nationals, nor were they domiciled here prior to their arrest. None of the Defendants carried on any business or activity in the United States. There is no evidence that the drugs were destined for the United States, or that the offense would have a direct and foreseeable effect within the United States. The exercise of civil jurisdiction under circumstances such as these would clearly violate due process. *See id.* There is no reason why the Due Process Clause should have any less force in limiting the criminal jurisdiction of United States courts. *See also United States v. Zakharov*, 468 F.3d 1171, 1177 (9th Cir. 2006) (internal quotation omitted) (holding, in cases involving registered vessels, the court has held that due process requires a "nexus between the

United States and the defendant's activities," that is analogous to the "minimum contacts" required in personal jurisdiction analysis). Therefore, the exercise of jurisdiction over the Defendants is unreasonable and inconsistent with Due Process.

IV.     **The indictment should be dismissed as a sanction for the government's violations of Federal Rules of Criminal Procedure 5(a) and (b), and outrageous government conduct, in detaining the Defendants for approximately 24 days without judicial oversight.**

Finally, the Defendants move this Court to dismiss their indictment based on the government's outrageous conduct in holding them for 24 days without charges being filed and without being brought before a magistrate.

A.   The government violated Rule 5(a) by failing to bring the Defendants before a magistrate judge "without unnecessary delay".

Federal Rule of Criminal Procedure 5(a)(1)(B) states: "A person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." This requirement stems from common law, which "obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could." *Corley v. United States*, 566 U.S. 303, 306 (2009) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 6162 (1991) (Scalia, J., dissenting). This presentment requirement—"which was the law in nearly every American State and the National Government"—"tended to prevent secret detention and served to inform a suspect of the charges against him[.]" *Id.* (citations omitted).

The Supreme Court has held that confessions obtained during unreasonable or unnecessary delays in presentment must be suppressed. *See United States v. Corley*, 129 S. Ct. 1558, 1571 (2009); *Mallory v. United States*, 354 U.S. 449, 455 (1957); *McNabb v. United States*, 318 U.S. 332, 345 (1943). The delays in these cases are mere hours. The delay in the Defendants' case was 24 days.

16

Assuredly, "part of the delay was necessitated by the fact that the arrest was made [] far from port," in a vessel on the water. *United States v. Purvis,* 768 F.2d 1237, 1239 (11th Cir. 1985) (finding relevant to a Rule 5(a)(1)(B) analysis the distance between point of arrest and port of arrival, delay after arrival at port, the conditions of confinement, and whether exigent circumstances or emergencies contributed). Yet, at the average cruise speed of the USS Milwaukee on which Defendants traveled, it takes only an estimated less than 10 hours, at most (travelling at 25 knots), to reach the port of San Juan Puerto Rico from the location of 50 NM South of Oviedo, Dominican Republic (a distance of approximately 205 NM). This was the location where Defendants were taken into custody, (the USS Milwaukee has a top speed of 52 mph and a range of 3200 NM; [*See* https://en.wikipedia.org/wiki/USS_Milwaukee_(LCS-5) ] Furthermore, at the above average cruise speed it would have taken less than 2 days (1.7 days to be exact), to reach the Port in Miami from the location where the Defendants were detained, a distance of approximately 1039 NM. This leaves almost 22-23 days unaccounted for, and the record suggests no exigent circumstances justifying such a delay. *See United States v. Barros*, No. 1:21-cr-20306-CMA, ECF 47, at 10 (finding that while "at first glance" an 11-day delay appeared to be justified by the "ordinary logistical challenges" of sea to port transfers, coast guard officer testimony established "that the delay was unnecessary").

Under the circumstances, and following the reasoning of the Supreme Court and the text of Rule 5(a), this delay is far beyond what could be considered reasonable or necessary.

B.  The government violated Rule 5(b) by failing to secure a criminal complaint until at least 7 days after the Defendants' arrest.

Similarly, the government disregarded the requirements of Federal Rules of Criminal Procedure 5(b), which states: "If a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense

was allegedly committed."[7] This requirement stems from the Fourth Amendment's protection against unreasonable seizures and is generally held to require a judicial determination of probable cause within 48 hours of arrest. *See Gernstein v. Pugh* 420 U.S. 103 (1975). Any detention beyond that period without a judicial determination of probable cause is permissible only in the case of "a bona fide emergency or other extraordinary circumstance." *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991). Even a delay of less than 48 hours will be impermissible if it is unreasonable. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *County of Riverside,* 500 U.S. at 56. Defendants were detained for 7 days before any charges were filed. The record fails to reveal any legitimate reason for such a lengthy delay. Absent "a bona fide emergency or other extraordinary circumstances," such a lengthy delay cannot be considered anything but patently unreasonable. The Defendants' rights under Rule 5 and the Due Process Clause of the Fifth Amendment were violated.

    C.  <u>Dismissal is the appropriate remedy</u>.

    The government's actions in this case demonstrate a blatant disregard for the law and warrant dismissal—whether as a sanction for the Rule 5 violations or a remedy for violating the Defendants' due process rights.

    In 1973, Justice Rehnquist observed that the Court "may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction. *United States v. Russell*, 411 U.S. 423, 431–32 (1973). Such a situation might arise

---

[7] Because this alleged offense was committed outside the United States, the statute provides for venue in any district. *See* 46 U.S.C. § 70504(b)(2) ("Venue. --A person violating section 70503 or 70508-- (1) shall be tried in the district in which such offense was committed; or (2) if the offense was begun or committed upon the high seas, or elsewhere outside the jurisdiction of any particular State or district, may be tried in any district.").

where the government's conduct violates "'fundamental fairness,'" or is "'shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *See id*. (citation omitted).

Since then, courts have acknowledged that a Rule 5 violation may give rise to a due process violation, warranting dismissal, when a delay "rise[s] to the level of outrageous conduct which shocks the conscience." *United States v. Egan*, 501 F.Supp. 1252, 1263 (S.D.N.Y 1980). Additionally, dismissal may be required to deter illegal conduct and when the delay is purposeful, flagrant, or a part of a pattern of violations. *See, e.g.*, *United States v. Jernigan*, 582 F.2d 1211, 1214 (9th Cir. 1978) ("We deplore this kind of [deliberate delay in presentment], and its repetition may lead us to invoke the drastic remedy, dismissal of indictment."); *United States v. Cabral*, No C.R. 98–10188–MLW, 1998 WL 1543567, at *10 (D. Mass. 1998) (considering dismissal for a Rule 5 violation as "an exercise of the court's supervisory powers . . . to deter illegal conduct," though deciding against dismissal because the government represented that it had revised its procedures to prevent future Rule 5 and Speedy Trial Act violations); *United States v. Osunde*, 638 F.Supp. 171, 173–76 (N.D. Cal. 1986) (holding 106-day delay was a "serious and flagrant" violation of Rule 5(a), warranting dismissal to "redress an obvious and egregious infringement upon the defendant's legally cognizable and protected liberty interests, as well as to serve notice on the government that such action cannot and will not be countenanced or condoned by the courts").

The circumstances of the Defendants' 24-day confinement without process dictate that dismissal is the only appropriate response from this court. Initially, the court cannot vindicate the Defendants' rights or sanction the government through suppression of evidence even though all the Defendants gave statements to the Government. *United States v. Melendez*, 55 F.Supp.2d 104,

19

109 (D.P.R. 1999) (listing the availability of suppression as a potential remedy as one factor relevant to whether dismissal is warranted for a Rule 5 violation). Next, the 24-day delay was egregiously long, given the abhorrent conditions under which the Defendants and other detainees are confined. *See* Seth Freed Wessler, *The Coast Guard's 'Floating Guantanamos,* N.Y. Times Magazine, Nov. 20, 2017, (*attached as Exhibit 3)* at 6 (describing how detainees are not told where they are going, not given lawyers, and are not permitted to contact their consulates or family members; are forced to wear "papery" jumpsuits, cuffed at the ankles and chained to a cable running across the ground; given rubber mats instead of beds, forced to defecate into a bucket, and subsist on insufficient food).

Finally, the Defendants' extended extrajudicial detention is part of a pattern of illegal conduct by the government. In fact, unfortunately, these Defendants appear to have suffered more than most defendants in their circumstances. Over the most recent ten cases charged in this district alleging § 70503 violations, not a single defendant has been presented to a magistrate judge within a week of their initial detention. The average delay is over 12 days, with some defendants enduring over two weeks of confinement aboard Coast Guard vessels. These Defendants endured more than three (3) weeks of confinement aboard a United State Navy vessel.

The Defendants were arrested and held captive by the United States government without access to any of the protections of the American judicial system for 24 days. The government's conduct in this case, and as part of a pattern of callous disregard for the rights of the accused, is outrageous and requires that the indictment be dismissed.

## CONCLUSION

WHEREFORE, for the above reasons, the Defendants moves this Court to dismiss the indictment. They further request an evidentiary hearing.

### CERTIFICATE OF CONFERRAL UNDER THE LOCAL RULES

Undersigned conferred with AUSA Michele Vigilant on March 15th, 2022 regarding the Government's position on this motion and she advised that the Government opposes the motion.

Respectfully submitted,

**FRANK QUINTERO, JR.**
*Attorney for Domingo Martinez-Peralta*
QUINTERO BROCHE, P.A.
75 Valencia Avenue, Suite 800
Coral Gables, FL 33134
Tel.: (305) 446-0303 / Fax: (305) 446-4503
Email: fquintero@quinterolaw.net
        eservice@quinterolaw.net

By:      /s/ Frank Quintero, Jr.
         FRANK QUINTERO, JR.
         Florida Bar No.: 399167

**SHERRI A. ROMANO**
*Attorney for Riquelvis Alfonseca*
SHERRI A. ROMANO, P.A.
2103 Coral Way, Suite 304
Miami, FL 33145
Tel: (305) 441-9858
Fax: (866) 624-1721
Email: sromano@sarpalaw.com

BY:  /s/ Sherri A. Romano
        SHERRI A. ROMANO
        FBN: 317380

**KIRSTEN R. NELSON**
*Attorney for Carlos Miguel Oliver Cruz*
FEDERAL PUBLIC DEFENDER
150 West Flagler Street, Suite 1700
Miami, FL 33130
Tel: (305) 530-7000
Fax: (305) 536-4559
Email: kristen_nelson@fd.org

BY:      /s/ Kirsten R. Nelson
         KIRSTEN R. NELSON
         FL Special A No.: A5502543

**MANUEL LAZARO CASABIELLE**
*Attorney for Nicomedes Hernandez-Roballo*
BOYD RICHARDS PARKER
& COLONNELLI, P.L.
100 S.E. 2nd Street, Suite 2600
Miami, FL 33131
Tel: (786) 425-1045
Fax: (786)425-3905
Email: mcasabielle@boydlawgroup.com
        serviceMia@boydlawgroup.com

BY:    /s/ Manuel Lazaro Casabielle
        MANUEL LAZARO CASABIELLE
        FBN: 353213

**ROBERT MICHAEL PEREZ**
*Attorney for Jose Antonio Granados-Ipuana*
LAW OFFICES OF ROBERT M.
PEREZ, P.A.
3162 Commodore plaza, Suite 3E
Coconut Plaza, FL 33133
Tel: (305) 598-8889
Fax: (305) 397-2733
Email: rperez@rmplawpa.com

BY:    /s/ Robert Michael Perez
        ROBERT MICHAEL PEREZ
        FBN: 477474

## CERTIFICATE OF SERVICE

I HEREBY certify that on **March 16, 2022**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

**FRANK QUINTERO, JR.**
*Attorney for Domingo Martinez-Peralta*
QUINTERO BROCHE, P.A.
75 Valencia Avenue, Suite 800
Coral Gables, FL 33134
Tel.: (305) 446-0303 / Fax: (305) 446-4503
Email: fquintero@quinterolaw.net
        eservice@quinterolaw.net

By:    /s/ Frank Quintero, Jr.
        FRANK QUINTERO, JR.
        Florida Bar No.: 399167

**SHERRI A. ROMANO**
*Attorney for Riquelvis Alfonseca*
SHERRI A. ROMANO, P.A.
2103 Coral Way, Suite 304
Miami, FL 33145
Tel: (305) 441-9858
Fax: (866) 624-1721
Email: sromano@sarpalaw.com

BY:   */s/ Sherri A. Romano*
        SHERRI A. ROMANO
        FBN: 317380

**MANUEL LAZARO CASABIELLE**
*Attorney for Nicomedes Hernandez-Roballo*
BOYD RICHARDS PARKER
& COLONNELLI, P.L.
100 S.E. 2nd Street, Suite 2600
Miami, FL 33131
Tel: (786) 425-1045
Fax: (786)425-3905
Email: mcasabielle@boydlawgroup.com
          serviceMia@boydlawgroup.com

BY:   */s/ Manuel Lazaro Casabielle*
        MANUEL LAZARO CASABIELLE
        FBN: 353213

**KIRSTEN R. NELSON**
*Attorney for Carlos Miguel Oliver Cruz*
FEDERAL PUBLIC DEFENDER
150 West Flagler Street, Suite 1700
Miami, FL 33130
Tel: (305) 530-7000
Fax: (305) 536-4559
Email: kristen_nelson@fd.org

BY:   */s/ Kirsten R. Nelson*
        KRISTEN R. NELSON
        FL Special A No.: A5502543

**ROBERT MICHAEL PEREZ**
*Attorney for Jose Antonio Granados-Ipuana*
LAW OFFICES OF ROBERT M.
PEREZ, P.A.
3162 Commodore plaza, Suite 3E
Coconut Plaza, FL 33133
Tel: (305) 598-8889
Fax: (305) 397-2733
Email: rperez@rmplawpa.com

BY:   */s/ Robert Michael Perez*
        ROBERT MICHAEL PEREZ
        FBN: 477474

# EXHIBIT 1

23 F.4th 153
United States Court of Appeals, First Circuit.

UNITED STATES of America, Appellee,
v.
Jeffri DÁVILA-REYES, Defendant, Appellant.
United States of America, Appellee,
v.
José D. Reyes-Valdivia, Defendant, Appellant.

No. 16-2089, No. 16-2143
|
January 20, 2022

**Synopsis**
**Background:** After denial of defendants' motions to dismiss the indictments, defendants entered negotiated guilty pleas in the United States District Court for the District of Puerto Rico, Francisco A. Besosa, J., to drug trafficking in violation of Maritime Drug Law Enforcement Act (MDLEA). Defendants appealed. The Court of Appeals affirmed. Rehearing was granted.

**[Holding:]** The Court of Appeals, Lipez, Circuit Judge, held that as a matter of apparent first impression, Congress exceeded its constitutional authority to define and punish felonies committed on high seas, by enacting MDLEA's provision expanding definition of "vessel without nationality" beyond bounds of international law.

Vacated and remanded.

Howard, Chief Judge, filed an opinion concurring in the result.

Opinion, 🚩 937 F.3d 57, vacated.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

West Headnotes (33)

**[1]   International Law** 🔑 National interests and security; protective principle

The protective principle of international law permits a nation to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security.

**[2]   Criminal Law** 🔑 Plea of Guilty or Nolo Contendere

**Criminal Law** 🔑 Points and authorities

Defendant was not bound by appeal waiver provision of plea agreement for guilty plea to drug trafficking in violation of Maritime Drug Law Enforcement Act (MDLEA), though defendant's opening appellate brief did not explain why the appeal waiver provision was inapplicable, where it was apparent on face of plea agreement that defendant was not sentenced in accordance with agreement's sentencing recommendation; defendant was not obligated to make that obvious point in his opening brief.

🚩 46 U.S.C.A. § 70503(a)(1).

**[3]   Criminal Law** 🔑 Plea of Guilty or Nolo Contendere

Despite enforceable appeal waiver in defendant's plea agreement, Court of Appeals would exercise its inherent authority to avoid a miscarriage of justice by considering defendant's appeal from his guilty plea to drug trafficking in violation of Maritime Drug Law Enforcement Act (MDLEA); defendant raised significant constitutional claim that Congress exceeded its authority under Article I to define and punish felonies committed on high seas by enacting MDLEA's provision expanding definition of "vessel without nationality" beyond bounds of international law, and government would not be prejudiced because co-defendant, who was not bound by appeal waiver, presented same issues as defendant in the consolidated appeal. U.S. Const. art. 1, § 8, cl. 10; 🚩 46 U.S.C.A. §§ 70502(c)(1)(A), 🚩 (d)(1)(C), 🚩 70503(a)(1).

**[4]   Criminal Law** 🔑 Issues considered

An unconditional guilty plea does not prevent a criminal defendant from bringing a claim on direct appeal asserting that the defendant's conviction was within the scope of the statute but nonetheless was unconstitutional.

[5]     **Criminal Law**  Offenses on the high seas or beyond the jurisdiction of any state

The statutory phrase "vessel subject to the jurisdiction of the United States," in the Maritime Drug Law Enforcement Act (MDLEA), concerns legislative jurisdiction, i.e., Congress's authority to enact legislation regulating drug trafficking on ships, rather than the subject-matter jurisdiction of the federal courts.  46 U.S.C.A. § 70502(c)(1).

[6]     **Criminal Law**  Offenses on the high seas or beyond the jurisdiction of any state

Provision of Maritime Drug Law Enforcement Act (MDLEA) expanding the definition of a "vessel without nationality," to include a vessel aboard which the master or individual in charge made a "claim of registry" and for which the claimed nation of registry did not affirmatively and unequivocally assert that the vessel was of its nationality, also encompasses a vessel aboard which the master or individual in charge made a claim of nationality; a claim of registry is also a claim of nationality, and Congress's ultimate demand in the provision is for confirmation of nationality.  46 U.S.C.A. § 70502(c)(1)(A),  (d)(1)(C).

[7]     **Criminal Law**  Liberal or strict construction; rule of lenity

The rule of lenity, which requires that ambiguity in a federal criminal statute be resolved in favor of the accused, does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose.

[8]     **Criminal Law**  Presentation of questions in general

**Criminal Law**  Briefs

An appellant's request for supplemental briefing does not revive a claim that the appellant has failed to preserve.

[9]     **Criminal Law**  Review De Novo

A challenge to the constitutionality of a federal statute is reviewed de novo.

[10]    **Statutes**  Other countries

Where possible, courts construe statutes to be consistent with international law.

[11]    **Criminal Law**  Offenses on the high seas or beyond the jurisdiction of any state

**International Law**  Operation and effect in international waters or high seas

By original design when the Constitution granted authority to Congress to define and punish felonies committed on high seas, this authority is limited by principles of international law; the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations. U.S. Const. art. 1, § 8, cl. 10.

[12]    **International Law**  Universal jurisdiction; universality principle

Piracy, as defined by international law, i.e., robbery upon the sea, is a crime of universal jurisdiction, meaning that it can be punished by any country no matter where it is committed or by whom.

[13]    **International Law**  Universal jurisdiction; universality principle

Under the doctrine of universal jurisdiction, a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory

or its citizens. Restatement (Third) of Foreign Relations Law of the United States § 404.

**[14]**   **International Law** ⟜ Universal jurisdiction; universality principle

Crimes may be universal jurisdiction offenses under international law if they are contrary to a peremptory norm of international law and are so serious and on such a scale that they can justly be regarded as an attack on the international legal order.

**[15]**   **International Law** ⟜ Universal jurisdiction; universality principle

The crimes generally recognized as subject to universal jurisdiction under international law are piracy, the slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism.

**[16]**   **International Law** ⟜ Universal jurisdiction; universality principle

Drug trafficking is not recognized as a universal jurisdiction crime under international law.

**[17]**   **Criminal Law** ⟜ Offenses on the high seas or beyond the jurisdiction of any state

**International Law** ⟜ Operation and effect in international waters or high seas

The Framers' use of the separate terms "Piracies" and "Felonies," in the Constitution's grant of authority to Congress to define and punish piracies and felonies committed on high seas, manifests an intent to distinguish between crimes with different jurisdictional limits under international law: classic piracy, which can be punished no matter where committed or by whom, and felonies, which can be punished only if committed by United States nationals. U.S. Const. art. 1, § 8, cl. 10.

**[18]**   **International Law** ⟜ Operation and effect in international waters or high seas

Under the international law of the sea, all nations have an equal and untrammeled right to navigate on the high seas, and to ensure this right of free navigation, international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas, and vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly.

**[19]**   **International Law** ⟜ Customary international law; law of nations

**International Law** ⟜ Treaties, conventions, and other international agreements

Although the Senate has not ratified the United Nations Convention on the Law of the Sea (UNCLOS), it is generally recognized by the United States as reflecting customary international law, i.e., universal practice.

**[20]**   **Shipping** ⟜ Nationality of vessels

To preserve the system of flag-state jurisdiction, which reflects the equal and untrammeled right of all nations, under the international law of the sea, to navigate on the high seas, every vessel must sail under the flag of one and only one state, and those that sail under no flag enjoy no legal protection.

**[21]**   **Criminal Law** ⟜ Offenses on the high seas or beyond the jurisdiction of any state

The United States, and any other country, may exercise jurisdiction over vessels that are considered stateless under international law.

**[22]**   **International Law** ⟜ Nationality and allegiance

**Shipping** ⟜ Nationality of vessels

International law allows each nation to decide for itself the process through which it will grant its nationality to a vessel.

[23]    **Shipping**  ⬤━  Nationality of vessels

A stateless vessel under international law has not been granted nationality by any state, and a vessel will lack nationality, for example, if no state has ever authorized the vessel to fly its flag, or if a state has cancelled its authorization, or if the political entity that authorized a ship to fly its flag is not recognized as an international person.

[24]    **Shipping**  ⬤━  Nationality of vessels

Under international law, absent a flag or papers, a vessel may make an oral claim of nationality when a proper demand is made.

[25]    **Shipping**  ⬤━  Nationality of vessels

International law recognizes two specific circumstances in which a vessel may be deemed stateless regardless of its actual status and absent any effort to determine its nationality: when the vessel refuses to claim any nationality or when it claims more than one nationality.

[26]    **Shipping**  ⬤━  Inspection of Vessels

When authorities are seeking to ascertain a vessel's nationality in the first place by examining documents, or by eliciting an oral claim, or to resolve a concern about nationality that was declared by means of a flag, they may need close contact with the vessel and its master, and it is therefore understood that international law's so-called "right of visit" permits authorities to inquire, board, and conduct a limited search designed to elicit information about a vessel's identification and registration.

[27]    **Shipping**  ⬤━  Inspection of Vessels

The right of visit under international law is simply a mechanism for a state to investigate suspected wrongdoing on a vessel on the high seas and then take actions within its authority under international law, and the right of visit does not provide an independent ground for exercising jurisdiction over a vessel, and certainly does not allow a state to apply its domestic laws to those aboard that vessel.

[28]    **Criminal Law**  ⬤━  Conferring extraterritorial jurisdiction

Congress exceeded its constitutional authority to define and punish felonies committed on high seas, by enacting provision of Maritime Drug Law Enforcement Act (MDLEA) expanding definition of "vessel without nationality," i.e., stateless vessel, beyond bounds of international law, to extend jurisdiction of United States to foreigners on foreign vessels; expanded definition encompassed vessel aboard which master or individual in charge made claim of registry or nationality and for which claimed nation of registry did not affirmatively and unequivocally assert that vessel was of its nationality, thereby displacing, without requiring any affirmative evidence to the contrary, prima facie showing of nationality that arises from oral assertion of nationality or registry made in accordance with international law. U.S. Const. art. 1, § 8, cl. 10; 🏴 46 U.S.C.A. §§ 70502(c)(1)(A), 🏴 (d)(1)(C), 🏴 70503(a)(1), 🏴 (b), 🏴 (e)(1).

[29]    **Shipping**  ⬤━  Nationality of vessels

International law does not allow a vessel to be deemed stateless based solely on the absence of confirming evidence of the master's oral claim of nationality or registry.

[30]    **Shipping**  ⬤━  Nationality of vessels

Under international law, while master's oral declaration constitutes prima facie proof of nationality of vessel, the declaration can be undermined by contrary evidence, and thus, for example, if the vessel's claimed nationality differs from the nationality of most crew members, or if a small vessel is interdicted far from the claimed country, United States

authorities could properly seek verification of the master's claim.

**[31]    Shipping** ⬦ Nationality of vessels
When United States authorities are presented with mixed signals about the nationality of a vessel, it is permissible under international law for the United States to seek confirmation from the country of asserted nationality and, if none is forthcoming, to treat the vessel as stateless.

**[32]    Constitutional Law** ⬦ Rewriting to save from unconstitutionality
A court has no license to rewrite a statute to satisfy constitutional requirements.

**[33]    Constitutional Law** ⬦ Facial invalidity
**Constitutional Law** ⬦ Invalidity as applied
The mere fact that a cognizable legal challenge to the constitutionality of a statute, by necessity, concerns the application of the statute to individuals does not transform a facial challenge into an as-applied challenge.

**West Codenotes**

**Held Unconstitutional**

🚩 46 U.S.C.A. § 70502(d)(1)(C)

**\*156**    APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Francisco A. Besosa, U.S. District Judge]

**Attorneys and Law Firms**

Franco L. Pérez-Redondo, Research and Writing Specialist, with whom Eric Alexander Vos, Federal Public Defender, Vivianne M. Marrero, Assistant Federal Public Defender, and Liza L. Rosado-Rodríguez, Research and Writing Specialist, were on brief, for appellant José D. Reyes-Valdivia.

Raymond L. Sánchez-Maceira on brief for appellant Jeffri Dávila-Reyes.

Thomas F. Klumper, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, John A. Mathews II, Assistant United States Attorney, and David C. Bornstein, Assistant United States Attorney, were on brief, for appellee.

Before Howard, Chief Judge, Lipez and Thompson, Circuit Judges.

**Opinion**

LIPEZ, Circuit Judge.

**\*157**    These consolidated appeals arise from the U.S. Coast Guard's interdiction of a small speed boat in the western Caribbean Sea and the subsequent arrest and indictment of the three men on board for drug trafficking under the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-08. In a motion to dismiss the indictment, appellants José Reyes-Valdivia and Jeffri Dávila-Reyes challenged the constitutionality of the MDLEA in multiple respects. Most relevant here, they argued that the statute, which in certain circumstances allows U.S. law enforcement to arrest and prosecute foreign nationals for drug crimes committed in international waters, exceeds Congress's authority under Article I of the Constitution. The district court denied the motion to dismiss. Both appellants then pleaded guilty pursuant to plea agreements in which each waived his right to appeal if sentenced in accordance with his agreement's sentencing recommendation provision.

**[1]**    On appeal, appellants renew their constitutional objections to their prosecution. In our original decision, we did not reach appellants' "primary argument" -- that their prosecution was unlawful because their vessel was not properly deemed stateless -- on the ground that "our governing precedent concerning the protective principle of international law ... permit[ted] prosecution under the MDLEA even of foreigners on foreign vessels." 🚩 United States v. Dávila-Reyes, 937 F.3d 57, 59 (1st Cir. 2019) (withdrawn).[1]    That precedent, we concluded, required that we affirm appellants' convictions.

Appellants then petitioned for panel rehearing and en banc review. We held their requests in abeyance pending the en banc decision in another drug-trafficking case involving a constitutional challenge to the MDLEA. See 🚩 United States v. Aybar-Ulloa, 987 F.3d 1 (1st Cir. 2021) (en

banc). Subsequently, based on our view that the decision in ⎘ Aybar-Ulloa "diminished the force of this circuit's precedent on the protective principle," we concluded that it would no longer be appropriate to rely on that principle to uphold appellants' convictions. Order, Nos. 16-2089, 2143 (Mar. 17, 2021). We therefore granted panel rehearing to address appellants' constitutional challenge to their prosecution under the MDLEA.

We now hold that Congress exceeded its authority under **\*158** Article I of the Constitution in enacting § 70502(d)(1)(C) of the MDLEA. That provision expands the definition of a "vessel without nationality" beyond the bounds of international law and thus unconstitutionally extends U.S. jurisdiction to foreigners on foreign vessels. Hence, appellants' convictions must be vacated.

## I.

We draw the following facts primarily from appellants' change of plea colloquies and the uncontested portions of their Presentence Investigation Reports. See ⎘ United States v. Vélez-Luciano, 814 F.3d 553, 556 (1st Cir. 2016).[2] In October 2015, while patrolling waters approximately 30 nautical miles southeast of San Andrés Island, Colombia,[3] U.S. Coast Guard officers observed a small vessel[4] moving at a high rate of speed. When the occupants of the vessel became aware of the Coast Guard boat nearby, they began throwing packages and fuel barrels overboard. The Coast Guard officers approached the boat and began to question its occupants, the two appellants and a third co-defendant. Reyes-Valdivia, as the "master"[5] of the vessel, claimed Costa Rican nationality for the vessel but did not provide any documentation to support that claim.[6]

The Coast Guard officers boarded and searched the vessel pursuant to a provision of an agreement between the United States and Costa Rica "Concerning Cooperation to Suppress Illicit Traffic." See Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (Dep't of State Certification). The officers did not find any contraband, but a chemical test detected traces of cocaine. Based on that evidence, the Coast Guard detained the three men -- all citizens of Costa Rica -- and took them to the U.S. Naval Base at Guantánamo Bay, Cuba, and then eventually to Puerto Rico. At some point, the United States contacted the government of Costa Rica requesting

confirmation of the vessel's registry or nationality, and Costa Rica subsequently **\*159** responded that it could not confirm the vessel's registry. The United States thus determined that, pursuant to § 70502(d)(1)(C) of the MDLEA, the boat was "without nationality" and subject to U.S. jurisdiction.[7]

All three defendants were charged with two counts of trafficking cocaine in violation of the MDLEA. Reyes-Valdivia and Dávila-Reyes moved to dismiss the indictment for lack of jurisdiction,[8] arguing that the MDLEA, particularly ⎘ § 70502(d)(1)(C), is unconstitutional. In their view, ⎘ § 70502(d)(1)(C) exceeds Congress's authority under Article I of the Constitution, and it violates the Due Process Clause of the Fifth Amendment because it is unconstitutionally vague, subject to arbitrary enforcement, and criminalizes conduct that has no nexus with the United States. The district court denied the motion.

Reyes-Valdivia and Dávila-Reyes both subsequently agreed to plead guilty to one count of possession with intent to distribute five or more kilograms of cocaine in violation of the MDLEA. See ⎘ 46 U.S.C. § 70503(a)(1).[9] Both men agreed to waive appellate review if sentenced in accordance with the sentencing recommendation provisions in their plea agreements. Ultimately, the district court sentenced Dávila-Reyes consistently with his agreement (a 120-month term), but sentenced Reyes-Valdivia to a term longer than proposed in his agreement (70 months instead of 57) because it found that he should be given a two-level enhancement for being the "captain" of the vessel. See ⎘ U.S.S.G. § 2D1.1(b)(3)(C).

Reyes-Valdivia's motion for reconsideration was denied. Both Reyes-Valdivia and Dávila-Reyes then appealed. We affirmed their convictions on the basis that the protective principle permitted their prosecution.

## II.

As noted, this court's en banc decision in ⎘ United States v. Aybar-Ulloa led us to withdraw our prior opinion and reconsider appellants' claims. In ⎘ Aybar-Ulloa, the en banc court held that "international law accepts the criminal prosecution by the United States of persons ... who [are] seized by the United States while trafficking cocaine on a stateless vessel on the high seas." ⎘ 987 F.3d at 3.[10]

In so holding, the court bypassed our circuit's precedent on the protective principle, which could have provided a straightforward basis for affirming the conviction, and instead addressed a more complex issue of international law. Notably, the en banc court did not achieve unanimity on the legal basis for U.S. jurisdiction over foreign nationals apprehended on vessels conceded to be **\*160** stateless. See infra. The choice of a non-unanimous analytical path over reliance on the protective principle is one basis for our conclusion that Aybar-Ulloa weakened our circuit's protective principle jurisprudence.

In addition, statements in both the majority and concurring opinions in Aybar-Ulloa more directly suggest skepticism about applying the protective principle to a foreign vessel whose occupants are foreign nationals allegedly involved in drug trafficking, at least absent acquiescence by the flag nation. The majority observed that one of our primary precedents on the protective principle -- United States v. Cardales, 168 F.3d 548 (1st Cir. 1999) -- "can be read as applying only to the circumstance where a foreign flag nation consents to the application of United States law to persons found on that nation's flagged vessel." Aybar-Ulloa, 987 F.3d at 3. In our prior opinion in this case, we assumed that appellants' vessel was Costa Rican, as they had asserted, but we concluded that our precedent nonetheless required us to uphold their prosecution based on the protective principle. The Aybar-Ulloa majority's posited reading of Cardales, however, would foreclose reliance on the protective principle here because the record contains no consent from the Costa Rican government to the prosecution.

The Aybar-Ulloa concurring opinion aired an even broader uncertainty about the protective principle. In describing Aybar-Ulloa's contentions, the concurrence noted the long-ago observation by then-Judge Breyer that there is a " 'forceful argument' against application of [the] protective principle to encompass drug trafficking on the high seas." Id. at 15 (Barron, J., concurring) (quoting United States v. Robinson, 843 F.2d 1, 3 (1st Cir. 1988) (Breyer, J.)); see also id. at 20 (referencing the same skepticism about the protective principle with a citation to Robinson). Both Aybar-Ulloa opinions, then, caused the panel to doubt its reliance on the protective principle to uphold

Reyes-Valdivia and Dávila-Reyes's prosecution under the MDLEA. See also Aaron J. Casavant, In Defense of the U.S. Maritime Drug Law Enforcement Act: A Justification for the Law's Extraterritorial Reach, 8 Harv. Nat'l Sec. J. 191, 213 (2017) (noting that commentators have rejected the protective principle to support MDLEA prosecutions, "positing that 'the cases that see the MDLEA as an exercise of protective jurisdiction fundamentally misconceive the principle' " (quoting Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes, 93 Minn. L. Rev. 1191, 1231 (2009) (emphasis omitted))); but see id. at 222-23 (noting "a circuit split over whether the crime of maritime drug trafficking warrants the use of the protective principle"); id. at 225 (stating that "the protective principle of international law is broad enough to encompass maritime drug trafficking").

Apart from any reference to the protective principle, both Aybar-Ulloa opinions include statements indicating that the prosecution of a foreign national seized on the high seas under U.S. drug-trafficking laws would not be proper unless the targeted activity and seizure occurred on a stateless vessel. The majority, for example, concludes a passage on the reasonable expectations of "those who set out in stateless vessels" by noting: "Simply put, if a person intent on drug trafficking on the high seas wants to be prosecuted in his own country should he be caught, he should sail under that country's flag." Aybar-Ulloa, 987 F.3d at 9. The majority subsequently describes its holding as limited "to vessels flouting order and custom on the high seas by eschewing the responsibilities and protections of the flag-state system." Id. at 13; see also id. at 8 (quoting **\*161** United States v. Furlong, 18 U.S. (5 Wheat.) 184, 198, 5 L.Ed. 64 (1820), for the proposition that "the distinction between foreign vessels and stateless vessels serves to avoid 'offensive interference with the governments of other nations' "). In the same vein, the concurring opinion in Aybar-Ulloa notes the "fair amount of support" for the view that Congress lacks authority under Article I's Define and Punish Clause "to subject foreign nationals to our criminal laws" for acts occurring on foreign vessels on the high seas. Id. at 15 (Barron, J., concurring). [11]

In sum, we see in Aybar-Ulloa multiple signals that the majority of judges on our court do not view the protective principle as supporting U.S. jurisdiction over drug-trafficking

activity conducted on the high seas by foreign nationals on foreign vessels. [12] Hence, in light of ▯ Aybar-Ulloa, we decline to rely on the protective principle to uphold appellants' convictions. Rather, the question we must answer is whether -- as the United States claims -- appellants' vessel was properly deemed stateless, bringing the vessel and its occupants within the scope of the holding in ▯ Aybar-Ulloa.

Before addressing that question, however, we review and elaborate on our reasons, set forth in the withdrawn panel opinion, for rejecting the government's argument that appellants waived their claims of constitutional error. See ▯ Dávila-Reyes, 937 F.3d at 60-61.

### III.

**[2]** The government contends that Reyes-Valdivia and Dávila-Reyes waived their right to appeal in two distinct ways: by the express appellate waiver provisions in their plea agreements and by entry of unconditional guilty pleas to drug trafficking in violation of the MDLEA. With respect to Reyes-Valdivia, the government is wrong in arguing that his appeal is barred by his plea agreement. As described above, the district court declined to follow the parties' recommended term of 57 months and instead sentenced him to a 70-month term of imprisonment. Because Reyes-Valdivia's sentence exceeded the recommendation, the waiver provision plainly does not apply. [13]

*162 **[3]** Dávila-Reyes, however, received a 120-month sentence that aligns with the recommendation in his plea agreement. He argues that, despite the enforceable waiver, we should exercise our inherent authority to consider his claims to avoid "a miscarriage of justice." ▯ United States v. Teeter, 257 F.3d 14, 25-26 (1st Cir. 2001). He contends that his appeal raises "important questions of law and [of] first impression" -- including the constitutionality of § 70502(d)(1)(C) of the MDLEA -- and that preventing him from bringing his appeal would be unjust.

We agree that the constitutional issue Dávila-Reyes raises is significant and that the other factors allowing us to exercise our discretion to disregard the appellate waiver also are sufficiently present. See, e.g., United States v. Ortiz-Vega, 860 F.3d 20, 27-28 (1st Cir. 2017). Particularly important is the lack of prejudice to the government, given Reyes-

Valdivia's presentation of the same issues as Dávila-Reyes. See id. at 27. Moreover, the potential for relief should not depend on the happenstance that the district court added an enhancement to Reyes-Valdivia's sentence. Thus, we exercise our discretion and decline to enforce Dávila-Reyes's appellate waiver.

**[4]** Nor do appellants' guilty pleas foreclose their right to challenge the constitutionality of the MDLEA. The Supreme Court held in ▯ Class v. United States that "a guilty plea by itself" does not bar "a federal criminal defendant from challenging the constitutionality of the statute of conviction on direct appeal." ▯ — U.S. —, 138 S. Ct. 798, 803, 200 L.Ed.2d 37 (2018). In their briefing and oral argument, appellants present claims that are permissible under ▯ Class. Although they conceded through their guilty pleas that the MDLEA, by its terms, allows the government to prosecute them under U.S. law, they argue that Congress exceeded constitutional limits with the enactment of the applicable provision. In other words, appellants contend that their convictions were within the scope of the statute but nonetheless unconstitutional. Such claims may proceed notwithstanding an unconditional guilty plea. See ▯ id. at 805 (holding that a guilty plea does not bar claims that challenge "the Government's power to criminalize [the defendant's] (admitted) conduct" because "[t]hey thereby call into question the Government's power to 'constitutionally prosecute him' " (quoting ▯ United States v. Broce, 488 U.S. 563, 575, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989))).

**[5]** The government asserts that ▯ Class does not apply here because appellants "admitted without qualification that their vessel was one 'subject to the jurisdiction of the United States,' " without limiting the basis for jurisdiction to ▯ § 70502(d)(1)(C) (whose text is reproduced in footnote 7). [14] *163 Appellee's Supp. Br. at 18-19. In making that assertion, the government cites the appellants' general acknowledgment of guilt at their change-of-plea hearing but disregards their specific admissions. The prosecution -- and, accordingly, appellants' admissions of guilt -- was premised on their vessel's statelessness under ▯ § 70502(d)(1)(C). The indictment stated generally that jurisdiction was based on appellants' vessel being one without nationality, see ▯ 46 U.S.C. § 70502(c)(1)(A), [15] but the Department of State Certification that subsequently was filed specified

that "the Government of the United States determined the vessel was without nationality in accordance with 46 U.S.C. § 70502(d)(1)(C)," Reyes-Valdivia, ECF No. 46-2, at 3 (Mar. 25, 2016) (Dep't of State Certification) (emphasis added). Appellants' plea agreements also identified § 70502(c)(1)(A) -- i.e., the subsection referring to vessels "without nationality" - - as the basis for U.S. jurisdiction, see id., ECF Nos. 68, 72, at 1-2 (Apr. 4, 2016), and the "Government's Version of the Facts," incorporated into those agreements, set forth the facts concerning the vessel's status in language tracking the requirements of § 70502(d)(1) (C): the master's claim of Costa Rican nationality and the response from the government of Costa Rica "that it could neither confirm nor refute the registry of the suspect vessel," id. at 11. The same facts were recounted by the government at the change-of-plea hearing. See id., ECF No. 117, at 26 (Oct. 3, 2016). [16] The government's Motion in Limine and Memorandum of Law in Support of Jurisdiction [17] likewise asked the district court to "find, as a matter of law, that [appellants'] vessel was subject to the jurisdiction of the United States, as defined in ... Sections 70502(c)(1)(A) and (d)(1)(C)." Id., ECF No. 46, at 4 (Mar. 25, 2016). [18]

**\*164** Appellants thus pleaded guilty based on the government's assertion of jurisdiction pursuant to § 70502(d)(1)(C), in accordance with the facts stated in their plea agreements. In other words, they admitted that they "did what the indictment alleged" and that the government accurately described the facts giving rise to U.S. jurisdiction under § 70502(d)(1)(C). Class, 138 S. Ct. at 804. Hence, their challenge to the constitutionality of § 70502(d)(1)(C) does not "contradict the terms of the indictment or the written plea agreement," and, as in Class, the constitutional claim can "be 'resolved without any need to venture beyond th[e] record.' " Id. (quoting Broce, 488 U.S. at 575, 109 S.Ct. 757). Appellants' constitutional challenge is premised on the facts set forth by the government and legal principles that, they claim, invalidate § 70502(d)(1)(C)'s definition of a "vessel without nationality" as a basis for subjecting them to U.S. jurisdiction. We need not go outside the existing record to address that question of law. Consequently, appellants' guilty pleas do not bar this direct appeal. See id. at 805.

The government also appears to argue, however, that it is entitled to sidestep appellants' claim that § 70502(d)(1)(C) is unconstitutional because, it says, their vessel could have been deemed without nationality based on other jurisdictional theories and other facts. In its supplemental brief, the government asserts that Reyes-Valdivia's failure to produce registration paperwork or otherwise substantiate his verbal claim of nationality would suffice to "render[ ] the vessel stateless as a matter of domestic and international law." Appellee's Supp. Br. at 9 (emphasis omitted). [19] The government further notes that the vessel could be deemed stateless because it "had no indicia of nationality other than the master's say-so, and even he presented conflicting information, having initially stated the vessel had no nationality." Id. at 11 (internal quotation marks omitted). But these jurisdictional theories are not the basis on which the government relied to arrest and prosecute appellants, and to obtain their guilty pleas. The defendants therefore had no reason or opportunity to consider those rationales for deeming their vessel stateless before deciding to forgo their right to contest the MDLEA charges, [20] which relied on the undisputed **\*165** facts establishing statelessness under § 70502(d)(1)(C). [21] It is now simply too late for the government to proffer alternative bases for jurisdiction. Cf. United States v. Mitchell-Hunter, 663 F.3d 45, 50 n.7 (1st Cir. 2011) (stating that jurisdiction under the MDLEA may be established "any time prior to trial" (emphasis added)).

In sum, neither of the government's waiver-of-appeal arguments has merit.

### IV.

We must consider one last issue before reaching the merits of appellants' claims. As our colleague notes in his concurrence, the jurisdictional provision relied on by the government to prosecute appellants, 46 U.S.C. § 70502(d)(1)(C), refers to a vessel master's having made a claim of registry, but Reyes-Valdivia claimed Costa Rican nationality, not registry. The parties initially appeared to agree that § 70502(d)(1)(C) nonetheless applies to the facts of this case. In a supplemental brief submitted in response to questions from the court, however, appellants argued for the first time that the provision is inapt where the master of the vessel asserts only a nationality claim.

We are unpersuaded that this distinction between a claim of registry and a claim of nationality provides a basis for vacating appellants' convictions. Although the terms "nationality" and "registry," in formal usage, are not interchangeable, [22] the MDLEA treats them as such throughout 🚩 § 70502. Section 70502(e), for example, jointly defines a "claim of nationality or registry" to "include[ ] only":

> (1) possession on board the vessel and production of documents evidencing the vessel's nationality as provided in article 5 of the 1958 Convention on the High Seas; [ 23 ] (2) flying its nation's ensign or flag; or (3) a verbal claim of nationality or registry by the master or individual in charge of the vessel.

🚩 46 U.S.C. § 70502(e). By allowing the act of flying a national flag or the possession of **\*166** documents of nationality to suffice as a claim to either nationality or registry, the MDLEA effectively treats the distinction between nationality and registry as irrelevant. Congress's use of the two terms interchangeably, or at least inconsistently, is even more evident in 🚩 § 70502(d)(1)(C), where the rejection of a master's claim of registry is premised on the named country's failure to confirm nationality.

**[6]** Yet, this variation in terminology does not undermine what is otherwise Congress's clear intention to require verification when a master identifies a vessel as "foreign" -- whether by claiming nationality or registry -- and thereby seeks to avoid the jurisdiction possessed by the United States (and all nations) over stateless vessels. As we shall explain, we think it evident that Congress used the term "claim of registry" in the first part of 🚩 § 70502(d)(1)(C) to also encompass a "claim of nationality" -- a common, albeit imprecise, choice of language.

More than fifty years ago, one scholar noted the tendency to use the term registration to signify the broader concept of nationality. See Herman Meyers, The Nationality of Ships 28 (1967) (noting that "[t]he phrase 'registered in', and other word combinations in which the term register is

used," are sometimes imprecisely "used as synonymous with nationality"); id. at 127 (noting that, because "in the great majority of cases" nationality and registration, along with documentation and flying the flag, "occur in combination," "the differences between the terms have sometimes been neglected and a pars pro toto [a part taken for the whole] use of the word registration ... is by no means rare in the doctrine or in the sources of international law"). Indeed, a claim of registry is also a claim of nationality. See supra note 22. Thus, the variable word choice in 🚩 § 70502(d)(1)(C) does not have the import that it might have in other contexts.

See generally 🚩 DePierre v. United States, 564 U.S. 70, 83, 131 S.Ct. 2225, 180 L.Ed.2d 114 (2011) (noting the usual assumption that a legislature intends different meanings when it uses different words, but also recognizing that "Congress sometimes uses slightly different language to convey the same message").

Importantly, notwithstanding the prior reference to a claim of registry in 🚩 § 70502(d)(1)(C), Congress's ultimate demand in that same provision is for confirmation of nationality. We can detect no reason why Congress would require affirmative confirmation when a vessel's master makes a claim of registry, while allowing a claim of nationality to stand on its own. Excluding claims of nationality from the provision's scope would allow drug traffickers to evade the verification requirement simply by asserting a claim of nationality. Appellants attribute that glaring loophole to Congress's deference to foreign nations and its intention to stay within the bounds of international law. They note that a claim of nationality "presents a more complicated scenario since not all national ships are registered," making it more difficult for the claimed nation "to confirm or refute the nationality claim." Appellants' Supp. Br. at 8-9. Appellants do not explain, however, why that concern would prompt Congress, in effect, to nullify the verification provision by encouraging vessel masters to claim foreign nationality rather than registry. Inescapably, then, the reference in the first part of 🚩 § 70502(d)(1)(C) solely to "a claim of registry" must be attributable to the not infrequent practice of treating a "claim of registry" and a "claim of nationality" as essentially synonymous, even though the former term is technically narrower than the latter.

**\*167** Our view that 🚩 § 70502(d)(1)(C) is not reasonably construed as limited to claims of registry is reinforced when the provision is considered in the context of the MDLEA

as a whole in light of its legislative history. See, e.g., Abramski v. United States, 573 U.S. 169, 179 n.6, 134 S.Ct. 2259, 189 L.Ed.2d 262 (2014) ("[A] court should not interpret each word in a statute with blinders on, refusing to look at the word's function within the broader statutory context."); United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ("Statutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme -- because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)). The MDLEA reflects Congress's intention to enable the aggressive prosecution of maritime drug trafficking. See 46 U.S.C. § 70501 ("Congress finds and declares that ... trafficking in controlled substances aboard vessels is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States ...."). Indeed, § 70502(d)(1)(C) was among several provisions added to the MDLEA in 1996 to "expand the Government's prosecutorial effectiveness in drug smuggling cases." H.R. Rep. No. 104-854, at 142H.R. Rep. No. 104-854, at 142 (1996) (Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 4292, 4337. Given this statutory backdrop, the majority observed in United States v. Matos-Luchi that "Congress did not expect courts to render a cramped reading of the statute." 627 F.3d 1, 7 (1st Cir. 2010).

In addition, other portions of the MDLEA's legislative history indicate that Congress's specific reference to a claim of registry in subsections (A) and (C) of § 70502(d)(1) -- both involving the claimed nation's response (or lack thereof)[24] -- may reflect the fact that registry claims appear to have been the common way in which drug-trafficking defendants asserted their foreign nationality. There are multiple references to the difficulty faced by prosecutors in producing "judicially admissible documentary evidence" of the foreign nation's "consent [to board] or denial of a claim of registry." S. Rep. No. 99-530, at 15 (1986) (emphasis added); see also, e.g., USCG Authorizations and Load Lines: Hearing on H.R. 1362 Before the S. Subcomm. on Merchant Marine of the Comm. on Commerce, Sci. & Transp., 99th Cong. 39-40 (1986) (Responses of Adm. James Gracey

to questions from Sen. Hollings).[25] **\*168** But whatever the exact explanation for the chosen language, given the legislative background, together with Congress's blending of the concepts of nationality and registry elsewhere in the MDLEA, a reading of § 70502(d)(1)(C) that excludes claims of nationality would "produce[ ] a substantive effect that is [in]compatible with the rest of the law." United Sav. Ass'n of Tex., 484 U.S. at 371, 108 S.Ct. 626.

We note, in addition, that this court has treated claims of registry and nationality synonymously in multiple cases. For example, in Matos-Luchi, the majority cited § 70502(d)(1)(A) and (C) -- both of which refer only to a claim of registry -- as applicable to a "claim of nationality [that] is made but rejected [(d)(1)(A)] or not backed up by the nation invoked [(d)(1)(C)]." 627 F.3d at 6; see also United States v. Cuevas-Esquivel, 905 F.2d 510, 513-14 (1st Cir. 1990) (noting the absence of a claim of nationality but citing to a provision in an earlier codification of the MDLEA that referenced only registry (46 U.S.C. App. § 1903(c)(2)(A))); United States v. Maynard, 888 F.2d 918, 925 (1st Cir. 1989) ("Since a 'claim of nationality' was made, the [vessel] can be classified as a stateless vessel only if the 'claim is denied by the flag nation whose registry is claimed.' " (quoting § 1903(c)(2)(A))).

Other courts have likewise used the terms interchangeably. See United States v. Alarcon Sanchez, 972 F.3d 156, 162-63 (2d Cir. 2020) (stating that "[a] claim of registry may be made" by " 'a verbal claim of nationality or registry,' " quoting 46 U.S.C. § 70502(e) and relying on § 70502(d)(1)(C) in discussing the master's assertion of nationality); United States v. Prado, 933 F.3d 121, 130 (2d Cir. 2019) ("[A] verbal assertion of nationality by the master constitutes a claim, which is then tested by a U.S. officer's inquiry of the nation's registry authority."); United States v. Hills, 748 Fed. App'x 252, 253 (11th Cir. 2018) (per curiam) (finding that the defendant's vessel was without nationality based on § 70502(d)(1)(C) where the defendant "told [the Coast Guard] that he was the master of the vessel and identified the vessel as Costa Rican"); United States v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) (referring to "a false claim of nationality or registry" even though the provision at issue, 46 U.S.C. App. § 1903(c)(2)(A), referred only

to "a claim of registry"); id. at 174 ("[T]he prosecution can establish that a vessel is stateless by showing that the master or person in charge made a claim *169 of nationality or registry that was denied by the flag nation whose registry was claimed.").[26]

**[7]    [8]** We therefore see no basis for departing from our prior understanding of 🏴 § 70502(d)(1)(C)'s scope.[27] Congress's reference solely to claims of registry in the first part of 🏴 § 70502(d)(1)(C) is not reasonably construed to exclude from that subsection's verification requirement claims of nationality that are phrased without reference to registration.[28]

### V.

Having addressed these threshold issues, we turn to appellants' constitutional challenge to 🏴 46 U.S.C. § 70502(d)(1)(C). As described above, we have construed that provision to allow U.S. authorities to deem a vessel "without nationality" -- i.e., stateless -- when a claim of either registry or nationality asserted by the vessel's occupants is neither confirmed nor denied by the claimed country. See, e.g., 🏴 Matos-Luchi, 627 F.3d at 6. Under 🏴 Aybar-Ulloa, a determination of statelessness has a significant consequence: it permits prosecution under U.S. law of any foreign national aboard the vessel. See 🏴 987 F.3d at 3. Appellants contend that 🏴 § 70502(d)(1)(C) exceeds Congress's authority under the "Define and Punish Clause" of Article I, which gives Congress the power "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10.

It is undisputed that the "vessel without nationality" provisions of the MDLEA were enacted solely pursuant to Congress's authority to "define and punish ... Felonies committed on the high Seas" ("the Felonies Clause").[29] See 🏴 United States v. Cruickshank, 837 F.3d 1182, 1187 (11th Cir. 2016) (stating that the MDLEA "was enacted under Congress's authority provided by the Felonies Clause"). Appellants argue that the definition of "vessel without nationality" in 🏴 § 70502(d)(1)(C) conflicts with international law and thus *170 authorizes the arrest and prosecution of foreign nationals aboard vessels on the high

seas that the Constitution does not permit. This assertion of U.S. jurisdiction is incompatible with the Constitution, appellants contend, because Congress's authority under the Felonies Clause is constrained by international law. Put another way, appellants ask us to conclude that, under longstanding principles of international law, their vessel was not properly deemed stateless, and because Congress's authority in this instance is limited by international law, appellants' arrests and prosecution were unconstitutional.

**[9]** We review appellants' challenge to the constitutionality of a federal statute de novo. See 🏴 United States v. Booker, 644 F.3d 12, 22 (1st Cir. 2011). We begin by describing existing law on the MDLEA, and then consider the origins and meaning of the Define and Punish Clause generally, and the Felonies Clause specifically, before assessing whether § 70502(d)(1)(C) of the MDLEA violates the jurisdictional limits imposed by the Felonies Clause.

### A. Statutory Background and Overview of Case Law on the MDLEA

The MDLEA makes it unlawful for persons "on board a covered vessel ... [to] knowingly or intentionally ... manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 🏴 46 U.S.C. § 70503(a)(1). The MDLEA's prohibitions apply "even though the act is committed outside the territorial jurisdiction of the United States," 🏴 id. § 70503(b), and "a covered vessel" includes, inter alia, any "vessel subject to the jurisdiction of the United States," 🏴 id. § 70503(e) (1).[30] As relevant here, the Act defines "vessel subject to the jurisdiction of the United States" to include any "vessel without nationality." Id. § 70502(c)(1)(A).

A vessel is expressly considered "without nationality" -- or stateless -- under the MDLEA in three circumstances. First, that label applies when "the master or individual in charge fails," when asked by U.S. law enforcement, "to make a claim of nationality or registry for th[e] vessel." Id. § 70502(d)(1)(B). As noted above, a claim of nationality or registry can be made by presenting documents demonstrating nationality, "flying [the claimed] nation's ensign or flag," or verbally asserting nationality or registry. Id. § 70502(e) (1)-(3). Second, a vessel is considered stateless if its master does make a claim of nationality or registry, but the nation identified denies the claim when contacted by U.S. officials. Id. § 70502(d)(1)(A). Third, a vessel is considered stateless

when the country whose nationality is claimed "does not affirmatively and unequivocally assert that the vessel is of its nationality." Id. § 70502(d)(1)(C). This last situation -- the foundation for appellants' arrest and prosecution -- is the focus of the constitutional challenge now before us. [31]

Despite the frequency with which MDLEA cases arise in this circuit, waiver and other threshold procedural issues have **\*171** prevented us from fully addressing the merits of a challenge under Article I to any portion of the MDLEA. See United States v. Sarmiento-Palacios, 885 F.3d 1, 3-4 (1st Cir. 2018) (finding a challenge to the constitutionality of the MDLEA waived where the defendant failed to develop the argument and conceded that "the MDLEA is a valid exercise of Congress's Article I powers"); United States v. Díaz-Doncel, 811 F.3d 517, 518 (1st Cir. 2016) (holding, before Class, that the defendant had waived the right to challenge the constitutionality of the MDLEA on appeal by entering an unconditional guilty plea); United States v. Nueci-Pena, 711 F.3d 191, 196-98 (1st Cir. 2013) (addressing defendant's Article I challenge to the MDLEA under plain error review because the argument was not raised in the district court and concluding that there was no plain error in light of the lack of First Circuit and Supreme Court precedent addressing the constitutionality of the MDLEA); United States v. Cardales-Luna, 632 F.3d 731, 737-38 (1st Cir. 2011) (holding that, because the constitutionality of the MDLEA did not implicate the court's subject matter jurisdiction, it was not appropriate for the court to raise the issue sua sponte).

In Aybar-Ulloa, the en banc court was presented with a preserved constitutional challenge. The defendant argued that Article I did not give Congress the authority to assert U.S. jurisdiction over stateless vessels that have no nexus to the United States, basing his argument on the asserted existence of a nexus requirement in international law. See 987 F.3d at 15 (Barron, J., concurring) (elaborating Aybar-Ulloa's constitutional claim). The en banc court did not address Congress's authority under the Constitution, however, because it concluded that international law permits the United States to prosecute foreign nationals engaged in drug trafficking on any stateless vessel, at least when U.S. authorities have boarded and seized the vessel pursuant to the right of boarding recognized under international law. Id. at 6, 14. [32] The court expressly did not "reach the question

of whether the application of the MDLEA to Aybar[-Ulloa] would be constitutional were international law otherwise." Id. at 3. Aybar-Ulloa does not govern this case. Unlike the defendant there -- who admitted that his vessel was stateless -- Reyes-Valdivia and Dávila-Reyes insist that their vessel was not properly deemed "without nationality." They assert that the method of determining statelessness in § 70502(d)(1)(C) expands U.S. jurisdiction beyond the bounds permitted by the Constitution.

We have passed upon some related questions, such as whether another of the "without nationality" provisions of the **\*172** MDLEA is consistent with international law, see Matos-Luchi, 627 F.3d at 6-7 (noting that 46 U.S.C. § 70502(d)(1)(B) is consistent with international law allowing a vessel to be deemed stateless if the master refuses to claim a nationality), [33] and whether the MDLEA's flag-nation consent provisions provide due process, see Cardales, 168 F.3d at 553 (holding that "due process is satisfied when the foreign nation in which the vessel is registered authorizes the application of United States law to the persons on board the vessel"). Along with Aybar-Ulloa, these cases provide a useful backdrop to our discussion of the constitutionality of § 70502(d)(1)(C), but they do not answer the question now before us.

Although several of our sister circuits have addressed whether the MDLEA is, in general, a constitutional exercise of Congress's authority under the Felonies Clause, it appears that no circuit has considered the specific authority for § 70502(d)(1)(C)'s definition of a "vessel without nationality." Instead, courts have assumed that the MDLEA applies only to vessels that would be subject to U.S. jurisdiction under international law, i.e., U.S. vessels and those meeting the international law definition of statelessness. See, e.g., United States v. Ballestas, 795 F.3d 138, 146-47 (D.C. Cir. 2015) (holding that Congress had authority under the Felonies Clause to punish a defendant for conduct committed by his co-conspirators aboard a stateless vessel on the high seas); United States v. Campbell, 743 F.3d 802, 810 (11th Cir. 2014) (stating that "we have long upheld the authority of Congress to 'extend[ ] the criminal jurisdiction of this country to any stateless vessel in international waters engaged in the distribution of controlled substances' " (quoting United States v. Marino-Garcia, 679 F.2d 1373, 1383

(11th Cir. 1982)) (alteration in original)); United States v. Estupinan, 453 F.3d 1336, 1338 (11th Cir. 2006) (holding that the MDLEA's punishment of drug trafficking "on board a vessel subject to the jurisdiction of the United States" is within Congress's constitutional authority); United States v. Moreno-Morillo, 334 F.3d 819, 824 (9th Cir. 2003) (citing United States v. Davis, 905 F.2d 245, 248 (9th Cir. 1990), for the proposition that "this court clearly has held that the MDLEA is constitutional" in a case where the statelessness of the vessel was uncontested). We have thus found no precedent squarely addressing the argument that appellants make here: that the definition of a "vessel without nationality" in § 70502(d)(1)(C) is broader than the definition of a stateless vessel under international law and is therefore unconstitutional. [34]

**\*173** Thus, although we draw on prior cases addressing the constitutionality of the MDLEA and its relationship with international law, the issue before us appears to be one of first impression for the federal courts.

## B. Constitutional Limits on Congress's Authority to Define and Punish Felonies

As described above, appellants contend that § 70502(d)(1)(C) of the MDLEA defines "vessel without nationality" to encompass vessels -- including their own -- that are not in fact without nationality under international law. A conflict exists, they explain, because the provision treats a vessel as stateless despite a claim of nationality being made through a method long acceptable under international law -- specifically, in their case, the master's verbal claim -- if the named country does not "affirmatively and unequivocally assert that the vessel is of its nationality." 46 U.S.C. § 70502(d)(1)(C). In other words, appellants maintain that § 70502(d)(1)(C) rejects a claim of nationality in circumstances where international law accepts the claim. According to appellants, because of this disconnect between the MDLEA and international law, U.S. authorities who rely on the definition of a "vessel without nationality" contained in § 70502(d)(1)(C) will impermissibly arrest and prosecute foreign nationals on a foreign vessel -- which is what they say occurred in this case.

Appellants' assertion of improper arrest and prosecution depends on two propositions involving international law: first, that Congress's authority to "define and punish ...

Felonies committed on the high Seas," U.S. Const. art. I, § 8, cl. 10, is limited by principles of international law and, second, that § 70502(d)(1)(C) allows the United States to deem vessels stateless even when they would not be deemed stateless under international law. If both propositions are correct, § 70502(d)(1)(C) would unconstitutionally permit U.S. authorities to assert jurisdiction over vessels that would not be stateless under international law. In that scenario, the United States would be imposing its law on foreign individuals on foreign vessels -- an extension of jurisdiction that ordinarily is impermissible. See, e.g., Aybar-Ulloa, 987 F.3d at 5 (noting that "the flag-state system guarantees freedom of navigation in international waters, as states generally may not interfere with the passage on the high seas of ships lawfully flying the flag of another state" (citing Richard A. Barnes, "Flag States," in The Oxford Handbook on the Law of the Sea 313 (Rothwell et al. eds. 2015))); id. at 12 (noting "the presumption of exclusive flag-state jurisdiction" over vessels with identified nationality).

**[10]** Hence, resolving this case requires us first to examine the intersection between the Felonies Clause and international law. To be clear, the claim here is not that international law itself constrains Congress's authority to enact statutes. [35] **\*174** Rather, appellants contend that the Felonies Clause of the Constitution, by original design, requires Congress to adhere to the jurisdictional limits of international law with respect to determining statelessness. [36] We thus begin our discussion by examining how the Framers would have understood the authority given to Congress by the Felonies Clause.

## 1. The Constitution and International Law

The delegates who gathered to draft the Constitution had a primary goal of improving the new nation's ability to meet its obligations to other countries under international law. See Ryan Goodman & Derek P. Jinks, Filartiga's Firm Footing: International Human Rights and Federal Common Law, 66 Fordham L. Rev. 463, 464 (1997) ("[T]he Framers held the Constitutional Convention in large part due to the perceived inability of the Confederation to uphold American obligations under international law."). [37] When the Governor of Virginia, Edmund Randolph, introduced the "Virginia Plan" that was to become the basis for the Constitution, [38] he criticized the Articles of Confederation because they did not allow the federal government to punish states that "act[ ] against a

foreign power contrary to the laws of nations or violate[ ] a treaty" or to compel states to punish their citizens who violate the law of nations by, for example, "invad[ing]" the rights of an ambassador. 1 Records of the Federal Convention of 1787 24-25 (Max Farrand ed., 1911) (hereinafter "Farrand's Records"). Likewise, James Madison wrote to James Monroe in 1784 that "[n]othing seems to be more difficult under [the Articles of Confederation] than to impress on the attention of our [state] Legislatures a due sense of those duties which spring from our relations to foreign nations." Letter from James Madison to James Monroe (Nov. 27, 1784), in 2 The Writings of James Madison 93 (Gaillard Hunt ed., 1901).

**\*175** These statements reflect the Framers' concern that, without the power to "enforce national treaties against recalcitrant states, compel their compliance with the law of nations, punish offenses against that law, regulate foreign commerce, and so on, the new republic would be unable to obtain commercial advantages and, given its military weakness and perilous geographic situation, would face external threats." David M. Golove & Daniel J. Hulsebosch, A Civilized Nation: The Early American Constitution, the Law of Nations, and the Pursuit of International Recognition, 85 N.Y.U. L. Rev. 932, 980 (2010); see also id. at 934-35 (explaining that "[d]iplomatic frustrations resulting from state violations of the Treaty of Peace [with England], in particular, helped create the atmosphere of crisis that motivated profederal forces to organize and write a constitution").

In drafting a new constitution, the Framers thus aimed "to provide a national monopoly of authority in order to secure respect for international obligations." Stewart Jay, The Status of the Law of Nations in Early American Law, 42 Vand. L. Rev. 819, 829 (1989). The Framers were "commit[ted] to protecting sovereign interests through rigorous enforcement of the law of nations." Douglas J. Sylvester, International Law as Sword or Shield? Early American Foreign Policy and the Law of Nations, 32 N.Y.U. J. Int'l L. & Pol. 1, 9 (1999); see also Jesner v. Arab Bank, PLC, —— U.S. ——, 138 S. Ct. 1386, 1417, 200 L.Ed.2d 612 (2018) (Gorsuch, J., concurring) ("[W]hen the framers gathered to write the Constitution they included among their chief priorities endowing the national government with sufficient power to ensure the country's compliance with the law of nations."); Golove & Hulsebosch, supra, at 988 (stating that the Framers "carefully designed the new Constitution to ensure that the new nation would uphold its duties under the law of nations"); Louis Henkin, Foreign Affairs and the United States Constitution 234 (2d ed. 1996) ("The Framers assumed that the new federal government

would carry out the obligations of the United States under international law."); Anthony J. Bellia Jr. & Bradford R. Clark, The Law of Nations as Constitutional Law, 98 Va. L. Rev. 729, 751 (2012) ("Of all the rights that can belong to a nation, sovereignty is, doubtless, the most precious, and that which others ought the most scrupulously to respect, they would not do it an injury." (quoting 1 Emmerich de Vattel, The Law of Nations, bk. II, § 54, at 138 (London, J. Newberry et al., 1759), "the most well-known work on the law of nations in England and America at the time of the Founding," id. at 749)); Beth Stephens, The Law of Our Land: Customary International Law as Federal Law after Erie, 66 Fordham L. Rev. 393, 397 (1997) (stating that "the intent of the framers, incorporated into the Constitution, was to ensure respect for international law by assigning responsibility for enforcement of that law to the three branches of the federal government"). Laws governing interactions on the high seas were of particular concern: "The framers of the Constitution were familiar with [the law of the sea] and proceeded with it in mind. Their purpose was not to strike down or abrogate the system, but to place the entire subject ... under national control, because of its intimate relation to navigation and to interstate and foreign commerce." Panama R. Co. v. Johnson, 264 U.S. 375, 386, 44 S.Ct. 391, 68 L.Ed. 748 (1924).

The Framers' commitment to international law principles was both pragmatic and ideological. See Jay, supra, at 822 (explaining that, "[i]n the eighteenth century a consensus existed that the law of nations rested in large measure on natural **\*176** law," and thus the Framers viewed following the law of nations as a moral imperative); Beth Stephens, Federalism and Foreign Affairs: Congress's Power to "Define and Punish ... Offenses Against the Law of Nations", 42 Wm. & Mary L. Rev. 447, 465 (2000) (describing the Framers' belief that "[e]nforcement of international law norms was ... a moral obligation"). Indeed, the Framers believed that to be a "nation," the United States must honor the law of nations.[39] See Chief Justice John Jay, Charge to the Grand Jury of the District of New York (Apr. 4, 1790), reprinted in N.H. Gazette (Portsmouth 1790) (stating, in a charge to a grand jury, that "[w]e had become a nation -- as such, we were responsible to others for the observance of the Laws of Nations"). Hence, as they embarked on drafting a constitution, the Framers saw a federal system capable of upholding international law as an imperative for the United States to achieve equal status in the community of nations. See Aybar-Ulloa, 987 F.3d at 26 (Barron, J., concurring) ("The founding generation was attentive to the strictures of the law of nations.").

[11] With this backdrop, we think it apparent that the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations. As John Quincy Adams explained, "[t]he legislative powers of Congress are ... limited to specific grants contained in the Constitution itself, all restricted on one side by the power of internal legislation within the separate States, and on the other, by the laws of nations." John Quincy Adams, The Jubilee of the Constitution 71 (1839) (emphasis added).

There is a particular justification for interpreting the Define and Punish Clause in relation to the Framers' understanding of international law principles. The Define and Punish Clause, of which the Felonies Clause is a part, refers to "Offences against the Law of Nations," "Piracies," and "Felonies" -- all concepts taken directly from international law. See ▉ Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 451 & n.13, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (White, J., dissenting) (noting that the language of the Define and Punish Clause shows the Framers' belief that "the law of nations is a part of the law of the land"); Golove & Hulsebosch, supra, at 1009 (stating that "[t]his deliberate borrowing suggest[s] that the established principles of the law of nations might define the scope of the [congressional] powers themselves"). These phrases, found in the leading international law treatises of the day, were familiar shorthand for complex international law concepts. Their use in the Constitution is thus strong evidence that the Framers intended the Define and Punish Clause to align with the international law understanding of those terms. See 3 Emmerich de Vattel, The Law of Nations 295 (1758) (Charles G. Fenwick trans., 1916) (referencing "offenses against **177 the Law of Nations"); 4 William Blackstone, Commentaries *67-71 (discussing "offences against the law of nations," and defining "piracy" as one such offense); 3 Sir Edward Coke, The Institutes of the Laws of England 111 (1644) (describing "Piracies, and felonies ... done on the sea").

International law thus informs our inquiry into the meaning of the Define and Punish Clause and, specifically, the Felonies portion of the Clause.

### 2. The Meaning of the Felonies Clause

As noted above, the Define and Punish Clause grants Congress the following authority: "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. We discuss below primarily the text that precedes the comma -- i.e., the authority with respect to "Piracies and Felonies committed on the high Seas." That is so because, as we have noted, it is undisputed in this case that the MDLEA was enacted pursuant to Congress's authority under the Felonies Clause. Although the reference to "Piracies" -- a crime "committed on the high Seas" and appearing alongside the term "Felonies" -- necessarily plays a role in our analysis, the separate clause referencing "Offences against the Law of Nations," which applies to crimes committed both on land and at sea, sheds no light on the scope of U.S. jurisdiction on the high seas. We therefore focus solely on the authority specifically given to Congress over crimes "on the high Seas."

That focus requires us to determine what the Framers intended by the words they chose. In so doing, we seek guidance on the Framers' understanding of international law principles, including international law terminology, from contemporaneous sources. See ▉ U.S. Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 461-62 & n.12, 98 S.Ct. 799, 54 L.Ed.2d 682 (1978) (explaining the Framers' separate use of the terms "treaty," "compact," and "agreement" in Article I of the Constitution by reference to treatises on international law with which the Framers would have been familiar); Waring v. Clarke, 46 U.S. 441, 441 n.1, 5 How. 441, 12 L.Ed. 226 (1847) (stating that "[t]he Constitution ... refers to the law of nations for the meaning of" the terms "admiralty" and "maritime," and thus interpreting those terms in light of their meaning in international law); see also ▉ Zivotofsky ex rel. Zivotofsky v. Kerry, 576 U.S. 1, 12, 135 S.Ct. 2076, 192 L.Ed.2d 83 (2015) (looking to "prominent international scholars" from "the time of the founding" to elucidate the meaning of the Reception Clause, Article II, section 3, of the Constitution).

Just as it does today, at the time the Framers were drafting the Constitution the term "Felonies" meant serious crimes, such as treason, murder, arson, burglary, robbery, and rape. See Blackstone, supra, at *94; 2 Timothy Cunningham, A New and Complete Law Dictionary 23-28 (3d ed. 1783). Before the Constitution became the governing law, all such crimes, whether committed on land or at sea, were defined by state statutes or state common law and punished in state courts. In the only statement at the Constitutional Convention regarding the inclusion of the term "Felonies," James Madison explained that, "[i]f the laws of the states were to prevail on [the meaning of "Felonies"], the citizens of different states would be subject to different punishments for the same offence at sea. There would be neither uniformity

nor stability in the law." 5 Debates on the Federal Constitution 437 (Jonathan Elliot ed., 2d ed. 1836). As voiced by Madison, then, the constitutional drafters recognized **178** the need to create a uniform system of crimes and punishments on the high seas that would apply to all U.S. citizens. There was no mention, however, of conduct committed by foreigners on foreign vessels.

Nonetheless, the independent inclusion of "Piracies" in the Define and Punish Clause provides a clue to the Framers' intent regarding U.S. jurisdiction over felonies committed on foreign vessels. The separate references to "Piracies" and "Felonies" inescapably reflects the Framers' view that Congress's power over each category was meant to be distinct. See generally The Federalist No. 42, at 233 (James Madison) (E.M. Scott ed., 1898) (discussing the necessity of defining each term). That distinction has its origin in international law.

**[12]   [13]   [14]   [15]   [16]** Piracy, as defined by international law -- i.e., "robbery upon the sea," United States v. Smith, 18 U.S. 153, 162, 5 Wheat. 153, 5 L.Ed. 57 (1820)[40] -- is a crime of "universal jurisdiction,"[41] meaning that it can be punished by any country no matter where it is committed or by whom. At the time the Constitution was drafted, this feature of piracy under international law was well established. See Blackstone, supra, at *71 (stating that "every community has a right" to punish piracy because it "is an offense against the universal law of society"); 1 James Kent, Commentaries on American Law 174 (1826) (stating that "piracy, under the law of nations, is an offence against all nations, and punishable by all"). As Justice Story explained in an early piracy case:

> Pirates may, without doubt, be lawfully captured on the ocean by the public or private ships of every nation; for they are, in truth, the common enemies of all mankind, and, as such, are liable to the extreme rights of war. And a piratical aggression by an armed vessel sailing under the regular flag of any nation may be justly subjected to the penalty of confiscation for such a gross breach of the law of nations.

The Marianna Flora, 24 U.S. (11 Wheat.) 1, 40-41, 6 L.Ed. 405 (1825); see also Cardales-Luna, 632 F.3d at 741 (Torruella, J., dissenting) ("Until recently, piracy was the only crime which was punishable by all **179** nations ...."); United States v. Yousef, 327 F.3d 56, 104 (2d Cir. 2003) ("The class of crimes subject to universal jurisdiction traditionally included only piracy.").

That the Framers understood the term "Piracies" to refer to the specific offense subject to universal jurisdiction is supported by their statements describing piracy as a term borrowed from international law. For example, at the Virginia Convention, James Madison explained that "Piracies" was "[a] technical term of the law of nations." 3 Farrand's Records, supra, at 332. Thus, by separating the term "Piracies" from "Felonies," the Framers plainly intended to refer to the specific crime that, under international law, could be punished by Congress even when it was committed by foreign nationals on foreign vessels.

Just as plainly, then, the phrase "Felonies committed on the high Seas" was intended to reference other types of serious crimes committed on vessels. At the time, it was a well-accepted principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, but only as to a given country's own nationals or on vessels over which the country could exercise jurisdiction pursuant to international law. See Blackstone, supra, at *71 (describing acts that would be punished as felonies only if committed by an English "subject" at sea); Letter from Thomas Jefferson to Edmond Charles Genet (June 17, 1793) (explaining that a country's jurisdiction over crimes such as murder "on the high seas ... reaches its own citizens only"); William Rawle, A View of the Constitution of the United States of America 107 (2d ed. 1829) (explaining that Congress's power to punish felonies applies to anyone "except the citizens or subjects of a foreign state sailing under its flag," but that piracy is "punishable in our courts, and in the courts of all nations" (emphasis added)); Henry Wheaton, Elements of International Law 164 (Richard Henry Dana, Jr., ed., 8th ed. 1866) (observing that countries could enact laws punishing conduct at sea, but such conduct could "only be tried by that State within whose territorial jurisdiction" or "on board of whose vessels, the offence thus created was committed").

Confusingly, these other serious crimes, which would be denominated felonies if committed on land, were often

referred to as "piracies" when committed on the high seas, even though they were not "Piracy" as defined by international law. See Wheaton, supra, (explaining that "[t]here are certain acts which are considered piracy by the internal laws of a State, to which the law of nations does not attach the same signification"); Hon. John Marshall, Speech Delivered in the House of Representatives (Mar. 7, 1800), at 10 ("A statute may make any offence piracy, committed within the jurisdiction of the nation passing the statute, and such offence will be punishable by that nation."); Kent, supra, (explaining that, under international law, "[t]he statute of any government may declare an offence committed on board its own vessels to be piracy, and such an offence will be punishable exclusively by the nation which passes the statute"). As one scholar explains, the term piracy "had a popular meaning of serious or capital offense on the high seas," Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. L. Rev. 149, 166 (2009), and the term was thus used colloquially to refer to any felony committed at sea, see John Marshall Speech at 10 ("It is by confounding general piracy with piracy by statute, that indistinct ideas have been produced, respecting the power to punish offences committed on the high seas.").

[17] The Framers' separation of "Piracies" and "Felonies" in the Define and **180 Punish Clause avoids this confusion and reserves the precise meaning of "Piracy" under international law for that specific crime. The Framers' use of the separate terms "Piracies" and "Felonies" thus manifests an intent to distinguish between crimes with different jurisdictional limits under international law: classic piracy, which can be punished no matter where committed or by whom, and Felonies, which can be punished only if committed by U.S. nationals [42] or on vessels subject to U.S. jurisdiction under international law. As noted in the Aybar-Ulloa concurrence, "the United States itself early on took the position before the Supreme Court that the Define and Punish Clause" "is impliedly limited by the law of nations in ways that constrain Congress's authority to rely on that Clause to subject foreign nationals to our criminal laws for conduct that they engage [in] while they are on foreign vessels -- even when those vessels are on the high seas." 987 F.3d at 16 n.7, 15 (Barron, J., concurring); see id. at 16 n.7 (quoting the argument of Mr. Blake on behalf of the United States in United States v. Palmer, 16 U.S. (3 Wheat.) 610, 620, 4 L.Ed. 471 (1818): "A felony, which is made piracy by municipal statutes, and was not such by the law of nations,

cannot be tried by the courts of the United States, if committed by a foreigner on board a foreign vessel, on the high seas; because the jurisdiction of the United States, beyond their own territorial limits, only extends to the punishment of crimes which are piracy by the law of nations.").

**3. Jurisdiction on the High Seas under International Law**

[18] [19] Given the Framers' clear intention to draw a jurisdictional distinction between "Piracies" and "Felonies," the question of when a vessel sailing on the high seas may be subject to U.S. jurisdiction under international law -- i.e., the question at the heart of this case -- has constitutional significance. It is a bedrock principle of the international law of the sea, recognized long before the founding of this country, that "all nations have an equal and untrammeled right to navigate on the high seas." Marino-Garcia, 679 F.2d at 1380; see also United States v. Maine, 475 U.S. 89, 96 n.11, 106 S.Ct. 951, 89 L.Ed.2d 68 (1986) (explaining that "since the days of Grotius, the principle of the freedom of the high seas found an ever wider currency" and "crystallized into a universally accepted principle of international law" by "the beginning of the nineteenth century" (quoting Yehuda Z. Blum, Historic Titles in International Law § 61, at 242-43 (1965))); Hugo Grotius, The Freedom of the Seas 44 (Ralph V.D. Magoffin trans., 1916) ("It is clear ... that he who prevents another from navigating the sea has no support in law."); United Nations Convention on the Law of the Sea ("UNCLOS") art. 90, Dec. 10, 1982, 1833 **181 U.N.T.S. 397. [43] To ensure this right of free navigation, "international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas," and "vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly." [44] Marino-Garcia, 679 F.2d at 1380; see also Aybar-Ulloa, 987 F.3d at 5; John Marshall Speech at 5 (stating that "the opinion of the world is, that a fleet at sea, is within the jurisdiction of the nation to which it belongs").

[20] [21] To preserve this system of flag-state jurisdiction, "every vessel must sail under the flag of one and only one state; those that sail under no flag ... enjoy no legal protection." Matos-Luchi, 627 F.3d at 5; see also, e.g., Aybar-Ulloa, 987 F.3d at 6 (noting that "international law renders stateless vessels 'susceptible to the jurisdiction of any State'" (quoting Barnes, supra, at 314)); United States v.

Pinto-Mejia, 720 F.2d 248, 260 (2d Cir. 1983) (explaining that "a stateless vessel, which does not sail under the flag of one state to whose jurisdiction it has submitted, may not claim the protection of international law and does not have the right to travel the high seas with impunity"); United States v. Rubies, 612 F.2d 397, 403 (9th Cir. 1979) (" 'In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever, for the freedom of navigation on the open sea is freedom for such vessels only as sail under the flag of a State.' " (quoting Lassa Oppenheim, International Law 546 (7th ed. 1948))). Therefore, it has long been understood that the United States -- and any other country -- may exercise jurisdiction over vessels that are considered stateless under international law.

We confirmed that understanding in Aybar-Ulloa. See, e.g., 987 F.3d at 12 ("[S]tateless vessels are treated as subject to the exercise of authority by any nation."); see also, e.g., Matos-Luchi, 627 F.3d at 6 (noting that "international law ... treats the 'stateless vessel' concept as informed by the need for effective enforcement," and, hence, "a vessel may be deemed 'stateless,' and subject to the enforcement jurisdiction of any nation on the scene, if it fails to display or carry insignia *182 of nationality and seeks to avoid national identification"); Andrew W. Anderson, Jurisdiction over Stateless Vessels on the High Seas: an Appraisal Under Domestic and International Law, 13 J. Mar. L. & Com. 323, 337 (1982) ("[T]he extension of United States jurisdiction over stateless vessels seems not only to be a reasonable claim but completely consistent with both customary and treaty international law.").

These general principles of jurisdiction on the high seas are not disputed in this case, and, indeed, the Supreme Court applied these principles in the decades immediately following the Constitution's adoption. In 1790, Congress passed a law making murder and robbery committed by "any person" on the high seas punishable under U.S. law. See Palmer, 16 U.S. (3 Wheat.) at 626. It was an open question, however, whether the statute extended to conduct by foreigners on foreign vessels. When he was a congressman, John Marshall argued that the Define and Punish Clause

can never be construed to make to the government a grant of power, which the people making it, did not themselves possess. It has already

been shown that the people of the United States have no jurisdiction over offences, committed on board a foreign ship, against a foreign nation. Of consequence, in framing a government for themselves, they cannot have passed this jurisdiction to that government.

John Marshall Speech at 24-25.

Not surprisingly, then, the Supreme Court in United States v. Palmer, in an opinion written by now Chief Justice Marshall, held that the statute did not extend U.S. jurisdiction to foreigners on foreign vessels for the common law form of robbery, as distinguished from classic piracy. See 16 U.S. (3 Wheat.) at 630-34. The Court reiterated its holding on the statute's reach two years later, concluding that it did not criminalize the murder of a foreigner on a foreign vessel on the high seas because Congress knew it "had no right to interfere" in such cases. Furlong, 18 U.S. (5 Wheat.) at 198; see also id. at 197 (observing that "punishing [murder] when committed within the jurisdiction, or, (what is the same thing,) in the vessel of another nation, has not been acknowledged as a right, much less an obligation"). By contrast, the Supreme Court recognized the classic form of piracy as "a crime within the acknowledged reach of the punishing power of Congress" even when "committed by a foreigner upon a foreigner in a foreign ship," id. at 197, and noted in other cases that "[m]urders committed by and against foreigners on stateless vessels ... could be prosecuted in the United States," Aybar-Ulloa, 987 F.3d at 7 (citing United States v. Klintock, 18 U.S. (5 Wheat.) 144, 151, 5 L.Ed. 55 (1820) and United States v. Holmes, 18 U.S. (5 Wheat.) 412, 417-18, 5 L.Ed. 122 (1820)). [45]

Thus, in light of these well-established limitations on Congress's ability to criminalize the conduct of foreign nationals *183 aboard foreign vessels on the high seas, [46] the question that arises when the United States seeks to impose its law on foreigners on the high seas is how to identify a vessel that is not within any other country's jurisdiction -- potentially exposing those aboard to every country's jurisdiction. [47] In other words, when may a vessel be characterized as stateless? Stateless vessels do not appear

to have been a primary focus at the time of the Framers, and we have found no explicit statements in their deliberations on when a vessel should be deemed stateless. That silence, of course, is unsurprising, given the focus on avoiding improper intrusions into the affairs of foreign nations.

As we have concluded, however, there can be no doubt that the Constitution's drafters intended that Congress's authority under the Define and Punish Clause, including the Felonies portion of it, be constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas. The Framers sought to ensure that Congress would respect the sovereignty of other nations, and the limits placed on the prosecution of other countries' nationals is an essential component of the international system of mutual respect. Necessarily, then, that constraint applies when Congress passes legislation deeming vessels on the high seas stateless. If the Constitution instead permitted Congress to define a vessel as stateless in any way it wished, there would be a risk that Congress could contravene international norms determining when a country may prosecute felonies committed by foreign nationals on the high seas. It therefore follows that the Felonies Clause requires Congress to abide by international law principles in defining statelessness. We thus review those principles.

**4. Statelessness under International Law**

[22]  [23]  International law allows each nation to decide for itself the process through which it will grant its nationality to a vessel. See Lauritzen v. Larsen, 345 U.S. 571, 584, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) ("Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it."); UNCLOS art. 91, § 1 ("Every State shall fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag."); 5 J.H.W. Verzijl, International Law in Historical Perspective 146 (1972) (describing an 1801 proclamation by the King of England regarding the conditions under which merchant ships may fly the British flag, and noting "[t]he general *184 principle ... that it is within the domestic jurisdiction of any State ... to determine on what conditions it will allow a sea-going vessel to fly its flag and thus grant her its 'nationality' "). The simplest definition of a stateless vessel under international law is thus a vessel that has not been granted nationality by any state. Pursuant to that definition, a

vessel will lack nationality, for example, "if no state has ever authorized [the vessel] to fly its flag, if a state has cancelled its authorization, or if the political entity that authorized a ship to fly its flag is not recognized as an international person." Rosero, 42 F.3d at 171; see also id. ("[A] vessel is without nationality if it is not authorized to fly the flag of any state."); Matos-Luchi, 627 F.3d at 16 (Lipez, J., dissenting) ("Under international law, a stateless vessel is simply one that does not have a valid grant of nationality from any country.").

Authorities encountering a vessel on the high seas would not be aware of some of these circumstances -- e.g., if a state has cancelled a vessel's registration -- and thus will be unable to definitively determine nationality by sight even if a vessel is flying a flag. Nonetheless, international law recognizes a presumption of nationality in the flag-flying situation, among others. We have noted that "[b]y custom, a vessel claims nationality by flying the flag of the nation with which it is affiliated or carrying papers showing it to be registered with that nation." Matos-Luchi, 627 F.3d at 5 (citing Lassa Oppenheim, International Law § 261, at 594-96 (H. Lauterpacht ed., 8th ed. 1955)); see also United States v. Bustos-Guzman, 685 F.2d 1278, 1280 (11th Cir. 1982) (per curiam) (noting that flying a flag is generally "prima facie proof" of nationality under international law); The Chiquita, 19 F.2d 417, 418 (5th Cir. 1927) ("The flag under which a merchant ship sails is prima facie proof of her nationality.").

[24]  Absent a flag or papers, "a vessel may also traditionally make an oral claim of nationality when a proper demand is made." Matos-Luchi, 627 F.3d at 5; see also Aybar-Ulloa, 987 F.3d at 5 (quoting Matos-Luchi, 627 F.3d at 5); United States v. Obando, 891 F.3d 929, 939 (11th Cir. 2018) (Black, J., specially concurring) (noting that, under "longstanding principles of admiralty law," the master "speak[s] on behalf of the ship" and must be the one to make a verbal claim of nationality); The Little Charles, 26 F. Cas. 979, 982 (Marshall, Circuit Justice, C.C. Va. 1818) ("The vessel acts and speaks by the master."); Anderson, supra, at 341 (noting that a vessel may claim nationality "by showing its flag, presenting its documents, or making some other outward or oral claim to a nationality" (emphasis added)). The MDLEA itself recognizes this form of asserting nationality, stating that "[a] claim of nationality or registry under this section includes ... a verbal claim of nationality or registry by

the master or individual in charge of the vessel." 🏳 46 U.S.C. § 70502(e)(3).

**[25]** International law also recognizes two specific circumstances in which a vessel may be deemed stateless regardless of its actual status and absent any effort to determine its nationality: when the vessel refuses to claim any nationality or when it claims more than one nationality. See Matos-Luchi, 627 F.3d at 6-7 (stating that "a vessel may be deemed 'stateless' ... if it fails to display or carry insignia of nationality and seeks to avoid national identification" by "refus[ing], without reasonable excuse, to reveal its" nationality (quoting Meyers, supra, at 322) (internal quotation marks omitted)); UNCLOS art. 92, § 2 (stating that "[a] ship which sails under the flags of two or more States ... may be assimilated to a ship without nationality"); **\*185** The Commander's Handbook on the Law of Naval Operations ¶ 3.11.2.4 (2017), https://www.gc.noaa.gov/pdfs/ CDRs_HB_on_Law_of_Naval_Operations_AUG17.pdf (stating that "[a] vessel may be assimilated to a vessel without nationality," inter alia, "when the vessel makes multiple claims of nationality ... or the master's claim of nationality differs from the vessel's papers"). [48]

**[26]** **[27]** Hence, whether authorities are seeking to ascertain nationality in the first place -- by examining documents or eliciting a verbal claim -- or to resolve a concern about nationality that was declared by means of a flag, they may need close contact with the vessel and its master. It is therefore understood that international law's so-called "right of visit" permits authorities to inquire, board, and conduct a limited search "designed to elicit information about the vessel's identification and registration." Cuevas-Esquivel, 905 F.2d at 513; see also Aybar-Ulloa, 987 F.3d at 6 (recognizing that a "clearly-marked law enforcement ship of any state may board [a private ship] ... if there is reason to suspect that the ship ... is without nationality" (quoting Restatement (Third) of Foreign Relations Law of the United States § 522(2)(b) (1987)) (omissions in original)); United States v. Cortes, 588 F.2d 106, 109 (5th Cir. 1979) (stating that, under international law, "stateless vessels are subject to this type of examination"). [49] The question in this appeal, addressed in **\*186** Section V.C infra, is whether international law permits Congress to dictate the results of such an inquiry as provided in § 70502(d)(1)(C) of the MDLEA.

**5. Summary: The Felonies Clause and Stateless Vessels**

Our review of the law governing jurisdiction on the high seas thus reveals clear signs in multiple sources -- the historical record, the well-established perspective in the late eighteenth century on the role of individual nations in the international sphere, and contemporaneous legal precedent -- that the Framers' invocation of international law terminology in the Define and Punish Clause was deliberate. Seeking to ensure their new nation's compliance with international law, the Framers invoked principles drawn from that law in drafting the Define and Punish Clause generally and the Felonies Clause specifically. In particular, they knew the distinction in international law between "Piracies," which can be punished by any country wherever they occur, and other serious crimes on the high seas, which can be punished by a country only when committed by individuals subject to its jurisdiction. The Framers' goal of incorporating respect for international norms into the federal system thus makes clear that, under the Felonies Clause, Congress's authority to set the boundaries of domestic law on the high seas must be consistent with international law principles. Pursuant to those principles, the key to determining whether Congress can apply domestic law to foreign nationals on a non-U.S. vessel on the high seas ordinarily will depend on whether international law would deem the vessel to be "without nationality" -- i.e., stateless. Finally, international law recognizes that an oral claim by the vessel's master constitutes prima facie proof of the vessel's nationality.

With that understanding of the applicable law, we turn to the question of whether Congress exceeded its power to "define and punish ... Felonies committed on the high Seas" in the challenged provision of the MDLEA.

**C. Constitutionality of 🏳 § 70502(d)(1)(C)**

**[28]** The MDLEA reflects Congress's objective of addressing, to the full extent of its authority, the scourge of drugs entering the United States from abroad. See Matos-Luchi, 627 F.3d at 11 (Lipez, J., dissenting) (noting that the MDLEA and its predecessor, the Marijuana on the High Seas Act, Pub. L. No. 96-350, 94 Stat. 1159 (1980), manifest Congress's objective to "give the Justice Department the maximum prosecutorial authority permitted under international law" (quoting S. Rep. 96-855, at 2 (1980))); id. at 7 ("The MDLEA was responding to repeatedly frustrated efforts to prosecute maritime drug

trafficking."). Undoubtedly mindful of the prohibition against applying domestic law to foreigners traveling on foreign vessels on the high seas, Congress plainly sought in the MDLEA provision defining a stateless vessel to reach as broadly as possible through an expansive definition of statelessness. The statute, however, can reach no farther than the authority granted to Congress by the Felonies Clause, which, as we have determined, is constrained by the norms of international law.

As detailed above, the MDLEA provides three descriptions for a "vessel without nationality" in § 70502(d)(1). See 46 U.S.C. § 70502(d)(1). [50] Two are clearly consistent *187 with international law: when the nation whose registry is claimed denies the claim, id. § 70502(d)(1)(A), and when the individual in charge of a vessel fails to make a claim of nationality or registry for the vessel upon request of an authorized United States officer, id. § 70502(d)(1)(B); see, e.g., Matos-Luchi, 627 F.3d at 6 (involving a refusal to make a claim of nationality). The third definition, however -- the one at issue here -- allows a vessel to be treated as stateless where there is a claim of nationality recognized by international law but the identified country neither confirms nor denies that claim. See 46 U.S.C. § 70502(d)(1)(C).

This provision thus treats a response that reports only that the named country is unable to confirm nationality -- or the country's failure to respond at all to U.S. inquiry -- as evidence that is equivalent to an outright denial of a master's claim of nationality or registry. In other words, § 70502(d)(1)(C) displaces the prima facie showing of nationality that arises from an oral assertion of nationality or registry -- made in accordance with international law -- without any affirmative evidence to the contrary. See Bustos-Guzman, 685 F.2d at 1280 (referring to the "prima facie proof" of nationality that arises from flying a flag); The Chiquita, 19 F.2d at 418 (same); 46 U.S.C. § 70502(e) (listing flying a flag and a verbal claim as alternative methods of making a claim of nationality). In so doing, § 70502(d)(1)(C) adds a new category to the limited circumstances in which international law deems a vessel stateless (the refusal to claim a nationality, claiming more than one nationality, and disavowal of a claim of nationality by the named country). A response stating only that the country is unable to confirm nationality, or the country's failure to provide any response, suffices to nullify

even an unequivocal claim of nationality or registry made by the person in charge of the vessel.

The government contends that this variation on deeming a vessel stateless is implicitly, if not explicitly, recognized in international law. The government asserts that international law requires a vessel not only to make a claim of nationality, but also to " 'be in a position to provide evidence of [nationality].' " Appellee's Br. at 29 (quoting Matos-Luchi, 627 F.3d at 6). Consequently, the government proposes, an absence of "affirmative[ ] and unequivocal[ ]" confirmation from the claimed country may properly be relied upon in deeming the vessel stateless. Id. at 36.

[29]   In making this assertion, the government relies heavily on dicta in Matos-Luchi, a case in which the defendants had declined to make a claim of nationality in response to a request from Coast Guard personnel. See 627 F.3d at 2. [51] As we have described, avoiding national identification is a well-established basis for deeming a vessel stateless, and it is incorporated into the MDLEA in § 70502(d)(1)(B). See supra *188 note 50; see also, e.g., Meyers, supra, at 322 ("[A] ship which obscures the cognoscibility of its allocation repeatedly, deliberately, and successfully may be treated as stateless." (internal quotation marks omitted)). However, the Matos-Luchi majority went beyond that indisputable basis for deeming a vessel stateless -- and the facts before it - - to suggest that an oral declaration of nationality is inadequate if the vessel's master provides no other evidence of the claimed nationality. See 627 F.3d at 6. Stated without examination of the issue, the majority's dicta, which is not binding on another panel, does not support the government's contention that international law allows a vessel to be deemed stateless based solely on the absence of confirming evidence of the master's verbal claim. As the government acknowledges, the MDLEA recognizes "a verbal claim of nationality or registry by the master" as a "claim of nationality or registry" equivalent to flying a flag or producing "documents evidencing the vessel's nationality." 46 U.S.C. § 70502(e). Rejecting a verbal claim of nationality based solely on a lack of substantiating evidence effectively negates that distinct method for claiming nationality recognized both by the MDLEA and by international law.

The government also directly invokes international law to support its position. In its supplemental brief, the government

cites articles 17(1) and (2) of the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Dec. 20, 1988, 1582 U.N.T.S. 95 ("UN Narcotics Convention"), and article 5(2) of the 1958 Convention on the High Seas, supra, in arguing that the United States may deem a vessel stateless if neither its master nor the claimed nation substantiates a verbal claim of nationality. Neither of these sources supports that proposition. The first cited provision of the UN Narcotics Convention calls for cooperation "to suppress illicit traffic by sea, in conformity with the international law of the sea," id. art. 17(1), and the second states that a party with "reasonable grounds to suspect that a vessel flying its flag or not displaying a flag or marks of registry is engaged in illicit traffic may request the assistance of other [p]arties in suppressing its use for that purpose," id. at 17(2). These principles of cooperation do not speak to the circumstances in which international law deems a vessel stateless.

The provision of the 1958 Convention on the High Seas cited by the government provides that "each state shall issue to ships to which it has granted the right to fly its flag documents to that effect." The UNCLOS contains a nearly identical provision, see UNCLOS art. 91, § 2, and another UNCLOS provision specifically addresses registration, requiring states to "maintain a register of ships containing the names and particulars of ships flying its flag, except those which are excluded from generally accepted international regulations on account of their small size," id. art. 94, § 2(a). The government suggests that such provisions create an expectation that all vessels will carry documents and that, if a vessel's master does not substantiate a verbal claim with documents or other evidence, the claimed country of nationality "has accepted through its international treaty obligations that the vessel may be deemed stateless." Appellee's Supp. Br. at 16.

However, these treaty provisions demanding that countries issue documents evidencing vessel nationality say nothing about when a vessel may be deemed stateless. Nor can the provisions reasonably be construed to provide consent to the exercise of jurisdiction over a signatory's vessel by all other signatories based solely on the master's failure to produce documents in support of a claim of nationality. Indeed, **\*189** as we have noted, consent by the country whose nationality is claimed provides a separate basis for jurisdiction under the MDLEA, see 46 U.S.C. § 70502(c)(1)(C), and the statute specifies that consent "may be obtained by radio, telephone, or similar oral or electronic means," id. § 70502(c)(2)(A).

The government's theory of implicit consent is at odds with this scheme.

The government also attempts to infer from treaty provisions a principle of international law that when a country both fails to confirm a claim of registration or nationality and the vessel carries no registration or other identifying documents the vessel may be deemed stateless. This theory conflates two discrete international law issues. Even accepting documentation requirements as within customary international law, it does not follow that a country's failure to issue identifying documents or "maintain a register" renders a vessel stateless when its master has verbally claimed that country's nationality. The relevant question is not whether the claimed country has satisfied its obligations under international law. Rather, the question is what type of inquiry and response suffices to permit the United States to deem a vessel stateless despite a claim of nationality recognized by international law. On that question, the government cites no source of international law expressly recognizing a lack of documents, or the claimed country's failure to confirm nationality (instead of an outright denial), as a basis for overcoming the prima facie showing of nationality arising from the master's oral declaration.

That lack of support for the government's proposition is unsurprising. As we have explained, the master's oral declaration has long sufficed under international law to establish a presumption of nationality. See, e.g., N.P. Ready, Ship Registrations 3 (3d ed. 1998) ("A vessel may be considered as possessing the nationality of a State even though she is unregistered, possesses no documents evidencing that nationality, nor even flies the flag of that State."); see also Aybar-Ulloa, 987 F.3d at 5 (observing that, "[w]ithout a flag or papers, a vessel may also traditionally make an oral claim of nationality when a proper demand is made" (quoting Matos-Luchi, 627 F.3d at 5)).[52] That presumption is sensibly overcome by the named country's express denial of the claim, a scenario long embedded in international law.

However, a response stating that the country can neither confirm nor deny the claim, or the named country's failure to respond at all, may say very little about the veracity of the master's assertion of nationality. Indeed, the inability to confirm the claim may have more to do with the responding country's bureaucracy than with the vessel's status. The facts in **\*190** United States v. Hernandez, 864 F.3d 1292

(11th Cir. 2017), graphically illustrate the problem with ⚑ § 70502(d)(1)(C). The captain of a vessel told Coast Guard officers that his boat was registered in Guatemala -- a truthful claim -- and he and the other three crew members all identified themselves as Guatemalan citizens. ⚑ Id. at 1297. Indeed, at some point, Guatemalan registration documents were found on the vessel. ⚑ Id. Nonetheless, when asked by the Coast Guard to confirm the registry claim, the government of Guatemala responded that it could neither confirm nor deny it. ⚑ Id. Although the vessel plainly was not stateless, the court rejected the defendants' challenge to their convictions under the MDLEA because Guatemala had not " 'affirmatively and unequivocally assert[ed]' the ship's registry." ⚑ Id. at 1299 (quoting ⚑ § 70502(d)(1)(C)). [53] In other words, the vessel was deemed "stateless" even when verification of its nationality should have been easily accomplished.

Moreover, where -- as in Hernandez and here -- the master's oral declaration of nationality is consistent with the citizenship or nationality of all individuals aboard the vessel, the declaration is particularly forceful. To reject the master's declaration of nationality in such circumstances based solely on the claimed country's failure to provide affirmative and unequivocal confirmation -- or its failure to respond at all -- would eviscerate a method long accepted for identifying a vessel's nationality under international law. We cannot infer displacement of that method merely based on treaty provisions imposing obligations on signatory countries to register vessels or issue other documents. [54]

That is not to say that the government's emphasis on registration or documentary evidence of nationality is wholly misplaced. International law does, in general, promote a system of registration. [55] It is reasonable **191 to expect that registered vessels would have documents onboard, and, if not, that the claimed country of nationality would be able to easily confirm a legitimate claim by checking its registry. However, not all vessels must be registered. Small vessels are excluded from the UNCLOS registry requirement, see UNCLOS art. 94, § 2(a), perhaps because some countries typically do not register small vessels -- whether defined by length or by tonnage. In the United States, for example, the registration of smaller boats is generally left to individual states. See ⚑ 46 U.S.C. § 12102(b) (providing that "[a] vessel of less than 5 net tons may engage in a

trade without being documented"); id. § 12301 (providing that "[a]n undocumented vessel equipped with propulsion machinery of any kind shall have a number issued by the proper issuing authority in the State in which the vessel principally is operated"); see also U.K. Mar. & Coastguard Agency, Guidance: Vessel Classification and Certification (2018), https://www.gov.uk/guidance/vesselclassification-and-certification#certification-requirements-for-uk-vessels (stating that, in the United Kingdom, a certificate of registry is optional for "small commercial vessel[s]," defined as vessels under 24 meters (roughly 79 feet)); R.R. Churchill & A.V. Lowe, The Law of the Sea 213 n.19 (3d ed. 1999) (noting that "a State may not require, or permit, the registration of ships below a certain size"); Meyers, supra, at 160 ("Many states ... do not issue documents to ships with a tonnage below a given figure."). [56] Hence, proof of a vessel's nationality via a centralized registry or other evidence of registration may be unavailable, and a country whose citizens have properly claimed nationality on behalf of their vessels thus may be unable either to confirm or deny those claims when contacted by the U.S. Coast Guard or other authorities. [57]

*192 [30] Importantly, we do not suggest that international law requires the United States to accept a bare assertion of nationality where there is conflicting evidence and attempts to resolve the conflict prove fruitless. Although the master's oral declaration constitutes prima facie proof of nationality, that verbal assertion can be undermined by contrary evidence, as is the case for any prima facie showing. For example, if the vessel's claimed nationality differs from the nationality of most crew members, or if a small vessel is interdicted far from the claimed country, [58] U.S. authorities could properly seek verification of the master's claim. In other words, where surrounding facts provide legitimate reason to doubt an oral claim of nationality, international law would permit the United States to treat the vessel as stateless absent the sort of confirmation required by ⚑ § 70502(d)(1)(C). See, e.g., Commander's Handbook (2017), supra, ¶ 3.11.2.4 (stating that "[a] vessel may be assimilated to a vessel without nationality" if, inter alia, there are contradictory or inconsistent indicators of nationality).

[31] Put differently, when U.S. authorities are presented with mixed signals about the nationality of a vessel, it would be permissible under international law for the United States to seek confirmation from the country of asserted nationality and, if none is forthcoming, to treat the vessel as stateless. As we have described, a vessel may be deemed

United States v. Dávila-Reyes, 23 F.4th 153 (2022)

stateless under international law both when it "seeks to avoid national identification," Matos-Luchi, 627 F.3d at 6, and when it "sails under the flags of two or more States," UNCLOS art. 92, § 2 -- two situations that produce ambiguity concerning the vessel's nationality. [59] International law, by inference, likewise permits treating a vessel as stateless when its master makes a verbal claim of nationality that is both unsubstantiated and inconsistent with other relevant indicators *193 of the vessel's nationality. As when the master of a vessel avoids claiming a nationality or when a vessel indicates that it is attempting to claim multiple nationalities, conflicting signals of nationality create an ambiguity that properly gives rise to inquiry and, absent confirmation, permits designation of the vessel as "without nationality." [60]

[32] [33] However, that conflicting-signals limitation is not part of § 70502(d)(1)(C) as currently enacted. Rather, as we have described, even where the circumstances offer no rationale for displacing the prima facie showing of nationality established through a verbal claim, § 70502(d)(1)(C) treats a vessel as stateless based solely on the named country's failure to respond "affirmatively and unequivocally" to U.S. inquiry. The statute on its face is thus inconsistent with international law, [61] and we have no license to rewrite it to satisfy constitutional requirements. See Iancu v. Brunetti, ——U.S. ——, 139 S. Ct. 2294, 2301, 204 L.Ed.2d 714 (2019) (stating that, although the Court "may interpret 'ambiguous statutory language' to 'avoid serious constitutional doubts,' ... '[w]e will not rewrite a law to conform it to constitutional requirements' " (first quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009), and then quoting United States v. Stevens, 559 U.S. 460, 481, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010))); see also Jennings v. Rodriguez, —U.S. ——, 138 S. Ct. 830, 843, 200 L.Ed.2d 122 (2018) ("Spotting a constitutional issue does not give a court the authority to rewrite a statute as it pleases."). It is up to Congress to narrow the language of § 70502(d)(1)(C) if it so chooses. [62]

*194 Even the absence of conflicting evidence of nationality, however, does not mean that foreign nationals engaged in drug trafficking on the high seas can evade prosecution based solely on a verbal claim -- whether true or false -- of a vessel's nationality. The Coast Guard and other countries' authorities can always ask the claimed country of nationality for consent to arrest and prosecute the individuals onboard. See 46 U.S.C. § 70502(c)(1)(C) (stating that a "vessel subject to the jurisdiction of the United States" includes "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States"); see also, e.g., Cardales-Luna, 632 F.3d at 736 (noting that the United States obtained consent from the government of Bolivia, which "waived objection to the enforcement of U.S. laws by the United States with respect to the vessel ..., including its cargo and all persons onboard" (quoting State Department certification)); Matos-Luchi, 627 F.3d at 18 (Lipez, J., dissenting) (noting that the government in that case had failed to obtain consent from the likely country of nationality, "which could have provided a fallback position in the event that the evidence of statelessness proved deficient").

Indeed, it is common practice for countries, including the United States, to negotiate bilateral and multi-lateral agreements to facilitate the apprehension of drug traffickers operating on the high seas. See, e.g., Casavant, supra, at 205 (stating that the United States has entered into twenty-seven such agreements, including with countries in South America, Central America, and the Caribbean, providing a "process by which the two [or more] nations can operate to suppress drug trafficking while also respecting flag state jurisdiction"). [63] The United States can also address its concerns about maritime drug trafficking by seeking to persuade other countries to take enforcement action against their own vessels and nationals. See generally James Kraska, Broken Taillight at Sea: The Peacetime International Law of Visit, Board, Search, and Seizure, 16 Ocean & Coastal L.J. 1, 11 (2010) ("Nowhere is collaboration [among countries] so ingrained than in counter-drug operations at sea."). In this regard, a 2021 report by the U.S. Department of State noted that the Coast Guard of Costa Rica -- the claimed flag-state here -- "is a successful regional partner with the United States for maritime interdiction." See U.S. Dep't of State, Bureau of Int'l Narcotics & Law Enforcement Affairs, Int'l Narcotics Control Strategy Report, Vol. 1, Mar. 2021, at 117; see also id. at 119 ("[A] bilateral agreement between the United States and Costa Rica is regularly used in maritime drug interdiction operations[.]").

What the United States cannot do consistently with the Constitution, however, is arrest and prosecute foreigners on foreign vessels by relying on a concept of statelessness

United States v. Dávila-Reyes, 23 F.4th 153 (2022)

that conflicts with international law. And that is what 🚩 §
70502(d)(1)(C) allows. It overrides international law by
treating a country's failure to supply an "affirmative[ ] and
unequivocal[ ]" confirmation of nationality -- including a
failure to respond at all -- as evidence sufficient to invalidate
an oral claim of foreign nationality even when there are
no mixed signals **195** that would call the claim into
doubt. That is, the MDLEA treats as stateless a vessel that,
under international law, would be a vessel with nationality.
Accordingly, the prosecution of foreign nationals traveling
on such a vessel for a violation of U.S. law is impermissible
under the Felonies Clause of the Constitution, the only
source of authority asserted for Congress's adoption of the
MDLEA. See Aybar-Ulloa, 987 F.3d at 4 (referring to
"Congress's power under Article I '[t]o define and punish
Piracies and Felonies committed on the high Seas' " (quoting
U.S. Const. art. 1, § 8, cl.10)); Mitchell-Hunter, 663 F.3d at
49 n.3 (explicitly stating that "[t]he MDLEA is derived from
Congress' power to 'define and punish Piracies and Felonies
committed on the high Seas' " (quoting U.S. Const. art. 1, §
8, cl.10)); Cruickshank, 837 F.3d at 1187 (same).

### VI.

The Framers intended international law to be a constraint
on Congress's authority "[t]o define and punish ... Felonies
committed on the high Seas." Two centuries ago, the Supreme
Court held that Congress lacked authority under the Felonies
Clause to extend U.S. jurisdiction to felonies committed
by foreign nationals on foreign vessels. See Furlong, 18
U.S. (5 Wheat.) at 198; Palmer, 16 U.S. (3 Wheat.) at
632-34. With 🚩 § 70502(d)(1)(C), Congress violated this
principle, extending U.S. jurisdiction beyond the limits of
international law and, hence, beyond the authority conferred
by the Felonies Clause.

In this case, relying on the authority provided by 🚩 §
70502(d)(1)(C), the Coast Guard treated a vessel whose
master made a claim of Costa Rican nationality cognizable
under international law as a "vessel without nationality."
The United States government improperly relied on that
classification -- in violation of constitutional limits -- to
arrest and prosecute Costa Rican citizens, Reyes-Valdivia
and Dávila-Reyes. We therefore vacate their convictions and

remand the case to the district court with instructions to
dismiss the MDLEA charges against them. [64]

So ordered.

HOWARD, Chief Judge, concurring in the result.
As noted in the majority opinion, we withdrew our prior
panel opinion and granted panel rehearing after the en banc
court issued its opinion in Aybar-Ulloa. In Aybar-Ulloa,
the en banc court did not address arguments raised by the
parties about the protective principle. In light of the now
uncertain status of our protective principle precedent, like
my colleagues I am reluctant to unquestioningly rely on the
protective principle to affirm the convictions underlying these
appeals. Unlike my colleagues, I would not decide these
appeals on constitutional grounds.

I would instead reverse these convictions on the basis that the
agreed facts do not support the statelessness claim charged
by the government. [65] The government claims the vessel is
stateless per 🚩 **196** 46 U.S.C. § 70502(d)(1)(C), which
provides that 'vessels without nationality' include:

> a vessel aboard which the master
> or individual in charge makes a
> claim of registry and for which the
> claimed nation of registry does not
> affirmatively and unequivocally assert
> that the vessel is of its nationality.

The majority asserts that the facts here meet the criteria
described above in 🚩 § 70502(d)(1)(C) because 🚩 § 70502
treats "registry" and "nationality" synonymously. But I find
no support for that observation in the text of 🚩 § 70502 or
in our cases.

To reach its conclusion that "registry" and "nationality" are
used interchangeably in the statute, the majority argues that
interpreting these terms to have independent meanings would
leave an incongruous hole in statutory coverage; how, the
majority wonders, could Congress have intended to cover a
situation in which a master asserts Costa Rican registration,
but not Costa Rican nationality?

The answer becomes apparent when we examine the overall legal terrain. Section 70502(d)(1) establishes three avenues to find statelessness. But this list is not exclusive, and leaves in place other ways in which the government can establish lack of nationality. See United States v. Matos-Luchi, 627 F.3d 1, 4 (1st Cir. 2010); id. at 15 (Lipez, J., dissenting) ("As the majority correctly holds, Congress did not intend those three examples [in § 70502(d)(1)] to be exhaustive. The MDLEA extends to vessels that are considered stateless under international law, even if those vessels do not fall within one of the specifically enumerated categories."); see also United States v. Miranda, 780 F.3d 1185, 1197 (D.C. Cir. 2015) ("[T]he statute contains three nonexclusive examples of 'vessels without nationality,' each of which turns on the 'registry' of the vessel."); United States

v. Rosero, 42 F.3d 166, 171 (3d Cir. 1994) (Alito, J.). Thus, giving meaning to all the terms in § 70502(d)(1) does not immunize vessel masters who claim foreign nationality rather than registry.

Here, the master asserted Costa Rican nationality for the vessel; at no point did he assert Costa Rican registry. Accordingly, by its terms, § 70502(d)(1)(C) is not applicable, nor did the government assert an alternative basis for finding statelessness when prosecuting appellants. I would reverse the convictions on that ground and go no further.

**All Citations**

23 F.4th 153

## Footnotes

1   The protective principle of international law "permits a nation 'to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security.' " Dávila-Reyes, 937 F.3d at 62 (quoting United States v. Cardales, 168 F.3d 548, 553 (1st Cir. 1999)).

2   We also draw some facts from statements by Coast Guard officials that were submitted to the district court as attachments to the government's Motion in Limine and Memorandum of Law in Support of Jurisdiction. See United States v. Reyes-Valdivia, No. 3:15-cr-00721-FAB (D.P.R. Mar. 25, 2016), ECF No. 46.
We note that all citations to the district court's electronic docket in this case will hereafter be cited using the short-form "Reyes-Valdivia, ECF No. ——— (filing date)."

3   Although part of Colombia, San Andrés Island is located off the coast of Nicaragua.

4   The government's Motion in Limine describes the vessel as a 35-foot "low profile, open hull, 'go-fast-type' vessel." Reyes-Valdivia, ECF No. 46, at 3 (Mar. 25, 2016).

5   The term "master" is synonymous with "captain." It is a legal term of art meaning the person "to whom are committed the government, care, and direction of the vessel and cargo." Kennerson v. Jane R., Inc., 274 F. Supp. 28, 30 (S.D. Tex. 1967). The statement of facts attached to Reyes-Valdivia's plea agreement does not identify him as the "master" of the vessel, see Reyes-Valdivia, ECF No. 68, at 11 (Apr. 4, 2016), but a statement from a Coast Guard officer reports that Reyes-Valdivia identified himself as such, see id., ECF No. 46-1, at 1 (Mar. 25, 2016) (Statement of Officer Luis Rosado).

6   The Coast Guard reported that Reyes-Valdivia initially stated that "there was no nationality for the vessel" before asserting Costa Rican nationality. Reyes-Valdivia, ECF No. 46-1, at 1 (Mar. 25, 2016) (Statement of Officer Luis Rosado). However, this statement was not cited in the U.S. Department of State Certification as a basis for identifying the vessel as stateless. The Certification reported only that "[t]he master made a claim of Costa Rican nationality for the go fast vessel." Id., ECF No. 46-2, at 1 (Mar. 25, 2016). Nor was the statement included in the government's version of the facts in the appellants' plea agreements. See infra.

7   Section 70502(c)(1)(A) of the MDLEA provides that "a vessel without nationality" is "subject to the jurisdiction of the United States." 46 U.S.C. § 70502(c)(1)(A). As explained below, § 70502(d)(1)(C) defines a

"vessel without nationality" to include any vessel "aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality." ⚑ Id. § 70502(d)(1)(C).

8    Reyes-Valdivia filed the motion, and the district court granted Dávila-Reyes's motion to join.

9    The third defendant also pleaded guilty to this count and was sentenced to a 57-month term of imprisonment. He did not file an appeal.

10   Generally, there is a consensus that "high seas" denotes areas outside any country's territorial waters. See, e.g., United States v. Carvajal, 924 F. Supp. 2d 219, 234 (D.D.C. 2013), aff'd sub nom. United States v. Miranda, 780 F.3d 1185 (D.C. Cir. 2015).

11   Elsewhere, the ⚑ Aybar-Ulloa concurrence notes that "the application of the MDLEA to Aybar[-Ulloa]'s conduct in this case" -- i.e., conduct aboard a stateless vessel -- would likely be consistent with international law,

     [e]ven if we were to assume that the law of nations places limits on Congress's power under the Define and Punish Clause to subject foreign nationals on foreign vessels in international waters to our domestic criminal laws, and even if we were to assume that the United States may not assert protective jurisdiction over drug trafficking merely because it occurs on stateless vessels in international waters, see ⚑ Robinson, 843 F.2d at 3-4.

     ⚑ 987 F.3d at 20. Although the ⚑ Aybar-Ulloa concurrence does not take a position on those hypotheticals, we view them -- and the reiterated citation to ⚑ Robinson -- to indicate a level of doubt about the applicability of the protective principle, at a minimum, to drug-trafficking activity by foreign nationals on foreign vessels.

12   Of course, consent by the flag nation changes the calculus, as acknowledged by one commentator who has advocated for use of the protective principle in the context of drug-trafficking on the high seas. See Casavant, supra, at 223 (noting that "consent of the flag or coastal state" is a "check on the exercise of U.S. criminal jurisdiction").

13   The government contends that Reyes-Valdivia is nonetheless bound by the waiver provision because he failed to explain in his opening brief why it is inapplicable. However, it is apparent on the face of the plea agreement that Reyes-Valdivia was not sentenced in accordance with the sentencing recommendation provision, and he was not obligated to make that obvious point in his opening brief. See United States v. Colón-Rosario, 921 F.3d 306, 310-11 (1st Cir. 2019).

14   The statutory phrase "a vessel subject to the jurisdiction of the United States" in the MDLEA concerns legislative jurisdiction -- in other words, Congress's authority to enact legislation "regulat[ing] drug trafficking on [ ] ships" -- rather than the subject-matter jurisdiction of the federal courts. ⚑ United States v. González, 311 F.3d 440, 443 (1st Cir. 2002); see also ⚑ United States v. Prado, 933 F.3d 121, 130 (2d Cir. 2019) (adopting and elaborating on this interpretation and rejecting the alternative approach of other circuits). But see ⚑ United States v. Miranda, 780 F.3d 1185, 1192 (D.C. Cir. 2015) (agreeing with the Fifth and Eleventh Circuits that "the question of whether a vessel is 'subject to the jurisdiction of the United States' is a matter of subject-matter jurisdiction"). "Unlike Congress's employment in other statutes of one-factor jurisdictional elements such as 'by a Federal Reserve Bank,' or 'affect[ing] interstate commerce,' the facts that may cause a vessel to be 'subject to the jurisdiction of the United States' [under the MDLEA] involve numerous complex alternatives, which are spelled out at length in ⚑ § 70502 under 'Definitions.' " ⚑ Prado, 933 F.3d at 149. Although appellants assert that their challenge to their prosecution implicates subject-matter jurisdiction, our precedent, as noted above, holds otherwise.

15   As previously noted, ⚑ § 70502(c)(1) lists "a vessel without nationality" among the list of vessels that are "subject to the jurisdiction of the United States." ⚑ 46 U.S.C. § 70502(c)(1)(A). Other types of vessels on

the list include "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States," id. § 70502(c)(1)(C), and "a vessel in the customs waters of the United States," id. § 70502(c)(1)(D).

16   At the plea hearing, the government was asked to "give a brief explanation of the theory to be presented to prove each Defendant guilty if a trial were to be held." Id. at 25. In relevant part, the prosecutor stated:

> The vessel was tracked by aircraft and eventually came to a stop. The U.S. Coast Guard boarding team approached the vessel and commenced right of approach questioning.
> The master claimed Costa Rican nationality for the vessel but provided no registration[ ] paperwork, and there was no indicia of nationality on the vessel.
> The Government of Costa Rica was approached. They responded they could neither confirm nor refute the registry of [the] suspect vessel.
> The vessel was determined to be one without nationality.

Id. at 25-26.

17   In a 1996 amendment to the MDLEA, Congress stated that jurisdictional issues under the statute "are preliminary questions of law to be determined solely by the trial judge." 46 U.S.C. § 70504(a); see also González, 311 F.3d at 442-43. Appellants moved to change their pleas a week after the government filed the Motion in Limine, and the district court therefore did not rule on it. See Reyes-Valdivia, ECF Nos. 59, 63 (Apr. 1, 2016).

18   The government has continued to rely on § 70502(d)(1)(C) before us. In its initial brief, the government quoted the provision in full and then described appellants' admission consistently with the provision's terms -- i.e., "that Costa Rica did not confirm the registry of their vessel (which had no indicia of nationality) and that their vessel was determined to be one without nationality." Appellee's Br. at 36. In addition, in asserting that the MDLEA provided sufficient and unambiguous notice of the MDLEA's applicability to appellants, the government stated: "The absence of an assertion by the Costa Rican government rendered the Appellants' boat a 'vessel without nationality,' [ 46 U.S.C.] § 70502(d)(1), and thus a 'vessel subject to the jurisdiction of the United States,' id. § 70502(c)(1)(A)." Id. at 38.

19   This theory also plays a part in the government's defense of § 70502(d)(1)(C), and we address it in that context in Section V.C.

20   In his supplemental brief, Reyes-Valdivia challenges the government's assertion that the vessel bore no indicia of nationality. He contends that "[p]hotos of the vessel clearly show the civil ensign of Costa Rica painted, albeit vertically, on the port and starboard sides of the ship's bow," and he points out that "the Costa Rica ensign was prominent enough for a Marine Patrol Aircraft ['MPA'] to recognize it from overhead." Appellants' Supp. Br. at 18 n.4. The assertion of visibility from the air was based on the statement of Customs Officer Luis Rosado recounting that the MPA had detected a go-fast vessel "with a Costa Rican flag painted on the bow." Reyes-Valdivia, ECF No. 46-1, at 1 (Mar. 25, 2016). The government properly points out that appellants admitted in their plea agreements to a version of the facts stating that their vessel bore no indicia of nationality and argues that appellants "may not pursue any contention on appeal that 'would contradict' that admission." Appellee's Supp. Response Br. at 5 (quoting United States v. Sarmiento-Palacios, 885 F.3d 1, 4 (1st Cir. 2018)). However, the government, too, must abide by the facts on which it relied to obtain appellants' pleas.

21   We also note that the government has argued, on the one hand, that "[t]he MDLEA is ... clear about how the United States decides whether a vessel is stateless," citing 46 U.S.C. § 70502(d), Appellee's Br. at 35, but, on the other hand, has not identified a statutory provision that matches its newly offered theories of jurisdiction. As described more fully infra, the two other circumstances for classifying a vessel as "without nationality" expressly stated in § 70502(d)(1) -- the denial of a claim by the named country and the master's refusal

to make a claim upon request -- do not apply here. See [IMG] 46 U.S.C. § 70502(d)(1)(A), (B). Although [IMG] §
70502(d)(1)'s categories of stateless vessels are non-exclusive (the provision states that "the term 'vessel
without nationality' includes" the three listed examples (emphasis added)), the government cannot reasonably
expect defendants to assess their options if it invokes a particular statutory basis for jurisdiction but reserves
the right to shift theories -- including to theories beyond the statute's express language.

22    In general, the "nationality" of a vessel refers to the country that has certain "international rights and duties ...
      in connection with a given ship and its users." Herman Meyers, The Nationality of Ships 129 (1967). The
      term "registration" refers to the recording of nationality "on land and under the supervision of a government
      body." Id.; see also id. at 129-30 ("The purpose of a register is to declare the nationality of a vessel engaged

      in trade with foreign nations, and to enable her to assert that nationality wherever found." (quoting [IMG] The
      Mohawk, 70 U.S. (3 Wall.) 566, 571, 18 L.Ed. 67 (1865))).

23    Article 5 states, in part, that "[e]ach State shall issue to ships to which it has granted the right to fly its
      flag documents to that effect." United Nations Convention on the High Seas art. 5, Apr. 29, 1958 ("1958
      Convention on the High Seas"), 13 U.S.T. 2312.

24    Like [IMG] § 70502(d)(1)(C), see supra note 7, subsection (d)(1)(A) specifically references a claim of registry,
      stating that a "vessel without nationality" includes any vessel "aboard which the master or individual in charge
      makes a claim of registry that is denied by the nation whose registry is claimed."

25    This hearing, in May 1986, preceded the adoption that year of the MDLEA. Asked to "describe the kinds
      of problems the Coast Guard and federal prosecutors have encountered" in responding to jurisdictional
      objections from accused drug traffickers at trial, Admiral Gracey responded, in part, as follows:
           The princip[al] problems that have arisen involve the difficulty of proving vessel status. For [e]xample, if
           upon inquiry by the Coast Guard, a vessel makes a claim of registry, the U.S. must confirm that registry
           with the claimed flag state. If the flag state denies registry, the vessel is stateless, i.e., a "vessel subject
           to the jurisdiction of the United States" .... At this point, the U.S. may under international law take law
           enforcement action against that vessel. However, to prove the element of the offense in court, the U.S.
           must obtain a formal certification from the claimed flag state attesting that the vessel is not registered in
           that state. On the other hand, i[f] the claimed state verifies registry, the U.S. obtains that state's consent to
           take law enforcement action. ... However, to prove the element of the offense in court, the United States
           must obtain a formal certification from the flag state verifying registry and confirming its consent for the U.S.
           to take law enforcement action. The difficulties in obtaining these documents from foreign governments
           in a timely manner, and in a form acceptable to our courts under the Federal Rules of Evidence, have
           been considerable.
      USCG Authorizations and Load Lines: Hearing on H.R. 1362 Before the S. Subcomm. on Merchant Marine
      of the Comm. on Commerce, Sci. & Transp., 99th Cong. 39-40.
      A focus on registry as the common indicator of nationality also appears in the legislative history of the
      MDLEA's predecessor, the Marijuana on the High Seas Act, Pub. L. No. 96-350, 94 Stat. 1159 (1980).
      See, e.g., Stopping "Mother Ships" -- A Loophole in Drug Enforcement: Hearing Before the S. Subcomm.
      to Investigate Juvenile Delinquency of the Comm. on the Judiciary, 95th Cong., at 52 (1978) (Statement
      of Morris Busby, Acting Deputy Assistant Sec. of State for Oceans and Fisheries Affairs) (noting the "well-
      established principle under international law ... that a country may exercise jurisdiction on the high seas over
      a vessel without nationality, one that is not registered in any foreign state"); id. at 53 (explaining that, when
      the master or crew make "a claim of nationality," the Coast Guard's protocol involves contacting the claimed
      flag state to "request[ ] that the government verify the registry of the vessel").

26    The government in this case also blended the two concepts. Despite the claim solely of nationality, the United
      States asked Costa Rica to confirm "registry or nationality." Costa Rica then "replied that it could not confirm
      [the] vessel's registry." See Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (Dep't of State Certification).

27    In so concluding, we note that, contrary to appellants' assertion, the statutory imprecision here is not an
      instance of ambiguity requiring application of the rule of lenity. The rule of lenity, which "requires that ambiguity

in a criminal statute be resolved in favor of the accused," United States v. Jimenez, 507 F.3d 13, 20 (1st Cir. 2007), "does not apply if the ambiguous reading relied on is an implausible reading of the congressional purpose," Caron v. United States, 524 U.S. 308, 316, 118 S.Ct. 2007, 141 L.Ed.2d 303 (1998). As we have described, Congress clearly intended to subject a claim of nationality that is not premised on registry to the same verification requirement as a claim of registry. Accordingly, the rule of lenity does not come into play.

See Moskal v. United States, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) ("[W]e have always reserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." (internal quotation marks omitted)).

28 Although we do not rely on waiver in rejecting appellants' belated argument that § 70502(d)(1)(C) does not apply to the facts of this case, we note that a request for supplemental briefing does not revive a claim that a party has failed to preserve. See United States v. Galíndez, 999 F.3d 60, 69 n.10 (1st Cir. 2021).

29 Although it may be more accurate to refer to the "Felonies Clause" as the "Felonies Sub-Clause," given that it is contained within the Define and Punish Clause, we use the "Felonies Clause" designation for simplicity.

30 Another subsection of the statute defines "covered vessel" to include "any other vessel if the individual [allegedly engaged in drug activity] is a citizen of the United States or a resident alien of the United States." 46 U.S.C. § 70503(e)(2). At issue in this case is U.S. jurisdiction over foreigners, and we therefore do not consider the MDLEA's application to U.S. nationals.

31 A vessel also may be treated as stateless under the MDLEA if it displays more than one country's flag "and us[es] them according to convenience." 1958 Convention on the High Seas, supra, art. 6 (incorporated into the MDLEA at 46 U.S.C. § 70502(c)(1)(B)).

32 The concurring judge in Aybar-Ulloa declined to join the majority's approach, finding "no clear support in either case law or commentary for the comparatively modest proposition that persons on stateless vessels that a foreign country's officials have seized and boarded pursuant to their recognized right to visit it are subject to that country's territorial jurisdiction under international law." 987 F.3d at 18 (emphasis added).

More particularly, the Aybar-Ulloa concurrence observed that international law experts have "long noted the disagreement that exists over" whether "the prevailing view of the law of nations is that the interdicting country acquires the same territorial jurisdiction over the vessel's occupants as it acquires over the vessel itself." Id. at 17. Given this lack of support for the majority's approach, and related concerns, see id. at 20-22, the concurring opinion instead rejected Aybar-Ulloa's challenge based on "the more than two-century-old precedent" addressing "the United States' power to prosecute defendants of a range of citizenships and circumstances" "for their felonious conduct on stateless vessels in international waters." Id. at 22, 26 (relying on United States v. Holmes, 18 U.S. (5 Wheat.) 412, 5 L.Ed. 122 (1820)).

33 In Matos-Luchi, the panel majority made the broad statement that "the MDLEA is consistent with international law." 627 F.3d at 6. Read in context, however, that statement refers only to the jurisdictional provision at issue there -- § 70502(d)(1)(B). The discussion that follows focuses on deeming a vessel stateless when there is an attempt "to avoid national identification," and concludes by asserting that "the instances specified by Congress -- pertinently, the refusal 'aboard' the vessel to claim nationality, 46 U.S.C. § 70502(d)(1)(B) -- are not departures from international law but merely part of a pattern consistent with it." Id. at 7 (emphasis added).

34 Although the same MDLEA provision was at issue in United States v. Bravo, the defendants argued only that their prosecution was flawed because the government failed to satisfy a nexus requirement -- i.e., "that

the marijuana transported in the vessel would affect the United States." 489 F.3d 1, 7 (1st Cir. 2007). We rejected the challenge, stating that "[w]e do not read the MDLEA to require a jurisdictional nexus." Id. Hence, we were not confronted with the argument asserted here -- that Congress acted beyond its constitutional authority in adopting § 70502(d)(1)(C). We note that the author of Bravo subsequently rejected the position taken in that case. See United States v. Trinidad, 839 F.3d 112, 116 (1st Cir. 2016) (Torruella, J., dissenting) ("I can no longer support the approach taken by this and our sister circuits in embracing the sweeping powers asserted by Congress and the Executive under the [MDLEA]."). Trinidad also involved § 70502(d)(1)(C), but the defendant there did not challenge the government's determination that his vessel was "without nationality" under that provision or argue that "his plea agreement must be vacated because Congress exceeded its constitutional authority under Article I in enacting the MDLEA." Id. at 113 n.1.

35     The MDLEA states that a person charged under the statute "does not have standing to raise a claim of failure to comply with international law as a basis for a defense." 46 U.S.C. § 70505. The provision further states that "only ... a foreign nation" may raise such a claim and that "[a] failure to comply with international law does not divest a court of jurisdiction and is not a defense to a proceeding under this chapter." Id. This bar does not apply here precisely because defendants are not arguing that international law itself constrains Congress's authority.

36     Of course, where possible, we construe statutes to be consistent with international law. See Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804); Garcia v. Sessions, 856 F.3d 27, 41 (1st Cir. 2017).

37     In Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), the Second Circuit held that plaintiffs could bring actions under the Alien Tort Statute ("ATS") "based on modern human-rights laws absent an express cause of action created by an additional statute." Jesner v. Arab Bank, PLC, —— U.S. ——, 138 S. Ct. 1386, 1398, 200 L.Ed.2d 612 (2018). The plaintiffs in Filartiga were the family members of a young man who had been tortured and murdered by Paraguayan police officers, one of whom was living in New York. The suit was filed in the United States District Court for the Eastern District of New York, and the appeals court found jurisdiction existed under the ATS.

38     The Virginia Plan was a set of fifteen "republican Principles" introduced by Randolph for discussion at the Constitutional Convention. 1 Records of the Federal Convention of 1787 27-28 (Max Farrand ed., 1911). It described in general terms the governmental structure that was later adopted in significant part by the Constitution: a bicameral legislature, a national executive (albeit one elected by the legislature), and a judiciary with, among other powers, the authority to "determine Piracies, Captures, [and] Disputes between Foreigners and Citizens." Id. Before introducing this plan, Randolph listed five ways in which the Articles of Confederation did not fulfill "the objects for which it was framed." Id. at 24. The first of these, as explained above, was its failure to ensure compliance with international law. Id. at 24-25.

39     At the time of the founding, the phrase "law of nations" was generally used to refer to customary international law (i.e., law established by universal practice rather than by agreement in a treaty). See United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1251 (11th Cir. 2012) (stating that "[w]e and our sister circuits agree that the eighteenth-century phrase, the 'law of nations,' in contemporary terms, means customary international law," and collecting cases). However, it was also used as a broader term for international law, including treaties. See Sarah H. Cleveland & William S. Dodge, Defining and Punishing Offenses under Treaties, 124 Yale L.J. 2202, 2206-07 (2015) (arguing that "Offences against the Law of Nations" includes treaty violations). In this case, where no treaty is at issue, we need not consider the precise meaning of the term "law of nations"

as used by the Framers, and we henceforth use the modern term "international law" to refer to the body of law that includes both customary international law and treaties.

40    A more expansive definition of the universal crime of piracy, updated to include the realm of aviation, is as follows:

> Piracy includes any illegal act of violence, detention or depredation committed for private ends by the crew or passengers of a private ship (or aircraft) against another ship (or aircraft) or persons or property on board it, on (or over) the high seas[.]

R.R. Churchill & A.V. Lowe, The Law of the Sea 209-10 (3d ed. 1999).

41    As stated in modern international law, the doctrine of universal jurisdiction provides that "a nation may prosecute certain serious offenses even though they have no nexus to its territory or its nationals, and no impact on its territory or its citizens." Cardales-Luna, 632 F.3d at 740 (Torruella, J., dissenting); see also Restatement (Third) of Foreign Relations Law of the United States § 404 (1987) (noting that "[a] state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern," even where there is no nexus between the offense and the state). Crimes may be universal jurisdiction offenses if they are "contrary to a peremptory norm of international law" and are "so serious and on such a scale that they can justly be regarded as an attack on the international legal order." Kontorovich, Beyond the Article I Horizon, supra, at 1224 n.228 (quoting Universal Jurisdiction: National Courts and the Prosecution of Serious Crimes under International Law 178-79 (Stephen Macedo ed., 2004)). At present, in addition to piracy, the crimes generally recognized as subject to universal jurisdiction are the "slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism." See Restatement (Third) of Foreign Relations Law of the United States § 404. Drug trafficking is not recognized as a universal jurisdiction crime. Aybar-Ulloa, 987 F.3d at 14.

42    As stated supra, we do not address here the MDLEA's application to U.S. citizens and resident aliens. However, the sources quoted above indicate that the Framers would have understood the Felonies Clause to permit U.S. authorities to exercise jurisdiction over U.S. nationals on foreign vessels in at least some circumstances. See Skiriotes v. Florida, 313 U.S. 69, 73, 61 S.Ct. 924, 85 L.Ed. 1193 (1941) (stating that "the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed"); United States v. Kaercher, 720 F.2d 5, 5 (1st Cir. 1983) (per curiam) (quoting the Restatement of Foreign Relations Law of the United States for the proposition that "[a] state has jurisdiction to prescribe a rule of law ... attaching legal consequences to conduct of a national of the state wherever the conduct occurs" (alteration and omission in original)).

43    Although the Senate has not ratified the UNCLOS, it was signed by the President and is generally recognized by the United States as reflecting customary international law, i.e., universal practice. See United States v. Alaska, 503 U.S. 569, 588 n.10, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992) (acknowledging the U.S. government's position that the UNCLOS provisions are part of customary international law); see also Aybar-Ulloa, 987 F.3d at 5 n.2 (citing the UNCLOS "as evidence of the customs and usages of international law"); United States v. Hasan, 747 F. Supp. 2d 599, 635 (E.D. Va. 2010) ("[T]he United States has consistently accepted UNCLOS as customary international law for more than 25 years."). Moreover, "many of the provisions of the [UNCLOS] follow closely provisions in the 1958 conventions to which the United States is a party and which largely restated customary law as of that time." Restatement (Third) of Foreign Relations Law of the United States, Part V, Introductory Note; see also Mayagüezanos por la Salud y el Ambiente v. United States, 198 F.3d 297, 304 n.14 (1st Cir. 1999) (referring to the "UNCLOS only to the extent that it incorporates customary international law," and noting that, as a signatory, "the United States 'is obliged to refrain from acts that would defeat the object and purpose of the agreement' " (quoting Restatement (Third) of Foreign Relations Law of the United States § 312(3))). The UNCLOS provisions defining a stateless vessel

discussed infra have long been part of the international law of the sea and are largely identical to those in the 1958 Convention on the High Seas, which has been ratified by the United States. See supra, arts. 5 & 6.

44    Although the nationality of a vessel is often referred to as its "flag," there is no requirement that a vessel fly a physical flag to maintain its nationality. See ▯ Matos-Luchi, 627 F.3d at 5. Rather, "[s]hips have the nationality of the State whose flag they are entitled to fly." UNCLOS art. 91, § 1 (emphasis added).

45    As noted above, the concurring opinion in ▯ Aybar-Ulloa also reports the historical support, in caselaw and commentary, for the contention that Congress lacks authority under the Define and Punish Clause to punish foreign nationals for conduct committed on foreign vessels, "even when those vessels are on the high seas."

      ▯ 987 F.3d at 15-16 & n.7 (Barron, J., concurring); see also ▯ id. at 22-26 (discussing the cases "decided just decades after the Constitution's ratification" that "dealt with the United States' power to prosecute defendants of a range of citizenships and circumstances who shared the attribute of having been indicted in our country pursuant to our criminal justice system for murder, robbery, or other wrongdoing on the high seas").

46    There are, of course, exceptions to the broad principle that Congress cannot extend U.S. criminal jurisdiction to crimes like common law robbery or murder committed by foreigners against foreigners on foreign vessels.

      For example, a country may prosecute such crimes with the consent of the foreign nation. See ▯ Matos-Luchi, 627 F.3d at 7; see also ▯ 46 U.S.C. § 70502(c)(1)(C). But these exceptions are not pertinent here.

47    We use the word "potentially" because we declined in ▯ Aybar-Ulloa to decide "whether the United States may prosecute a foreign citizen engaged in drug trafficking on a stateless vessel where the United States never boarded and seized the vessel." ▯ 987 F.3d at 14. We note, in addition, the observation in the ▯ Aybar-Ulloa concurrence that the Third and Fourth Restatements of Foreign Relations Law of the United States do not "establish that the prevailing view of the law of nations is that the interdicting country acquires the same territorial jurisdiction over the [stateless] vessel's occupants as it acquires over the vessel itself." ▯ Id. at 17 (Barron, J., concurring).

48    The 2017 version of the Commander's Handbook -- applicable to the U.S. Navy, Marine Corps, and Coast Guard -- also states that a vessel may be "treated as one without nationality" when, among other factors, it displays no "identifying characteristics," when -- consistent with ▯ § 70502(d)(1) -- the master makes no claim of nationality or registry, or when "[t]he claim of registry or the vessel's display of registry is either denied or not affirmatively and unequivocally confirmed by the State whose registry is claimed." Commander's Handbook ¶ 3.11.2.3 (2017), supra; see also id., References 4 (listing MDLEA, 46 U.S.C. §§ 70501-70507). Interestingly, the Handbook's previous version, in effect when appellants were detained, did not include the failure-to-verify scenario that mirrors § 70502(d)(1)(C) of the MDLEA. Rather, its list of characteristics of a stateless vessel all relied on inconsistencies in a vessel's presentation of nationality to observers or the absence of, or refusal to provide, identification. See Commander's Handbook ¶ 3.11.2.4 (2007), https://www.marines.mil/Portals/1/Publications/MCTP%2011-10B%20(%20Formerly%20MCWP% 205-12.1).pdf?ver=2017-07-11-151548-683 (providing "a partial list of factors that should be considered in determining whether a vessel is appropriately assimilated to stateless status: (1) No claim of nationality; (2) Multiple claims of nationality; (3) Contradictory claims or inconsistent indicators of nationality (e.g. master's claim differs from vessel's papers; homeport does not match nationality of flag); (4) Changing flags during a voyage; (5) Removable signboards showing different vessel names and/or homeport; (6) Absence of anyone admitting to be the master; displaying no name, flag, or other identifying characteristics; and (7) Refusal to claim nationality").

49    The "right of visit" under international law allows a "warship" (which would include a law enforcement ship like the Coast Guard vessel here) to stop and question a foreign ship if "there is reasonable ground for suspecting that the ship is engaged in piracy," slave trading, or illegal broadcasting, "is without nationality," or, although flying a foreign flag, is actually of the same nationality as the warship. UNCLOS art. 110, § 1. However, the right of visit does not provide an independent ground for exercising jurisdiction over a vessel, and certainly

does not allow a state to apply its domestic laws to those aboard that vessel. Rather, it is simply a mechanism for a state to investigate suspected wrongdoing and then take actions within its authority under international law. See, e.g., Penelope Mathew, Address - Legal Issues Concerning Interception, 17 Geo. Immigr. L.J. 221, 224-25 (2003) (discussing the limited nature of the right of visit and noting that "a State would have to rely on some positive basis of jurisdiction ... to exercise jurisdiction over persons on a stateless ship").

50   For convenience, we provide here the full text of ⚑ § 70502(d)(1):

In this chapter, the term "vessel without nationality" includes --

(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;

(B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

⚑ 46 U.S.C. § 70502(d)(1).

51   In ⚑ Matos-Luchi, when the Coast Guard approached a small vessel whose crew members were suspected of drug trafficking, the crew initially fled and, when subsequently apprehended, "declined to make a claim of nationality" for their vessel. ⚑ 627 F.3d at 2.

52   In addition to the traditional methods of claiming nationality discussed above -- flying the flag, presenting documents, and oral declaration -- authorities may in some instances look to the nationality of the vessel's owner. See, e.g., The Chiquita, 19 F.2d at 418 ("If [a vessel] is not properly registered, her nationality is still that of her owner."). However, whether the owner's nationality establishes that of the vessel will depend on the practice of the particular country. As discussed above, "a State is absolutely independent in framing the rules concerning the claim of vessels to its flag." Oppenheim (8th ed.), supra, at 595; see also id. (noting that Great Britain "allow[s] only such vessels to sail under [Great Britain's] flags as are the exclusive property of their citizens or corporations established on their territory," while "[o]ther [countries] allow vessels which are the property of foreigners" to do so); Churchill & Lowe, supra, at 213 n.19 (noting that a country may not register small ships but may "regard such ships as having its nationality if they are owned by its nationals").

53   The defendants in ⚑ Hernandez contended that jurisdiction under the MDLEA was improper because their vessel was in fact registered and because the Coast Guard had identifying information about their vessel "that would easily have confirmed its registry," but "failed in bad faith to convey that information" to the ⚑ Guatemalan government. 864 F.3d at 1299. In rejecting those contentions, the court observed that "[t]he MDLEA does not state what information the United States must convey to the foreign government during its communication, and it does not state that actual registry overrides the [Department of State] certification's proof of statutory statelessness." ⚑ Id. "MDLEA statelessness," the court explained, "does not turn on actual statelessness, but rather on the response of the foreign government." ⚑ Id. The court further observed that, given the MDLEA's "clear terms" deeming their vessel stateless, "any diplomatic consequences of the criminal prosecution" -- including any violation of international law -- were the responsibility of the executive branch and not a basis for undoing the convictions. ⚑ 864 F.3d at 1297.

One defendant in ⚑ Hernandez also argued "that the MDLEA is an unconstitutional assertion of Congressional power because it reaches stateless vessels on the high seas without a proven nexus to the United States" -- an argument rejected there as foreclosed by ⚑ Eleventh Circuit precedent. 864 F.3d at 1303. The ⚑ Hernandez defendants did not make the argument asserted here that ⚑ § 70502(d)(1)(C) is unconstitutional because Congress acted beyond its authority under the Felonies Clause in defining a vessel

without nationality to include a vessel whose master makes a verbal claim of nationality that is not affirmatively and unequivocally confirmed by the identified country.

54    Importantly, 🏴 § 70502(d)(1)(C) on its face applies not only to verbal claims of nationality, but to any claim of registration or nationality, even one based on documentation. By its terms, therefore, it allows the United States to reject a claim of registration or nationality that is supported by documentary evidence based solely on an equivocal response, or no response at all, from the identified country.

55    As we recognized in 🏴 Aybar-Ulloa, it is important that some country exercise jurisdiction over a vessel. See 🏴 987 F.3d at 5. A flag state

has several responsibilities [under international law], including the responsibility to ensure that its ships comply with domestic and international law and regulations. ... Most notably, a state must exercise "jurisdiction and control [over its fleet] in administrative, technical, and social matters." Control includes ensuring that ships are seaworthy and comply with relevant labor regulations and criminal laws.

Allyson Bennett, Note, That Sinking Feeling: Stateless Ships, Universal Jurisdiction, and the Drug Trafficking Vessel Interdiction Act, 37 Yale J. Int'l L. 433, 439 (2012) (second alteration in original) (footnotes omitted) (citing various provisions of the UNCLOS); see also Purchase of Ships of Belligerents by Neutrals, 6 Op. U.S. Att'y Gen. 638, 640 (1854) ("The law of nations and common sense combine to require that every ship shall have a nationality[.]").

56    We note that 24 meters (roughly 79 feet) is a cutoff point for the applicability of several major international conventions. See, e.g., International Convention on Tonnage Measurement of Ships art. 4, June 23, 1969, 1291 U.N.T.S. 4 (exempting "ships of less than 24 metres (79 feet) in length"); International Convention on Load Lines art. 5, Apr. 5, 1966, 9159 U.N.T.S. 134 (same); see also Gudrun Petursdottir, Olafur Hannibalsson & Jeremy M.M. Turner, Part II: International Conventions and Guidelines on Safety at Sea, in Safety at Sea as an Integral Part of Fisheries Management, Food & Agric. Org. of the United Nations (2001), available at https://www.fao.org/3/X9656E/X9656E01.htm (stating that recommendations and conventions developed by the International Maritime Organization and International Labor Organization "are aimed at large vessels, primarily the merchant fleet on international voyages" and observing that "[s]ome conventions explicitly exempt fishing vessels, and most do not apply to vessels under 24m thus leaving out the majority of fishing vessels and transport boats in the developing countries"). According to the government, appellants' boat was 35 feet in length. See supra note 4.

57    That may be what occurred in this case. The Department of State's Certification, which describes the measures taken to verify the master's claim of nationality, indicates that, on the day the Coast Guard encountered the vessel -- October 29, 2015 -- U.S. officials "requested that the Government of the Republic of Costa Rica confirm the registry or nationality of the suspect vessel, and, if confirmed, provide disposition instructions." Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016) (emphasis added). The Certification reports that, nearly three months later, "the Government of Costa Rica replied that it could not confirm [the] vessel's registry." Id. (emphasis added). Separately, although not presented as an issue on appeal, the time lag between the defendants' initial detention and Costa Rica's response to the verification request strikes us as problematic, given that the status of a vessel determines whether U.S. law enforcement officials may proceed with prosecuting the crew members under the MDLEA.

58    The government posits such a scenario, asserting that it would be absurd to require countries to accept unconfirmed verbal claims of nationality because "[d]rug traffickers ... could falsely claim their vessels are the nationals of a small Micronesian island or, more perplexingly, a country like North Korea with limited diplomatic contacts." Appellee's Supp. Br. at 15. We do not disagree. Our analysis permits further inquiry when a vessel's master claims a nationality that is at odds with surrounding circumstances, including the vessel's location or the nationality of the master and crew.

59    These two circumstances are reflected in the MDLEA's provisions addressing vessels without nationality. As we have described, 🏴 § 70502(d)(1)(B) covers the avoidance scenario, defining a "vessel without nationality" to include one for which the master fails "to make a claim of nationality or registry" upon inquiry. The scenario

United States v. Dávila-Reyes, 23 F.4th 153 (2022)

of multiple identities is covered in ▧ § 70502(c)(1)(B), which states that a "vessel subject to the jurisdiction of the United States" includes "a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas." Paragraph (2) of the Convention states: "A ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a ship without nationality." 1958 Convention on the High Seas, supra, art. 6.

60      As described above, the government in its supplemental briefing suggests that the circumstances here involved mixed signals because, according to a Coast Guard officer's statement, Reyes-Valdivia initially stated that the vessel lacked a nationality. Although the government noted the reported disclaimer of nationality in its Motion in Limine in support of jurisdiction, it chose for whatever reason not to include that fact in the version of the facts presented at appellants' change-of-plea hearing or in appellants' plea agreements. See supra. Accordingly, as indicated in our discussion of the government's Class argument, see Section III supra, it may not rely now on that untested fact. Moreover, any attempt to raise a new theory of prosecution at this juncture would raise serious due process questions.

61      Although the government in its briefing at times depicts appellants' claim that ▧ § 70502(d)(1)(C) is unconstitutional as an as-applied challenge, that characterization is inapt. The classification of a vessel as stateless based solely on the named country's indecisive response to inquiry, or its failure to respond, is a "constitutional flaw evident in the statutory terms themselves." Marc E. Isserles, Overcoming Overbreadth:

         Facial Challenges and the Valid Rule Requirement, 48 Am. U.L. Rev. 359, 365 (1998); cf. ▧ Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449-50, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases."). The mere fact that a cognizable legal challenge by necessity concerns the application of a statute to individuals does not transform a facial challenge into an as-applied challenge. See generally Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321 (2000).

62      We recognize that the three examples of vessels without nationality listed in ▧ § 70502(d)(1) are not exclusive, and the government might argue in future cases -- as the government belatedly argued in this case -- that a vessel may be properly deemed without nationality under the MDLEA based solely on mixed signals, without the need to make any inquiry of the sort required by ▧ § 70502(d)(1)(C). We need not, and therefore do not, consider the viability of such an argument, including whether reliance on a rationale for deeming a vessel without nationality that is not expressly described in the MDLEA would raise due process concerns.

63      As previously noted, the United States relied on such an agreement to board appellants' vessel. The State Department's Certification reports that "United States law enforcement personnel boarded the vessel" "pursuant to Article V of the Agreement between the Government of the Republic of the United States of America and the Government of the Republic of Costa Rica Concerning Cooperation to Suppress Illicit Traffic." Reyes-Valdivia, ECF No. 46-2, at 1 (Mar. 25, 2016).

64      Because we vacate appellants' convictions based on their Felonies Clause argument, we do not reach their due process challenges to the MDLEA or Reyes-Valdivia's appeal from the district court's application of the "captain" sentencing enhancement.

65      Although this ground for reversal of the convictions was not initially raised in the appeals, the panel was concerned enough about the mismatch that we requested that the parties brief the issue, and they complied. That issue was addressed by the parties through supplemental briefing may not by itself be reason enough for us to bypass appellate waiver -- including not only the failure to raise the issue on appeal but also, in the case of Dávila-Reyes, the affirmative waiver of appeal contained in the plea agreement. But the majority's constitutional analysis depends in part on an equivalency between "nationality" and "registry" that it finds in ▧ § 70502(d)(1)(C). My disagreement about whether that equivalency exists is consequential, such that it should not be relegated to a dicta detour along the way to finding waiver. At this stage of the proceedings, the

United States v. Dávila-Reyes, 23 F.4th 153 (2022)

gap in the statelessness determination under ⚑ § 70502(d)(1)(C) is stark enough for me to join the majority, albeit in result only.

---

**End of Document**                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

competent international organization with a view to their adoption.  The organization may adopt only such sea lanes and traffic separation schemes as may be agreed with the archipelagic State, after which the archipelagic State may designate, prescribe or substitute them.

10.  The archipelagic State shall clearly indicate the axis of the sea lanes and the traffic separation schemes designated or prescribed by it on charts to which due publicity shall be given.

11.  Ships in archipelagic sea lanes passage shall respect applicable sea lanes and traffic separation schemes established in accordance with this article.

12.  If an archipelagic State does not designate sea lanes or air routes, the right of archipelagic sea lanes passage may be exercised through the routes normally used for international navigation.

*Article 54*
*Duties of ships and aircraft during their passage,*
*research and survey activities, duties of the archipelagic State*
*and laws and regulations of the archipelagic State*
*relating to archipelagic sea lanes passage*

Articles 39, 40, 42 and 44 apply *mutatis mutandis* to archipelagic sea lanes passage.

# PART V

## EXCLUSIVE ECONOMIC ZONE

*Article 55*
*Specific legal regime of the exclusive economic zone*

The exclusive economic zone is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention.

*Article 56*
*Rights, jurisdiction and duties of the coastal State in the exclusive*
*economic zone*

1.  In the exclusive economic zone, the coastal State has:
   (a)  sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or non-living, of the waters superjacent to the seabed and of the seabed and its subsoil, and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds;
   (b)  jurisdiction as provided for in the relevant provisions of this Convention with regard to:
      (i)  the establishment and use of artificial islands, installations and structures;

      (ii)  marine scientific research;
      (iii)  the protection and preservation of the marine environment;
   (c)  other rights and duties provided for in this Convention.

2. In exercising its rights and performing its duties under this Convention in the exclusive economic zone, the coastal State shall have due regard to the rights and duties of other States and shall act in a manner compatible with the provisions of this Convention.

3. The rights set out in this article with respect to the seabed and subsoil shall be exercised in accordance with Part VI.

*Article 57*
*Breadth of the exclusive economic zone*

The exclusive economic zone shall not extend beyond 200 nautical miles from the baselines from which the breadth of the territorial sea is measured.

*Article 58*
*Rights and duties of other States in the exclusive economic zone*

1. In the exclusive economic zone, all States, whether coastal or land-locked, enjoy, subject to the relevant provisions of this Convention, the freedoms referred to in article 87 of navigation and overflight and of the laying of submarine cables and pipelines, and other internationally lawful uses of the sea related to these freedoms, such as those associated with the operation of ships, aircraft and submarine cables and pipelines, and compatible with the other provisions of this Convention.

2. Articles 88 to 115 and other pertinent rules of international law apply to the exclusive economic zone in so far as they are not incompatible with this Part.

3. In exercising their rights and performing their duties under this Convention in the exclusive economic zone, States shall have due regard to the rights and duties of the coastal State and shall comply with the laws and regulations adopted by the coastal State in accordance with the provisions of this Convention and other rules of international law in so far as they are not incompatible with this Part.

*Article 59*
*Basis for the resolution of conflicts*
*regarding the attribution of rights and jurisdiction*
*in the exclusive economic zone*

In cases where this Convention does not attribute rights or jurisdiction to the coastal State or to other States within the exclusive economic zone, and a conflict arises between the interests of the coastal State and any other State or States, the conflict should be resolved on the basis of equity and in the light of all the relevant circumstances, taking into account the respective importance of the interests involved to the parties as well as to the international community as a whole.

*Article 60*
*Artificial islands, installations and structures*
*in the exclusive economic zone*

1.   In the exclusive economic zone, the coastal State shall have the exclusive right to construct and to authorize and regulate the construction, operation and use of:

(a)  artificial islands;

(b)  installations and structures for the purposes provided for in article 56 and other economic purposes;

(c)  installations and structures which may interfere with the exercise of the rights of the coastal State in the zone.

2.   The coastal State shall have exclusive jurisdiction over such artificial islands, installations and structures, including jurisdiction with regard to customs, fiscal, health, safety and immigration laws and regulations.

3.   Due notice must be given of the construction of such artificial islands, installations or structures, and permanent means for giving warning of their presence must be maintained.  Any installations or structures which are abandoned or disused shall be removed to ensure safety of navigation, taking into account any generally accepted international standards established in this regard by the competent international organization.  Such removal shall also have due regard to fishing, the protection of the marine environment and the rights and duties of other States.  Appropriate publicity shall be given to the depth, position and dimensions of any installations or structures not entirely removed.

4.   The coastal State may, where necessary, establish reasonable safety zones around such artificial islands, installations and structures in which it may take appropriate measures to ensure the safety both of navigation and of the artificial islands, installations and structures.

5.   The breadth of the safety zones shall be determined by the coastal State, taking into account applicable international standards.  Such zones shall be designed to ensure that they are reasonably related to the nature and function of the artificial islands, installations or structures, and shall not exceed a distance of 500 metres around them, measured from each point of their outer edge, except as authorized by generally accepted international standards or as recommended by the competent international organization. Due notice shall be given of the extent of safety zones.

6.   All ships must respect these safety zones and shall comply with generally accepted international standards regarding navigation in the vicinity of artificial islands, installations, structures and safety zones.

7.   Artificial islands, installations and structures and the safety zones around them may not be established where interference may be caused to the use of recognized sea lanes essential to international navigation.

8.   Artificial islands, installations and structures do not possess the status of islands.  They have no territorial sea of their own, and their presence does not affect the delimitation of the territorial sea, the exclusive economic zone or the continental shelf.

*Article 61*
*Conservation of the living resources*

1.   The coastal State shall determine the allowable catch of the living resources in its exclusive economic zone.

46

2.   The coastal State, taking into account the best scientific evidence available to it, shall ensure through proper conservation and management measures that the maintenance of the living resources in the exclusive economic zone is not endangered by over-exploitation.  As appropriate, the coastal State and competent international organizations, whether subregional, regional or global, shall cooperate to this end.

3.   Such measures shall also be designed to maintain or restore populations of harvested species at levels which can produce the maximum sustainable yield, as qualified by relevant environmental and economic factors, including the economic needs of coastal fishing communities and the special requirements of developing States, and taking into account fishing patterns, the interdependence of stocks and any generally recommended international minimum standards, whether subregional, regional or global.

4.   In taking such measures the coastal State shall take into consideration the effects on species associated with or dependent upon harvested species with a view to maintaining or restoring populations of such associated or dependent species above levels at which their reproduction may become seriously threatened.

5.   Available scientific information, catch and fishing effort statistics, and other data relevant to the conservation of fish stocks shall be contributed and exchanged on a regular basis through competent international organizations, whether subregional, regional or global, where appropriate and with participation by all States concerned, including States whose nationals are allowed to fish in the exclusive economic zone.

*Article 62*
*Utilization of the living resources*

1.   The coastal State shall promote the objective of optimum utilization of the living resources in the exclusive economic zone without prejudice to article 61.

2.   The coastal State shall determine its capacity to harvest the living resources of the exclusive economic zone.  Where the coastal State does not have the capacity to harvest the entire allowable catch, it shall, through agreements or other arrangements and pursuant to the terms, conditions, laws and regulations referred to in paragraph 4, give other States access to the surplus of the allowable catch, having particular regard to the provisions of articles 69 and 70, especially in relation to the developing States mentioned therein.

3.   In giving access to other States to its exclusive economic zone under this article, the coastal State shall take into account all relevant factors, including, *inter alia*, the significance of the living resources of the area to the economy of the coastal State concerned and its other national interests, the provisions of articles 69 and 70, the requirements of developing States in the subregion or region in harvesting part of the surplus and the need to minimize economic dislocation in States whose nationals have habitually fished in the zone or which have made substantial efforts in research and identification of stocks.

4.   Nationals of other States fishing in the exclusive economic zone shall comply with the conservation measures and with the other terms and conditions established in the laws and regulations of the coastal State.  These laws and regulations shall be consistent with this Convention and may relate, *inter alia*, to the following:

(a) licensing of fishermen, fishing vessels and equipment, including payment of fees and other forms of remuneration, which, in the case of developing coastal States, may consist of adequate compensation in the field of financing, equipment and technology relating to the fishing industry;

(b) determining the species which may be caught, and fixing quotas of catch, whether in relation to particular stocks or groups of stocks or catch per vessel over a period of time or to the catch by nationals of any State during a specified period;

(c) regulating seasons and areas of fishing, the types, sizes and amount of gear, and the types, sizes and number of fishing vessels that may be used;

(d) fixing the age and size of fish and other species that may be caught;

(e) specifying information required of fishing vessels, including catch and effort statistics and vessel position reports;

(f) requiring, under the authorization and control of the coastal State, the conduct of specified fisheries research programmes and regulating the conduct of such research, including the sampling of catches, disposition of samples and reporting of associated scientific data;

(g) the placing of observers or trainees on board such vessels by the coastal State;

(h) the landing of all or any part of the catch by such vessels in the ports of the coastal State;

(i) terms and conditions relating to joint ventures or other cooperative arrangements;

(j) requirements for the training of personnel and the transfer of fisheries technology, including enhancement of the coastal State's capability of undertaking fisheries research;

(k) enforcement procedures.

5.   Coastal States shall give due notice of conservation and management laws and regulations.

### Article 63
### Stocks occurring within the exclusive economic zones of two or more coastal States or both within the exclusive economic zone and in an area beyond and adjacent to it

1.   Where the same stock or stocks of associated species occur within the exclusive economic zones of two or more coastal States, these States shall seek, either directly or through appropriate subregional or regional organizations, to agree upon the measures necessary to coordinate and ensure the conservation and development of such stocks without prejudice to the other provisions of this Part.

2.   Where the same stock or stocks of associated species occur both within the exclusive economic zone and in an area beyond and adjacent to the zone, the coastal State and the States fishing for such stocks in the adjacent area shall seek, either directly or through appropriate subregional or regional organizations, to agree upon the measures necessary for the conservation of these stocks in the adjacent area.

### Article 64

**48**

*Highly migratory species*

1.   The coastal State and other States whose nationals fish in the region for the highly migratory species listed in Annex I shall cooperate directly or through appropriate international organizations with a view to ensuring conservation and promoting the objective of optimum utilization of such species throughout the region, both within and beyond the exclusive economic zone.   In regions for which no appropriate international organization exists, the coastal State and other States whose nationals harvest these species in the region shall cooperate to establish such an organization and participate in its work.

2.   The provisions of paragraph 1 apply in addition to the other provisions of this Part.

*Article 65*
*Marine mammals*

Nothing in this Part restricts the right of a coastal State or the competence of an international organization, as appropriate, to prohibit, limit or regulate the exploitation of marine mammals more strictly than provided for in this Part.   States shall cooperate with a view to the conservation of marine mammals and in the case of cetaceans shall in particular work through the appropriate international organizations for their conservation, management and study.

*Article 66*
*Anadromous stocks*

1.   States in whose rivers anadromous stocks originate shall have the primary interest in and responsibility for such stocks.

2.   The State of origin of anadromous stocks shall ensure their conservation by the establishment of appropriate regulatory measures for fishing in all waters landward of the outer limits of its exclusive economic zone and for fishing provided for in paragraph 3(b).  The State of origin may, after consultations with the other States referred to in paragraphs 3 and 4 fishing these stocks, establish total allowable catches for stocks originating in its rivers.

3.   (a)  Fisheries for anadromous stocks shall be conducted only in waters landward of the outer limits of exclusive economic zones, except in cases where this provision would result in economic dislocation for a State other than the State of origin. With respect to such fishing beyond the outer limits of the exclusive economic zone, States concerned shall maintain consultations with a view to achieving agreement on terms and conditions of such fishing giving due regard to the conservation requirements and the needs of the State of origin in respect of these stocks.

(b)  The State of origin shall cooperate in minimizing economic dislocation in such other States fishing these stocks, taking into account the normal catch and the mode of operations of such States, and all the areas in which such fishing has occurred.

(c)  States referred to in subparagraph (b), participating by agreement with the State of origin in measures to renew

anadromous stocks, particularly by expenditures for that purpose, shall be given special consideration by the State of origin in the harvesting of stocks originating in its rivers.

(d) Enforcement of regulations regarding anadromous stocks beyond the exclusive economic zone shall be by agreement between the State of origin and the other States concerned.

4.   In cases where anadromous stocks migrate into or through the waters landward of the outer limits of the exclusive economic zone of a State other than the State of origin, such State shall cooperate with the State of origin with regard to the conservation and management of such stocks.

5.   The State of origin of anadromous stocks and other States fishing these stocks shall make arrangements for the implementation of the provisions of this article, where appropriate, through regional organizations.

*Article 67*
*Catadromous species*

1.   A coastal State in whose waters catadromous species spend the greater part of their life cycle shall have responsibility for the management of these species and shall ensure the ingress and egress of migrating fish.

2.   Harvesting of catadromous species shall be conducted only in waters landward of the outer limits of exclusive economic zones.  When conducted in exclusive economic zones, harvesting shall be subject to this article and the other provisions of this Convention concerning fishing in these zones.

3.   In cases where catadromous fish migrate through the exclusive economic zone of another State, whether as juvenile or maturing fish, the management, including harvesting, of such fish shall be regulated by agreement between the State mentioned in paragraph 1 and the other State concerned.  Such agreement shall ensure the rational management of the species and take into account the responsibilities of the State mentioned in paragraph 1 for the maintenance of these species.

*Article 68*
*Sedentary species*

This Part does not apply to sedentary species as defined in article 77, paragraph 4.

*Article 69*
*Right of land-locked States*

1.   Land-locked States shall have the right to participate, on an equitable basis, in the exploitation of an appropriate part of the surplus of the living resources of the exclusive economic zones of coastal States of the same subregion or region, taking into account the relevant economic and geographical circumstances of all the States concerned and in conformity with the provisions of this article and of articles 61 and 62.

2.   The terms and modalities of such participation shall be established by the States concerned through bilateral, subregional or regional agreements taking into account, *inter alia*:

(a) the need to avoid effects detrimental to fishing communities or fishing industries of the coastal State;

50

      (b)  the extent to which the land-locked State, in accordance with the provisions of this article, is participating or is entitled to participate under existing bilateral, subregional or regional agreements in the exploitation of living resources of the exclusive economic zones of other coastal States;

      (c)  the extent to which other land-locked States and geographically disadvantaged States are participating in the exploitation of the living resources of the exclusive economic zone of the coastal State and the consequent need to avoid a particular burden for any single coastal State or a part of it;

      (d)  the nutritional needs of the populations of the respective States.

    3.    When the harvesting capacity of a coastal State approaches a point which would enable it to harvest the entire allowable catch of the living resources in its exclusive economic zone, the coastal State and other States concerned shall cooperate in the establishment of equitable arrangements on a bilateral, subregional or regional basis to allow for participation of developing land-locked States of the same subregion or region in the exploitation of the living resources of the exclusive economic zones of coastal States of the subregion or region, as may be appropriate in the circumstances and on terms satisfactory to all parties.   In the implementation of this provision the factors mentioned in paragraph 2 shall also be taken into account.

    4.    Developed land-locked States shall, under the provisions of this article, be entitled to participate in the exploitation of living resources only in the exclusive economic zones of developed coastal States of the same subregion or region having regard to the extent to which the coastal State, in giving access to other States to the living resources of its exclusive economic zone, has taken into account the need to minimize detrimental effects on fishing communities and economic dislocation in States whose nationals have habitually fished in the zone.

    5.    The above provisions are without prejudice to arrangements agreed upon in subregions or regions where the coastal States may grant to land-locked States of the same subregion or region equal or preferential rights for the exploitation of the living resources in the exclusive economic zones.

### Article 70
#### *Right of geographically disadvantaged States*

    1.    Geographically disadvantaged States shall have the right to participate, on an equitable basis, in the exploitation of an appropriate part of the surplus of the living resources of the exclusive economic zones of coastal States of the same subregion or region, taking into account the relevant economic and geographical circumstances of all the States concerned and in conformity with the provisions of this article and of articles 61 and 62.

    2.    For the purposes of this Part, "geographically disadvantaged States" means coastal States, including States bordering enclosed or semi-enclosed seas, whose geographical situation makes them dependent upon the exploitation of the living resources of the exclusive economic zones of other States in the subregion or region for adequate supplies of fish for the nutritional purposes of their populations or parts thereof, and coastal States which can claim no exclusive economic zones of their own.

3.    The terms and modalities of such participation shall be established by the States concerned through bilateral, subregional or regional agreements taking into account, *inter alia*:

(a)    the need to avoid effects detrimental to fishing communities or fishing industries of the coastal State;

(b)    the extent to which the geographically disadvantaged State, in accordance with the provisions of this article, is participating or is entitled to participate under existing bilateral, subregional or regional agreements in the exploitation of living resources of the exclusive economic zones of other coastal States;

(c)    the extent to which other geographically disadvantaged States and land-locked States are participating in the exploitation of the living resources of the exclusive economic zone of the coastal State and the consequent need to avoid a particular burden for any single coastal State or a part of it;

(d)    the nutritional needs of the populations of the respective States.

4.    When the harvesting capacity of a coastal State approaches a point which would enable it to harvest the entire allowable catch of the living resources in its exclusive economic zone, the coastal State and other States concerned shall cooperate in the establishment of equitable arrangements on a bilateral, subregional or regional basis to allow for participation of developing geographically disadvantaged States of the same subregion or region in the exploitation of the living resources of the exclusive economic zones of coastal States of the subregion or region, as may be appropriate in the circumstances and on terms satisfactory to all parties.    In the implementation of this provision the factors mentioned in paragraph 3 shall also be taken into account.

5.    Developed geographically disadvantaged States shall, under the provisions of this article, be entitled to participate in the exploitation of living resources only in the exclusive economic zones of developed coastal States of the same subregion or region having regard to the extent to which the coastal State, in giving access to other States to the living resources of its exclusive economic zone, has taken into account the need to minimize detrimental effects on fishing communities and economic dislocation in States whose nationals have habitually fished in the zone.

6.    The above provisions are without prejudice to arrangements agreed upon in subregions or regions where the coastal States may grant to geographically disadvantaged States of the same subregion or region equal or preferential rights for the exploitation of the living resources in the exclusive economic zones.

### Article 71
### Non-applicability of articles 69 and 70

The provisions of articles 69 and 70 do not apply in the case of a coastal State whose economy is overwhelmingly dependent on the exploitation of the living resources of its exclusive economic zone.

### Article 72
### Restrictions on transfer of rights

1.    Rights provided under articles 69 and 70 to exploit living resources shall not be directly or indirectly transferred to third States or their nationals

**52**

by lease or licence, by establishing joint ventures or in any other manner which has the effect of such transfer unless otherwise agreed by the States concerned.

2.   The foregoing provision does not preclude the States concerned from obtaining technical or financial assistance from third States or international organizations in order to facilitate the exercise of the rights pursuant to articles 69 and 70, provided that it does not have the effect referred to in paragraph 1.

### Article 73
*Enforcement of laws and regulations of the coastal State*

1.   The coastal State may, in the exercise of its sovereign rights to explore, exploit, conserve and manage the living resources in the exclusive economic zone, take such measures, including boarding, inspection, arrest and judicial proceedings, as may be necessary to ensure compliance with the laws and regulations adopted by it in conformity with this Convention.

2.   Arrested vessels and their crews shall be promptly released upon the posting of reasonable bond or other security.

3.   Coastal State penalties for violations of fisheries laws and regulations in the exclusive economic zone may not include imprisonment, in the absence of agreements to the contrary by the States concerned, or any other form of corporal punishment.

4.   In cases of arrest or detention of foreign vessels the coastal State shall promptly notify the flag State, through appropriate channels, of the action taken and of any penalties subsequently imposed.

### Article 74
*Delimitation of the exclusive economic zone*
*between States with opposite or adjacent coasts*

1.   The delimitation of the exclusive economic zone between States with opposite or adjacent coasts shall be effected by agreement on the basis of international law, as referred to in Article 38 of the Statute of the International Court of Justice, in order to achieve an equitable solution.

2.   If no agreement can be reached within a reasonable period of time, the States concerned shall resort to the procedures provided for in Part XV.

3.   Pending agreement as provided for in paragraph 1, the States concerned, in a spirit of understanding and cooperation, shall make every effort to enter into provisional arrangements of a practical nature and, during this transitional period, not to jeopardize or hamper the reaching of the final agreement.    Such arrangements shall be without prejudice to the final delimitation.

4.   Where there is an agreement in force between the States concerned, questions relating to the delimitation of the exclusive economic zone shall be determined in accordance with the provisions of that agreement.

### Article 75
*Charts and lists of geographical coordinates*

1.   Subject to this Part, the outer limit lines of the exclusive economic zone and the lines of delimitation drawn in accordance with article 74 shall be shown on charts of a scale or scales adequate for ascertaining their

position.  Where appropriate, lists of geographical coordinates of points, specifying the geodetic datum, may be substituted for such outer limit lines or lines of delimitation.

2.   The coastal State shall give due publicity to such charts or lists of geographical coordinates and shall deposit a copy of each such chart or list with the Secretary-General of the United Nations.

# PART VI

## CONTINENTAL SHELF

### Article 76
*Definition of the continental shelf*

1.   The continental shelf of a coastal State comprises the seabed and subsoil of the submarine areas that extend beyond its territorial sea throughout the natural prolongation of its land territory to the outer edge of the continental margin, or to a distance of 200 nautical miles from the baselines from which the breadth of the territorial sea is measured where the outer edge of the continental margin does not extend up to that distance.

2.   The continental shelf of a coastal State shall not extend beyond the limits provided for in paragraphs 4 to 6.

3.   The continental margin comprises the submerged prolongation of the land mass of the coastal State, and consists of the seabed and subsoil of the shelf, the slope and the rise.  It does not include the deep ocean floor with its oceanic ridges or the subsoil thereof.

4.   (a)  For the purposes of this Convention, the coastal State shall establish the outer edge of the continental margin wherever the margin extends beyond 200 nautical miles from the baselines from which the breadth of the territorial sea is measured, by either:

   (i)   a line delineated in accordance with paragraph 7 by reference to the outermost fixed points at each of which the thickness of sedimentary rocks is at least 1 per cent of the shortest distance from such point to the foot of the continental slope; or

   (ii)  a line delineated in accordance with paragraph 7 by reference to fixed points not more than 60 nautical miles from the foot of the continental slope.

   (b)  In the absence of evidence to the contrary, the foot of the continental slope shall be determined as the point of maximum change in the gradient at its base.

5.   The fixed points comprising the line of the outer limits of the continental shelf on the seabed, drawn in accordance with paragraph 4 (a)(i) and (ii), either shall not exceed 350 nautical miles from the baselines from which the breadth of the territorial sea is measured or shall not exceed 100 nautical miles from the 2,500 metre isobath, which is a line connecting the depth of 2,500 metres.

6.   Notwithstanding the provisions of paragraph 5, on submarine ridges, the outer limit of the continental shelf shall not exceed 350 nautical miles from the baselines from which the breadth of the territorial sea is measured. This paragraph does not apply to submarine elevations that are natural

# EXHIBIT 3

**The New York Times Magazine**   https://www.nytimes.com/2017/11/20/magazine/the-coast-guards-floating-guantanamos.html

FEATURE

# The Coast Guard's 'Floating Guantánamos'

In an expansion of the war on drugs, the U.S. Coast Guard is targeting low-level smugglers in international waters — shackling them on ships for weeks or even months before arraignment in American courts.

By Seth Freed Wessler
Nov. 20, 2017

On nights when the November rain poured down and he had not slept at all, Jhonny Arcentales had visions of dying, of his body being cast into the dark ocean. He would imagine his wife and their teenage son tossing his clothes into a pit in a cemetery and gathering at the local church for his funeral. It had been more than two months since Arcentales, a 40-year-old fisherman from Ecuador's central coast, left home, telling his wife he would return in five days. A cuff clamped onto his ankle kept him shackled to a cable along the deck of the ship but for the occasional trip, guarded by a sailor, to defecate into a bucket. Most of the time, he couldn't move more than an arm's length in either direction without jostling the next shackled man. "The sea used to be freedom," he told me. But on the ship, "it was the opposite. Like a prison in the open ocean."

By day Arcentales would stand against the wall and stare out at the water, his mind blank one moment, the next racing with thoughts of his wife and their newborn son. He had not spoken to his family, though he asked each day to call home. He increasingly felt panicked, fearing his wife would believe he was dead.

Arcentales has wide muscular shoulders from his 25 years hauling fishing nets from the sea. But his meals now consisted of a handful of rice and beans, and he could feel his body shrinking from the undernourishment and immobility. "The moment we would stand up, we would get nauseated, our heads would spin," he recalled. The 20-some prisoners aboard the vessel — Ecuadorians, Guatemalans and Colombians — would often stand through the night, their backs aching, their bodies frigid from the wind and rain, waiting for the morning sun to rise and dry them.

In the first weeks, Arcentales had turned to his friend Carlos Quijije, another fisherman from the small town of Jaramijó, to calm him. They were chained side by side, and the 26-year-old would offer some perspective. "Relax brother, everything is going to work out," Arcentales remembered Quijije saying. "They'll take us to Ecuador, and we will see our families." But after two months of being shackled aboard the ship, Quijije seemed just as despondent. They often thought they would simply disappear.

By this time it was November 2014, and in the brick box of a house where Arcentales lived in Ecuador, Lorena Mendoza, Arcentales's wife, and their children were praying together for his return. In Jaramijó, it is not unheard-of for fishermen to vanish, stranded by a broken motor, shot by a pirate or shipwrecked in a storm. "I was always worried that we would never see him again," she told me. "But he always came home." This time Mendoza was certain she would receive a call to collect Arcentales's waterlogged body from the docks.

Mendoza had no way of knowing that her husband was still alive. He had departed Jaramijó because his family needed money so desperately that he accepted a job smuggling cocaine off the coast of Ecuador. But deep in the Pacific, Arcentales and the other fishermen he traveled with were stopped not by pirates or vigilantes but by the United States Coast Guard, deployed more than 2,000 miles from U.S. shores to trawl for Andean cocaine. Over the past six years, more than 2,700 men like Arcentales have been taken from boats suspected of smuggling Colombian cocaine to Central America, to be carried around the ocean for weeks or months as the American ships continue their patrols. These fishermen-turned-smugglers are caught in international waters, or in foreign seas, and often have little or no understanding of where the drugs aboard their boats are ultimately bound. Yet nearly all of these boatmen are now carted from the Pacific and delivered to the United States to face criminal charges here, in what amounts to a vast extraterritorial exertion of American legal might.

**The U.S. Coast Guard never intended** to operate a fleet of "floating Guantánamos," as a former Coast Guard lawyer put it to me in May. The Coast Guard has a humanitarian public image, celebrated in local newspapers for rescuing pleasure boaters off Montauk or hurricane survivors in Florida. But as a lone branch of the military that serves as a law-enforcement agency, the 227-year-old service has also long been in the business of interdicting contraband, from Chinese opium smugglers to Prohibition rumrunners. For centuries, Coast Guard operations waited to arrest smugglers once they crossed into U.S. territorial waters. Then, in the 1970s, as marijuana trafficking ballooned on the route from Colombia into the Caribbean before arriving in the United States, Justice Department officials argued to Congress that current U.S. law constrained law enforcement's ability to punish drug smugglers caught on the high seas. While the Coast Guard, then a branch of the Department of Transportation, could chase smugglers into the Caribbean, Justice Department lawyers could rarely hold smugglers caught in the legal gray zone of international waters criminally liable in U.S. court.



San Lorenzo, Ecuador, near Jhonny's departure point.  Glenna Gordon for The New York Times

Congress responded by passing a set of laws, including the 1986 Maritime Drug Law Enforcement Act, that defined drug smuggling in international waters as a crime against the United States, even when there was no proof that the drugs, often carried on foreign boats, were bound for the United States. The Coast Guard was conscripted as the agency empowered to seek out suspected smugglers and bring them to American courts.

In the 1990s and through the 2000s, maritime detentions averaged around 200 a year. Then in 2012, the Department of Defense's Southern Command, tasked with leading the war on drugs in the Americas, launched a multinational military campaign called Operation Martillo, or "hammer." The goal was to shut down smuggling routes in the waters between South and Central America, stopping large shipments of cocaine carried on speedboats thousands of miles from the United States, long before they could be broken down and carried over land into Mexico and then into the United States. In 2016, under the Southern Command's strategy, the Coast Guard, with intermittent help from the U.S. Navy and international partners, detained 585 suspected drug smugglers, mostly in international waters. That year, 80 percent of these men were taken to the United States to face criminal charges, up from a third of detainees in 2012. In the 12 months that ended in September 2017, the Coast Guard captured more than 700 suspects and chained them aboard American ships.

Over the last year, I've interviewed seven former Coast Guard detainees, some of whom are still in American federal prison, and received detailed letters, some with pencil renderings of the detention ships, from a dozen others. Most of these men remain confounded by their capture by the Americans, dubious that U.S. officials had the authority to arrest them and to lock them in prison. But it is the memory of their surreal imprisonment at sea that these men say most torments them. Together with thousands of pages of court records and interviews with current and former Coast Guard officers, these detainees paint a grim picture of the conditions of their extended capture on ships deployed in the extraterritorial war on drugs.

Their protracted detention is justified by Coast Guard officials and federal prosecutors alike, who argue that suspects like Arcentales are not formally under arrest when the Coast Guard detains them. While on board, they're not read Miranda rights, not appointed lawyers, not allowed to contact their consulate or their families. They don't appear to benefit from federal rules of criminal procedure that require that criminal suspects arrested outside the United States be presented before a judge "without unnecessary delay." It is as if their rights are in suspension during their capture at sea. "It's hard-wired into the Coast Guard's minds," says Eugene R. Fidell, a former Coast Guard lawyer who teaches at Yale Law School, "that usual law enforcement constraints don't apply."

The increased detentions and the domestic prosecutions of extraterritorial activity were ushered in largely under the watch of Gen. John Kelly, who from 2012 to 2016 served as the head of the Southern Command and is now the White House chief of staff. He has long championed the idea that drug smuggling and the drug-related violence in Central America poses what he has called an "existential" threat to the United States and that to protect the homeland, American law enforcement must reach beyond U.S. borders. This April, during his brief tenure as Trump's secretary of Homeland Security

which now oversees the Coast Guard, Kelly gave a lecture at George Washington University. "We are a nation under attack" from transnational crimi networks, he told the audience. "The more we push our borders out, the safer our homeland will be," he said. "That includes Coast Guard drug interdictions at sea." Asked about the detainments, a White House spokesperson said, "Under General Kelly's command, U.S. personnel treated detainees humanely and followed applicable laws." The spokesperson declined to comment further.

**Like most men** he grew up with in Jaramijó, Arcentales began fishing as a teenager and never stopped. He often worked with Quijije, who lived with h wife, daughter and his wife's family in a two-room house just up the hill from Arcentales. After working on their boss's skiff, they would meet up and ta for hours about their children and their plans to someday buy a boat of their own.

Arcentales never had much money. The $6,000 he could hope to make a year, on the skiff and working on tuna ships for a month or two at a time, does not stretch far in Ecuador's economy. The house where he and Mendoza lived was just a single room for their family of nine: their teenage son, Enriqu Mendoza's two older daughters from a previous marriage, Nelly and Juliana, who have three children between them; and Nelly's husband, Wladimir Jaramillo. They all slept on fraying mattresses, sharing a single toilet. When it rained, the roof leaked and muddy water trickled through the door.

The thrum of anxiety about money became an alarm in 2014 when Mendoza unexpectedly became pregnant at 43. A doctor prescribed bed rest. Too worried to be out at sea for long, Arcentales worked less. That July, Mendoza gave birth to a boy they named Ismael. The household had grown to 10. would be more than two months before his next fishing trip, and Arcentales could not escape the nagging sense of failure. "I would lie some nights in bed, asking myself, 'Am I going to live my entire life in a hut that is close to falling apart?'" he said. "'What will I leave my children?'"

On the morning of Sept. 5, after a very bad night of sleep, Arcentales left Mendoza and their children. "Viejita," he told her, "don't worry, everything w be O.K." A fisherman Arcentales had known for years had been soliciting Arcentales for two years to accept a cocaine smuggling job. Arcentales alwa refused. But when he left home that September morning, Arcentales went looking for that man. Ecuador is a secondary shipment point for Colombian drug-smuggling groups who work increasingly for Mexican cartels, and in Jaramijó, recruiters, called *enganchadores*, those who "hook," have become fixtures. Residents of the town have watched as their neighbors return from what they say were fishing trips, then buy cars or fix up their homes. Residents call the trip "*la vuelta*," which means, aspirationally, "round trip." The fisherman told Arcentales that he would earn $2,000 up front, and the $20,000 apiece for him and his partner upon their return. It was as much as Arcentales could expect to earn in three or four years. If Quijije joined hin they could finally buy their boat.

The next evening, he and Quijije met another man in San Lorenzo, near the Colombian border. The man led them to a skiff, gave Arcentales a GPS tracker and instructed the pair to meet another boat at a location 50 nautical miles away. There, he said, they would collect 100 kilos of cocaine, split in four packages, and the coordinates for another vessel less than a day's trip away where they would drop off the drugs and then be done. But when the arrived at the location to retrieve the drugs, they were instead given 440 kilos of cocaine and joined by a baby-faced Colombian in his early 20s named Jair Guevara Payan, paid to watch the drugs. Payan led Arcentales and Quijije on a five-day voyage, 1,100 miles to the north, farther than either man l ever ventured. Arcentales considered refusing to go, but he knew there was no real choice now that they were at sea. "We had been screwed," he told

When Arcentales, Quijije and Payan finally arrived at their final coordinates, 145 miles off the coast of Guatemala, a small white speedboat motored toward them, then another, each manned by two Guatemalan men. Together, the men offloaded the drugs onto one of the boats, and Payan motored av on it with a pair of Guatemalan brothers. Arcentales and Quijije were told to step into the second boat, a skiff called the Yeny Arg, manned by the two other Guatemalans, Giezi Zamora, a mechanic, and Hector Castillo, a fisherman. The four of them headed for shore, and Arcentales let his senses dull the first time since he had set out. "We are free," he thought to himself, and nearly fell asleep.

But a U.S. Navy patrol airplane had been tracking the Guatemalan boats since the morning. The plane's crew had watched the men step into the arriv boats and the Southern Command had contacted the Coast Guard. Soon, Arcentales spotted a white military ship, then a speedboat with five officers aboard racing toward them. The officers ordered Arcentales and the others not to move, and the men raised their hands in the air.

When boats are not registered to a country or flying a country's flag, they are considered stateless, and maritime laws allow U.S. officials to board. Hundreds of these unmarked boats depart from Ecuador and Colombia each year. But the Yeny Arg was registered in Guatemala, so federal officials contacted their Guatemalan counterparts to gain permission, under a bilateral agreement, to board and conduct a search. U.S. authorities have some agreements with countries around the world to gain access to foreign vessels. For some countries, U.S. prosecution removes a burden from their own legal systems; with other countries, the U.S. has exerted pressure on governments to forge such agreements. Countries in the Americas and the Caribbean have generally allowed U.S. officials to board and search ships that bear their flags.

For several hours, the Coast Guard officers searched the Yeny Arg. By midafternoon, Arcentales, Quijije and the two Guatamalans were moved to the Coast Guard speedboat, and were delivered to the Coast Guard ship. On board, they had mug shots taken. Less than 12 hours later, the men were mov to a Coast Guard ship called the Boutwell, a 378-foot, 46-year-old cutter with a crew of 160. Payan and the Guatemalan brothers were already onboar



Jhonny's wife, Lorena Mendoza, with a note Jhonny sent her from America.  Glenna Gordon for The New York Times

The men were not told where they would be taken nor allowed to call their families. Officials told them to strip down and change into papery white Ty jump suits, and then guards led them up a flight of stairs above the deck and into a hangar. Arcentales felt a cuff close around his ankle. He and Quijije looked at each other, and then at their ankles, which, he said, were now attached to the floor by short chains. Thin rubber mats would serve as their be "A deep sadness came over me," Arcentales said. "Right there my life changed."

> **Sign up for The New York Times Magazine Newsletter**  The best of The New York Times Magazine delivered to your inbox every week, including exclusive feature stories, photography, columns and more. Get it sent to your inbox.

**On the Boutwell,** Arcentales and the other men began asking the guards where they were being taken. One Spanish-speaking guard explained to the men that American officials were coordinating with officials from his country to arrange a transfer. The guard, Arcentales said, told him they would b land in five days. Several nights passed on the Boutwell. Then, as the sun rose on the fifth day, the men spotted land. They could make out a volcano, then a port — the topology of Central America. "We thought we were going back to our country," Arcentales said. "We thought we were going to han us over to migration. Migration or the Ecuadorean consulate."

But as they approached land, a guard showed up with a plastic bucket to use as a toilet. An officer closed the doors of the hangar where they were hel Through small holes in the wall, they could see people walking on the docks. The Guatemalans recognized a port called Acajutla. An hour passed, the four, then eight. When the narrow beams of light that had shone through the holes in the hangar wall faded, they felt the Boutwell move. The boat's engines roared, and a guard threw open the doors: The sun was setting, and the men were back at sea. For 30 minutes, an hour maybe, they sat in silence, watching the water and the sky become dark, their minds turning to their families. That night, Arcentales and Castillo, the Guatemalan fisherman, both cried, their chests heaving as the other men looked out at the sea.

When the sun rose the next morning, the men took notice of each other not as they had before, as accidental fellow prisoners, but as longer-term companions. Castillo, who was just shy of 24, asked Arcentales, whom he called "Don Jhonny" out of his respect for his age, about his family. They learned that Zamora, Quijije and Arcentales were fathers of newborns, or had a child on the way. "We would talk of our young kids," Arcentales said about conversations the men had. "And then there were days when I would not say a word. I would just stay in my mind thinking of my kids, my baby my failure." They had all accepted what they thought was the remote risk of arrest in order to provide for their family. Castillo said that he had alread taken *la vuelta* two weeks before. It had been relatively easy, so he'd taken another. "You start to think you can get away with it," Castillo told me.

Coast Guard and Southern Command officials, including John Kelly, have argued that if the agency had more ships to deploy, it could interdict four tir as much cocaine. "Because of asset shortfalls, we're unable to get after 74 percent of suspected maritime drug smuggling," Kelly said at a Senate Arm Services Committee hearing in 2014. "I simply sit and watch it go by." Colombian cocaine production is again on the rise, and while the Coast Guard s it has seized nearly half a million pounds of cocaine over the past year, agency officials have warned as recently as this September that they need mo resources to stop the flow.

Government officials say intelligence gained from small-time boatmen is key to investigating and dismantling larger transnational criminal networks The Coast Guard has claimed that between 2002 and 2011, cases against these maritime smugglers helped the government secure three-quarters of i extraditions of Colombian drug kingpins. Affidavits filed more recently in criminal cases against three Mexican and Central American drug leaders, including the notorious cartel leader El Chapo, have noted boat interdictions as small points in larger constellations of evidence. By linking kingpins boats, prosecutors can add maritime smuggling to the list of charges against them. But the fishermen caught aboard these small smuggling boats, ma detained on their first or second run, often have access to mere fragments of information about the people they're working for. For the most part, me

like Arcentales barely know the identity of their recruiter, sometimes just a first name or moniker, and nothing more. "They are not key widgets in thi process," said Bruce Bagley, a leading scholar on drug smuggling and a professor of political science at the University of Miami. By prosecuting them added, "you don't slow down the broader operations."

**On Oct. 6,** 25 days after the men were caught, the Boutwell returned to its home port in San Diego. The crew of the ship lined up for photos on the deck behind bales of cocaine wrapped in black tarps, collected from 14 smuggling boats, including, presumably, Payan's, and worth, according to the Coast Guard, more than $400 million.

The cocaine made land long before the detainees. For 44 more days, Arcentales, Quijije, Payan and the Guatemalans were transferred from one ship t the next, passing a week or 10 days on one, a few days on another, always chained to the decks. "I remember one time I asked the nurse officer if he could do me a favor," Payan wrote later in a letter, "just shoot me and kill me, I would appreciate, because I cannot take this anymore." As day after m numbing day dragged on, hunger began to rival their families as their central preoccupation. Food logs from Coast Guard ships and testimony from Coast Guard officers show that on some ships, detainees' meals consisted of only small portions of black beans and rice, on occasion with a bit of spin or chicken. Arcentales says that he learned to eat slowly, to fool his mind into thinking the plate contained more than it did. The men watched the gua discard their unfinished meals into trash bags hanging nearby and devised a plan. "Someone would ask to be taken to the restroom so that we could t to reach the trash and take the food," Quijije said in testimony. They would pass a piece of leftover chicken down the line, each detainee taking a bite a handing it to the next, until the bone was picked clean. After more than two months of detention, Arcentales says, he had lost 20 pounds; Payan says lost 50. Time began to warp for them. "We could no longer endure living in such conditions for that prolonged period of time," Arcentales wrote later i letter. "It did not matter to us where they would leave us; we were desperate to communicate with our family." The Coast Guard and the Department Justice maintain that all detainees are treated humanely and with accordance to the law. The Coast Guard adds that it shackles detainees and concea them while in port for their own safety and the safety of the crew.

The Coast Guard does not have discretion over where and when to transfer drug-interdiction detainees. Those decisions are made by the Department Justice, the D.E.A. and federal prosecutors with information from the Coast Guard. Coast Guard officers I spoke to, one of whom was disturbed enoug to call the vessels "boat prisons," say they want detainees removed far more rapidly from their ships, which they acknowledge were never designed t serve as detention centers. Drug Enforcement Administration agents say in court filings that rapid transfers to U.S. soil are logistically impossible, wi few countries allowing airport transfers and a shortage of available D.E.A. flights. The Coast Guard says the agency patrols six million square miles, which creates "logistical and transportation challenges."

But there's evidence in those court filings that budgetary considerations may also add to the delays. In 2015, a Southern Command official suggested an email to a D.E.A. agent who was handling a Coast Guard detainee transfer that the agency "may save costs to the taxpayers" when weighing the benefits of one route back versus another. In an April 2017 brief in a separate case, the government argued that pulling a cutter from normal drug-smuggling patrol to hasten a detainee transfer would be a "considerable waste of government resources and time."

Coast Guard ships and frigates on loan from the Navy instead slowly fill up their hangars or decks, waiting to unload detainees when port calls can be arranged with foreign officials and flights arranged with the D.E.A. Other detainees are simply kept aboard cutters as they make trips back to San Di or through the Panama Canal on the way to East Coast ports. No matter the route, federal judges have repeatedly waived normal protections against extended prearraignment detention, accepting the government's claims that transferring detainees from the Pacific is too logistically complex to allo for a speedy appearance before a judge. And so over the years federal judges have allowed for progressively longer periods of detainment: five days the Caribbean in 1985; then 11 in 2006; in 2012, 19 days in the Pacific. Average detention time is now 18 days. An official told me that men have be up to 90 days.

Maritime- and human-rights-law scholars caution that the delayed periods of detention employed by the United States in its antidrug campaign run counter to international human rights norms. "In a European context, what the U.S. does would not meet the standard," says Efthymios Papastavridi maritime-law scholar at Oxford University. "It would have to be measured against human rights and due-process law and this would be unlikely to pa the test."

But Melanie Reid, a former federal prosecutor in the Department of Justice's Dangerous Narcotics division, said the department's position was that " clock does not start ticking, in the procedural sense, until these people get to the United States and are arrested." A senior Coast Guard lawyer wrote 2016 paper on maritime enforcement and human rights that "no remedy for these delays is generally available to defendants."

**On Nov. 21,** 77 days after her husband left on his *vuelta,* Lorena Mendoza walked with her newborn in a stroller from Jaramijó to the nearby port city Manta as part of a procession of the Virgen de Montserrat. Amid a crowd of thousands of people who had packed into the streets with brass bands, sh prayed for her husband, imagining what her life would be like if he was really dead.



Ismael, age 3, son of Jhonny and Lorena. He was born just before Jhonny left
Jaramijó.  Glenna Gordon for The New York Times

When she returned home, Mendoza saw that she had missed a series of phone calls from the United States. At 11 the next morning the phone rang ag
"I am here," Arcentales said. "I am alive." Mendoza cried, overcome by a great swell of relief. "Thank God I can hear my family again, thank God you
all O.K.," Arcentales said.

Several days before, the American ship had taken yet another trip to port, this time on the coast of Panama. This time the detainees were told to stan
up. Guards unlocked their ankle cuffs and led them off the ship. He would see his family soon, Arcentales thought. Then he heard a guard announce:
"Gentlemen, D.E.A. agents are waiting for you outside. You are going to the United States."

Unlike domestic arrests, which stipulate that defendants be charged in the jurisdiction of their crime, maritime smugglers can be prosecuted anywhe
as long as it's the first place they land or in the District of Columbia. American law-enforcement officials have developed a clear preference for
prosecuting maritime smuggling cases in Florida, where federal agencies have set up interagency drug-task forces and prosecutors have expertise o
maritime drug cases. Trying these cases in Florida may have made practical sense in the 1980s and even the 1990s, when the bulk of maritime
interdictions took place in the Caribbean. But now that sea smuggling has shifted significantly to the Pacific, the desire to prosecute defendants in
Florida's federal courts has arguably played a role in the increasingly prolonged maritime detentions.

One reason few trials have moved to the West Coast may be that the Ninth Circuit Court of Appeals, which covers California, has placed a significant
limit on the reach of the U.S. Coast Guard. Unlike courts on the East Coast, the Ninth Circuit requires federal prosecutors to prove that drugs discove
on foreign-registered boats were actually bound for the United States. That decision, in 1994, returned the legal framework in California to something
more like the one that existed nationally in the 1980s. Prosecuting smugglers found aboard a foreign-flagged ship without proving their cargo was
intended for U.S. markets, the court found, violates Fifth Amendment due-process protections. "We try not to bring these cases to the Ninth Circuit,"
Aaron Casavant, a Coast Guard lawyer who until 2014 provided legal guidance to the service's law-enforcement operations and recently wrote a law-
review article defending the legal basis of extraterritorial drug enforcement. Casavant points to the fact that there are more lawyers and judges with
maritime experience in Florida. But the Justice Department would likely lose a case like Arcentales's in the Ninth Circuit, where there is a burden of
proof. The majority of these cases are tried in the 11th Circuit in Florida, where no such burden exists.

Orlando do Campo, a private defense lawyer in Miami, has been assigned by the courts to handle 23 cases of maritime smuggling. "It's like a nature
documentary where you see the hawk grab the fish out of water, and the fish is there saying, 'What the hell am I doing in the air?' " do Campo said. "I
them that's Florida. 'A few weeks ago, I was in Ecuador, then I went into the middle of the Pacific and now I'm here?' It's entirely surreal."

Arcentales, Quijije, Payan and the four Guatemalans were put on a flight to Florida. On Nov. 19, they were formally arrested. Arcentales says he told
federal agent all he knew about the operation. "But the truth is," Arcentales told me, "I don't know anything about it at all." At least one other man in
group of seven talked to investigators, too, providing all the information he had: the route he'd taken and the last name of the *enganchador* who'd hir
him. All seven accepted plea agreements. No motions were filed challenging the conditions of their extended detentions.

Such motions, in the rare instances when defense lawyers file them, have little effect. Lawyers for three men whose detention overlapped on a cutter
with Arcentales petitioned a federal court to throw out their indictments for "outrageous government conduct." The judge said he was troubled by
detainees' accounts of "inadequate nutrition, weight loss, lack of privacy for toilet use and lack of sufficient protection from the elements." Even so, h
said, the "inhumane treatment" had not been used "in an effort to secure an indictment," so he could not dismiss this indictment. "This is not to say th
such treatment of detainees is condoned by this court," he added. "Far from it."



Glenna Gordon for The New York Times

On July 2, 2015, Arcentales and Castillo were taken to court for a sentencing hearing. In testimony before Congress this year, John Kelly attested that "suspects from these cases divulge information during prosecution and sentencing that is critical to indicting, extraditing and convicting drug-cartel leadership and dismantling their sophisticated networks." But the judge presiding in the Arcentales case, Virginia Hernandez Covington, made it clea that the two men were of little use. "They are just trying to do it to make some money for their family," Covington said in court. "The higher up you ar the more information you have. You're more culpable. But you have more information." She continued, "The lower level folks have less information to bargain with." But defendants charged under the Maritime Drug Law Enforcement Act, even mules like Arcentales, are rarely provided reduced sentences on mandatory minimums, as a suspect caught on U.S. shores with the same quantities of drugs might be. Covington sentenced Arcentales 10 years in federal prison and Castillo to just over 11.

**When I met Arcentales** for the first time at the Fort Dix federal prison in New Jersey in late 2016, his face had been transformed from the angular, gau one I'd seen in mug shots taken by jail officials shortly after his arrival in Florida. He appeared to have gained back the weight he'd lost at sea. We sa beside each other in the visitation room, set up like an airport waiting area, and talked in Spanish amid the drone of mothers and wives speaking in English to their incarcerated loved ones. Speaking slowly and precisely, he told me he had never considered before he was charged that by smuggling drugs he might be committing a crime against the United States. He wondered repeatedly why the United States would not let him serve his time in Ecuador. At least then he would have contact with his family, beyond a time-limited call every few weeks. He thinks about them constantly. And of the Coast Guard cutters he was detained on.

"I had a terrible nightmare about the chains," Arcentales told me in the visitation room. "I would wake up feeling the chains digging into my ankle an jerk my leg thinking I was shackled, and feel my leg free and be relieved that I was not chained there on the boat. I would wake up sweating; almost crying, thinking I was still chained. Over time it passes. But a thing like this, it never leaves you."

In the home that Arcentales had left behind, life is no less destitute than when he departed. Two weeks after Arcentales arrived in Florida, Mendoza opened a store in what was once their small sitting area, but it was a good day if it brought in $15. When I met her in Jaramijó, Mendoza welcomed m warmly into her home, which is crowded with her children and grandchildren and a flow of customers who step inside to buy diapers, plantains or cheese.

Both Mendoza and Arcentales assumed that his fate, now widely known in the community, would serve as a warning for those being approached by t *enganchadores*. In April at Fort Dix, Arcentales told me that if he could he "would tell everyone not to go, never take *la vuelta*!" But the *vueltas* have increased since Arcentales went to prison. In April 2016, a catastrophic earthquake struck the Ecuadorean coast. Whole blocks in Jaramijó were level leaving thousands homeless. Fishing boats and storage and canning operations were destroyed. Blue tents, supplied by the Chinese government as emergency shelters, remained a year later on the edge of the cliff that rises over the town's now quiet docks.

The quake sent a flood of the unemployed, including impoverished fishermen, in search of smuggling jobs. In late 2016, Mendoza's son-in-law Wladim who had been living in her house, disappeared. The young man had worked selling *morocho*, a homemade sweet corn drink, on the street ever since l hurt his back unloading fish in Manta. But that brought in only a few dollars a day, and he'd been telling his wife, Nelly, that he was thinking of taking *vuelta*. Wladimir had never fished a day in his life, Nelly told me, and she never believed he would take the job. But in December 2016, Wladimir said was going to the store and never came back. For six weeks, Nelly worried constantly about her husband, asking in Facebook messages if I could che see if he was in a U.S. prison. In early February, one week before I arrived in Jaramijó, Wladimir called Nelly from a jail in Florida. A Coast Guard shi had detained him in the Pacific Ocean.

Wladimir's court-appointed lawyer, Joaquin Mendez, argued in a federal court in Florida that the 31-day delay between his interdiction and his delive to court in the United States was a violation of federal statutes requiring that defendants be arraigned within 30 days. "The Coast Guard made a calculated determination to continue on with their interdiction, to keep these individuals in the conditions that they were, while they're going about d their business," Mendez told Judge James I. Cohn.

For what may have been the first time in federal court, Cohn dismissed the indictment against Wladimir because of the delay. "If government's argum is taken to its logical extreme, an individual could be detained indefinitely for a federal crime as long as the government did not file a formal complair Cohn said in court. But he threw the case out "without prejudice" — a small embarrassment for federal attorneys, yet one that allowed them to file a

complaint. In late August, Wladimir was sentenced to 10 years.

In Ecuador, government officials have publicly warned fishermen to refuse offers from *enganchadores*. Yet men are still making the trip, many traveli... directly into the Coast Guard's net. I met more than 20 families in Jaramijó and other towns who have lost men. A frail woman I met in her thatch hom... told me her oldest son, a fisherman, barely an adult himself, had provided the family its only source of income. Three months after the earthquake, th... fish market stalls were still decimated, and only about a third of fishermen were working. He'd followed the flow of men out onto the high seas.

One evening in February, after the arrests of Arcentales and Wladmir, I sat with Mendoza under a pomegranate tree in the mud-rutted driveway outs... Mendoza's house. A group of her neighbors and relatives gather there most nights as the sun falls and the air cools. While we talked, a man carrying ... gleaming swordfish walked by and waved. One of the men who lay in a hammock told me that the passing fisherman had recently taken *la vuelta*. Lorena pointed up the street to a new car parked against the curb. It had been purchased with *vuelta* money. As we talked, a young relative of Mendoza's, who had until then lay quietly in a hammock, told me that he was thinking hard about taking a job, too. "I know it's only about a 50 percen... chance I'll make it back," he said. "I know what happened to Jhonny."